## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BUTTERMILK TOWNE CENTER, LLC, | ) | CASE NO. 10-21162 |
| | ) | CHAPTER 11 |
| Debtor. | ) | |

## DEBTOR'S EXPEDITED MOTION FOR
## INTERIM USE OF CASH COLLATERAL

Buttermilk Towne Center, LLC, as debtor and debtor-in-possession (the "Debtor"), by counsel, pursuant to 11 U.S.C. § 363, Fed. R. Bankr. Proc. 4001(b) and E.D. Ky. LBR 4001-2, hereby moves the Court for the entry of an Interim Cash Collateral Order ("Interim Order") in the form tendered herewith or such other order as the Court may approve or the Debtor may agree with its secured lender, and for authority to use cash collateral as set forth on the financial projections attached hereto as **Exhibit A** (the "Interim Budget"), until a final hearing for continued use can be held, and to provide adequate protection as set forth herein. The debtor states that entry of the Interim Order is necessary to ensure continued going concern operations and to protect and preserve the value of the Debtor's assets and ongoing operations for the benefit of its creditors and all constituencies. In support of said Motion, the Debtor states as follows:

## Rule 4001(b) Statement

(a)    Name of Each Entity That May Claim an Interest in Cash Collateral (referred to as the "Cash Collateral Creditor"):

| Cash Collateral Creditor | Asserted Amount Of Principal and Interest Due | Collateral |
|---|---|---|
| | | **Real Property and Rents** |
| Bank of America, N.A. (including U.S. Bank National Association, as Trustee for Bank of America, N.A., as purchaser of the Bonds (defined below)) | $36,384,256.79 as of March 29, 2010 | (a) Amended and Restated Open-End Mortgage, Security Agreement and Agreement as to Real Estate Matters dated as of December 1, 2007 and recorded December 28, 2007 with the Kenton County Clerk, Covington, KY (the "Mortgage"); (b) Amended and Restated Agreement of Lease dated as of December 1, 2007 and recorded December 28, 2007 with the Kenton County Clerk, Covington, KY (the "Ground Lease"); (c) Assignment of Rents and Subleases dated as August 1, 2004 and recorded September 1, 2004 with the Kenton County Clerk, Covington, KY (the "Rent Assignment") and (d) Amended and Restated Trust Indenture dated as of December 1, 2007 (the "Indenture"). |

(b)    Purposes for Use of Cash Collateral:  As set forth in more detail in the Interim Budget, the Debtor proposes to use cash collateral to meet its post-petition obligations and to pay its expenses, general and administrative operating expenses, and other necessary costs and expenses, including maintenance and insurance and other expenses incurred during the pendency of the bankruptcy case, as well as to make adequate protection payments to the Cash Collateral Creditor as set forth below.

(c)    Terms and Duration:  The Debtor seeks authority to use Cash Collateral for the interim period effective nunc pro tunc from the Petition Date, April 28, 2010 through the date of the final hearing, pursuant to the Interim Budget or subsequent budgets to be filed with the Court.  Any expenditure which would cause the Debtor to exceed any line item in the Interim Budget by more than fifteen percent (15%) shall require the approval of the Court or consent of its Cash Collateral Creditor.

(d)    Adequate Protection:  As part of the adequate protection for any diminution in the value of the Cash Collateral Creditor's interests in the pre-petition collateral, pursuant to §§ 361 and 363 of the Bankruptcy Code, the Debtor proposes to grant to the Cash Collateral Creditor a replacement lien consisting of a lien upon all property of the Debtor of the same type and description as the pre-petition collateral to the extent the Cash Collateral Creditor holds a valid, properly perfected lien on such collateral as of the Petition Date (the "Replacement Lien") and monthly interest payments commencing June 2010 at the rate of four and one-quarter percent (4.25%) per annum in the amount set forth in the Interim Budget (the "Adequate Protection Payments").  As further adequate protection, the Debtor shall continue to account for all cash use, and the proposed cash use is being incurred to preserve property of the Estate.

## Jurisdiction and Venue

1.    On April 28, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").  The Debtor is operating its business as debtor and debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2.    This Court has jurisdiction over this chapter 11 case under 28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A).

3.    The Debtor's principal asset consists of a commercial real estate development known as Buttermilk Towne Center located in Crescent Springs, Kenton County, Kentucky.[1]  Accordingly, venue for the Debtor's chapter 11 case is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

[1] A more detailed overview of the Debtor's business and the events leading to the commencement of this Chapter 11 case can be found in the Affidavit of Timothy S. Baird in Support of Chapter 11 Petition and First Day Motions, which was filed with the Court on the Petition Date.

4.    No trustee or examiner has been appointed in this chapter 11 case, and no creditors' committee or other official committee has been appointed.

### Background

5.    The construction of the Buttermilk Towne Center project required a significant amount of debt capital.

6.    The Debtor originally entered into a Construction Financing Agreement dated as of August 1, 2004 with LaSalle Bank National Association n/k/a Bank of America, N.A. (the "Lender" or "BofA") pursuant to which the Lender was to loan to the Debtor up to $34,700,000 for the construction of the project through the purchase by the Lender of bonds to be issued by the City of Crescent Springs, Kentucky (the "City"). The Construction Financing Agreement was amended by that certain First Amendment to Construction Financing Agreement dated as of June 14, 2005 and those certain Modification of Financing Documents dated as of September 30, 2007, January 31, 2008, February 29, 2008, April 30, 2008, June 30, 2008 and January 1, 2009 (the Construction Financing Agreement as amended, the "Financing Agreement").

7.    To provide the financing for the project, the City issued its Taxable Industrial Building Revenue Bonds, Series 2007 (Buttermilk Towne Center, LLC Project), dated December 28, 2007 (the "Bonds") outstanding as of March 29, 2010 in the principal amount of $34,664,322.49, plus interest accrued in the amount of $1,719,934.30.

8.    Industrial revenue bonds, such as the Bonds, are frequently issued by political subdivisions in Kentucky as a method of exempting the project financed with the proceeds of the bonds from real estate taxes. The real estate is conveyed to the political

subdivision and is leased back to the developer during the term of the bonds. When the

bonds are retired the real estate, including the project, is conveyed back to the developer.

9.      The Bonds are secured by an Amended and Restated Trust Indenture dated

as of December 1, 2007 (the "Indenture") between the City ("Issuer") and U.S. Bank

National Association ("Trustee"), as Trustee for the holders of the Bonds, wherein the

Issuer assigns to the Trustee, with certain exceptions, all rights and payments due Issuer

under the Ground Lease as security for repayment of the Bonds.

10.     Principal and interest on the Bonds are to be paid through lease payments

to be made by the Debtor under the Ground Lease between the Issuer and the Debtor.

Except for certain expense, reimbursement and indemnity payments, the Issuer's rights

under the Ground Lease and all lease payments thereunder are assigned to the Trustee as

security for the Bonds.

11.     Obligations owing under the Ground Lease and the Financing Agreement

are secured by (i) the Mortgage among the Debtor (Grantor), the Issuer, LaSalle Bank

National Association (Grantee) and the Trustee; and (ii) the Rent Assignment executed

by Debtor in favor of the Trustee.

12.     The Bonds were purchased by the Lender pursuant to a Bond Purchase

Agreement dated December 28, 2007 (the "Purchase Agreement") among the Issuer, the

Debtor and the Lender.

13.     Payment of principal and interest on the Bonds was also guaranteed by

Matthew C. Daniels and Timothy S. Baird pursuant to a Guaranty of Payment and

Completion dated as of August 1, 2004.

14.     The Bonds are scheduled to mature on December 1, 2032, are subject to mandatory redemption through monthly payments of principal and interest beginning February 1, 2008 and on the first day of each month thereafter as set forth in the Financing Agreement, and are subject to mandatory purchase by the Debtor on December 31, 2009, unless extended pursuant to the Financing Agreement at a purchase price of the outstanding principal amount thereof, plus accrued interest to the purchase date.

15.     The Debtor was unable to make the required mandatory redemption payments and failed to purchase the outstanding Bonds on December 31, 2009.

## Requested Relief

16.     BofA may claim an interest in Cash Collateral pursuant to the Mortgage, Ground Lease, Rent Assignment and Indenture encumbering the rents generated from Debtor's interest as ground lessee of the real property known as Buttermilk Towne Center.  Copies of the Mortgage, Ground Lease, Rent Assignment, and Indenture evidencing perfection of BofA's interest in the Cash Collateral are attached hereto as **Exhibit B**.  The Debtor requests the authority to use Cash Collateral on an interim basis and to set a final hearing for continued cash use pursuant to a final order.

17.     Upon information and belief, the going concern value of the collateral that secures the claim of BofA exceeds the amount of said claim.  As used herein, "Cash Collateral" shall mean (i) all cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents derived from BofA's collateral; and (ii) proceeds, rents, or profits of BofA's collateral.

18.    The Debtor's need to use Cash Collateral is essential to continuation of this chapter 11 proceeding and to ensure continued going concern operations to maximize the recovery to all creditors. Without the use of Cash Collateral as a means of providing working capital, the Debtor cannot meet its ongoing obligations incurred in the ordinary course of business. The Debtor requires use of such funds to meet its post-petition obligations and to pay its expenses, general and administrative operating expenses, and other necessary costs and expenses, including maintenance and insurance. In short, the Debtor is unable to operate without the use of Cash Collateral and the entry of an Interim Order is necessary to avoid immediate and irreparable harm to the Debtor's operations, its creditors and other parties in interest.

19.    To preserve the value of the Debtor's assets, the Debtor requires the interim use of Cash Collateral and without such use, the value of the Debtor's assets will immediately and substantially diminish and the Debtor would be forced to cease operations.

20.    11 U.S.C. §§ 363(c)(2) provides that a debtor "may not use, sell or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."

21.    The Debtor is unable to otherwise obtain funds, either unsecured or secured, in an amount necessary for the maintenance and preservation of the Debtor's assets from sources other than as provided by the use of Cash Collateral, pursuant to the terms of the proposed Order or such other interim order as the Court may approve.

22.    Good cause has been shown for the entry of the Interim Order. Among other things, entry of the Interim Order will allow the Debtor to maintain its operations and preserve its assets, to maximize recovery to all creditors. Further, the use of Cash Collateral will allow the Debtor to pay utilities, insurance, maintenance costs and other expenses necessary to maintain the Debtor's ongoing operation.

23.    The Debtor proposes entry of an Interim Order pursuant to the Interim Budget. The Debtor proposes using Cash Collateral pursuant to the Interim Budget, subject to the ability to exceed any line item in the budget by up to fifteen percent (15%) of projected expenses. As adequate protection for any diminution in the value of the Cash Collateral Creditor's interests in the Cash Collateral, pursuant to Code §§ 361 and 363, the Debtor proposes to grant BofA the Replacement Lien, subject only to any valid and enforceable, perfected and non-avoidable liens of other secured creditors. As further adequate protection, the Debtor shall make Adequate Protection Payments in the amount of $128,861 commencing June 2010 and shall continue to account for all cash use, and the proposed cash use is being incurred to preserve property of the Estate.

24.    The proposed interim use of Cash Collateral is for the time period until such date as the Court may set a final hearing on this Motion, which final hearing date is being requested hereby.

WHEREFORE, the Debtor respectfully requests entry of an Order (i) authorizing the use by the Debtor of Cash Collateral as set forth herein on an interim basis through the date of a final hearing, (ii) approving and granting such measure of adequate

protection as set forth herein, (iii) scheduling a final hearing, and (iv) granting any and all

other such relief to which the Debtor may be justly entitled.

## NOTICE

Notice is hereby given that the foregoing shall be brought on for hearing before
the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine
Street, 3rd Floor, Lexington, Kentucky, on Friday, April 30, 2010, at the hour of 10:30
a.m., or as soon there after as counsel may be heard.

Dated:  April 28, 2010                          Respectfully submitted,

                                                **TAFT STETTINIUS & HOLLISTER
                                                LLP**

                                                By: /s/ *Paige Leigh Ellerman*
                                                Timothy J. Hurley (OH 0006458 *Pro Hac
                                                     Vice* admission pending)
                                                Paige Leigh Ellerman (KY 88172)
                                                Beth A. Silvers (KY 92202) (admission
                                                pending)
                                                425 Walnut Street, Suite 1800
                                                Cincinnati, OH  45202
                                                (513) 381-2838 (Telephone)
                                                (513) 381-0205 (Facsimile)
                                                and
                                                1717 Dixie Highway, Suite 910
                                                Covington, KY  41011-4704
                                                (859) 331-2838 (Telephone)
                                                hurley@taftlaw.com
                                                ellerman@taftlaw.com
                                                silvers@taftlaw.com

                                                **PROPOSED ATTORNEYS FOR
                                                DEBTOR AND DEBTOR-IN-
                                                POSSESSION**

1222172

**Buttermilk Towne Centre, LLC**
**Proforma Cash Flow Forecast**
As of : May 1, 2010

| Forecast Week / For Week Ending | 1 1-May | 2 8-May | 3 15-May | 4 22-May | 5 29-May | 6 5-Jun | 7 12-Jun | 8 19-Jun | 9 26-Jun | 10 3-Jul | 11 10-Jul | 12 17-Jul | 13 24-Jul | 14 31-Jul | 15 7-Aug | 16 14-Aug | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scheduled Rental Income | | | | | | | | | | | | | | | | | |
| Net Rental Income | $105,325 | $105,325 | $105,325 | | | $102,658 | $102,659 | | | $105,339 | $105,339 | | | $105,339 | $105,339 | | $837,325 |
| Reimbursable Income | | 10,782 | 10,782 | | | 6,844 | 6,844 | | | 7,032 | 7,032 | | | 7,032 | 7,032 | | 63,317 |
| Insurance Income | | 1,112 | 1,112 | | | 812 | 812 | | | 823 | 823 | | | 823 | 823 | | 7,140 |
| Other Income | | 11,769 | 11,769 | | | 11,769 | 11,769 | | | 12,129 | 12,129 | | | 12,129 | 12,129 | | 95,588 |
| Total Reimbursable Income | | 23,632 | 23,632 | | | 19,424 | 19,424 | | | 19,984 | 19,984 | | | 19,984 | 19,984 | | 166,045 |
| Gross Rental Income | | 128,957 | 128,957 | | | 122,082 | 122,082 | | | 125,323 | 125,323 | | | 125,323 | 125,323 | | 1,003,370 |
| Total Operating Expenses | | | | | | | | | | | | | | | | | |
| Net Operating Income Before Adjustments | | 128,957 | 128,957 | | 15,488 | 122,082 | 122,082 | | 12,602 | 125,323 | 125,323 | | 14,901 | 125,323 | 125,323 | | 960,381 |
| Interest Expense - 4.25% on $36,384,257 | | (12,531) | (60,291) | | | (12,531) | (60,291) | | (12,602) | | (60,291) | | | | (72,821) | (128,861) | (386,583) |
| NOI (loss) Before Professional Fees | | 116,426 | 68,666 | | (15,488) | 109,552 | (67,089) | | 112,566 | (12,602) | 112,792 | (63,829) | | 110,422 | 52,502 | (128,861) | 282,513 |
| Professional Fees - Feathers, LLC | (15,000) | (15,000) | (15,000) | (5,000) | (15,000) | (15,000) | (15,000) | (5,000) | (15,000) | (15,000) | (15,000) | (5,000) | (15,000) | (15,000) | (15,000) | (5,000) | (20,000) |
| Professional Fees - Taft | (15,000) | (15,000) | (20,000) | (15,000) | (15,000) | (15,000) | (15,000) | (20,000) | (15,000) | (15,000) | (20,000) | (15,000) | (15,000) | (15,000) | (20,000) | (20,000) | (240,000) |
| Total Professional Fees | (15,000) | (15,000) | (15,000) | (20,000) | (15,000) | (15,000) | (15,000) | (20,000) | (15,000) | (15,000) | (20,000) | (20,000) | (15,000) | (15,000) | (20,000) | (20,000) | (260,000) |
| Net Cash Flow (Outflow) | | 101,426 | 53,666 | (20,000) | (30,488) | 94,552 | (82,069) | (20,000) | 97,792 | (27,602) | 95,422 | (78,829) | (15,000) | 95,422 | 37,502 | (148,861) | 22,513 |
| Beginning Cash Balance | 30,477 | 15,477 | 116,903 | 170,569 | 150,569 | 120,083 | 214,635 | 132,566 | 112,566 | 84,984 | 182,756 | 103,927 | 83,927 | 68,927 | 164,349 | 201,851 | 30,477 |
| Ending Cash Balance | $ 15,477 | $ 116,903 | $ 170,569 | $ 150,569 | $ 130,083 | $ 214,635 | $ 132,566 | $ 112,566 | $ 84,984 | $ 182,756 | $ 103,927 | $ 83,927 | $ 68,927 | $ 164,349 | $ 201,851 | $ 52,990 | $ 52,990 |


PENGAD-Bayonne, N. J.
EXHIBIT A

vC3596Pg **184**

## AMENDED AND RESTATED AGREEMENT OF LEASE

Between

### CITY OF CRESCENT SPRINGS, KENTUCKY

And

### BUTTERMILK TOWNE CENTER, LLC

### $56,000,000 MAXIUMUM AGGREGATE PRINCIPAL AMOUNT

### TAXABLE INDUSTRIAL BUILDING REVENUE BONDS,

### SERIES 2007

### (BUTTERMILK TOWNE CENTER, LLC PROJECT)

### DATED

### AS OF

### December 1, 2007

The interest of City of Crescent Springs, Kentucky in any revenues and receipts derived under this Lease, except for certain expense, reimbursement and indemnity payments, has been assigned to U.S. Bank National Association, Chicago, Illinois, as hereinafter provided.

Prepared by:

Richard D. Spoor, Esq.
Keating, Muething & Klekamp, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202

Recorded
COVINGTON
Doc type:          RODNEY ELDRIDGE
Book/page:         KENTON COUNTY CLERK
Doc#:              LEASE
Dt/tm Recorded:    C-3596/   184   65 pg
Total fees:        07 12 28 059 00149
Clerk name:        12/28/2007   01:25:34pm
                   291.00  Tax:      0.00
                   KATHY WILLIAMS

EXHIBIT
**B**

# ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1        Definitions........................................................................................2
Section 1.2        Rules of Construction. ......................................................................8

# ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1        Representations and Warranties by the Landlord ............................9
Section 2.2        Representations and Warranties by the Tenant................................9

# ARTICLE III

## GRANTING OF LEASEHOLD

Section 3.1        Granting of Leasehold......................................................................14

# ARTICLE IV

## RENTALS

Section 4.1        Basic Rent .......................................................................................15
Section 4.2        Additional Rent.................................................................................15
Section 4.3        Rent Payable Without Abatement or Set-Off ..................................15
Section 4.4        Use of Rents.....................................................................................16
Section 4.5        Prepayment of Bonds.......................................................................16

# ARTICLE V

## IMPOSITIONS AND UTILITIES

Section 5.1        Duty to Pay Impositions...................................................................17
Section 5.2        Contest of Impositions .....................................................................17
Section 5.3        Utilities.............................................................................................18
Section 5.4        Net Lease .........................................................................................18

# ARTICLE VI

## SALE OF THE BONDS

Section 6.1        Sale of the Bonds .............................................................................19
Section 6.2        Bond Proceeds .................................................................................19

## ARTICLE VII

## ASSIGNMENT OF LEASE TO TRUSTEE

Section 7.1    Assignment of Lease to Trustee; Other Security .............................................20
Section 7.2    Amendment of the Indenture ..........................................................................20

## ARTICLE VIII

## ACQUISITION, CONSTRUCTION, EQUIPPING AND INSTALLATION OF PROJECT

Section 8.1    Acquisition, Construction, Equipping and Installation of the
Project ...........................................................................................................21
Section 8.2    Disbursements from the Construction Fund ...................................................21
Section 8.3    Protection of Landlord with Respect to Construction Fund
Disbursements................................................................................................22
Section 8.4    Project Property of Landlord .........................................................................22
Section 8.5    No Warranty of Suitability or Habitability ....................................................23

## ARTICLE IX

## INSURANCE

Section 9.1    Insurance .....................................................................................................24
Section 9.2    Other Insurance............................................................................................24

## ARTICLE X

## CHANGES IN PROJECT

Section 10.1    Removal, Disposition and Substitution of Furnishings, Machinery
and Equipment ..............................................................................................25
Section 10.2    Alteration of Project......................................................................................26
Section 10.3    Additional Improvements .............................................................................27
Section 10.4    Granting of Easements .................................................................................27

## ARTICLE XI

## OPTIONS AND OBLIGATIONS TO COMPEL REDEMPTION OR PURCHASE OF BONDS AND TO PURCHASE PROJECT

Section 11.1    Option of Tenant to Compel Redemption of Bonds .........................................29
Section 11.2    Option of Tenant to Compel Extraordinary Redemption of Bonds.................29
Section 11.3    Options to Terminate the Lease .....................................................................31
Section 11.4    Option to Purchase Project Under Certain Conditions ...................................31
Section 11.5    Obligation to Purchase Project......................................................................32
Section 11.6    Conveyance on Purchase ..............................................................................32
Section 11.7    Relative Position of Options and Indenture ...................................................33

Section 11.8        Actions by Issuer................................................................................ 33

### ARTICLE XII

### DAMAGE, DESTRUCTION AND CONDEMNATION

Section 12.1        Damage and Destruction.........................................................34
Section 12.2        Condemnation..........................................................................35
Section 12.3        Condemnation of Tenant-Owned Property.............................36

### ARTICLE XIII

### TENANT'S RIGHTS AS TO THE PROJECT

Section 13.1        Use of Premises.......................................................................37
Section 13.2        Assignment and Sublease By Tenant.......................................37

### ARTICLE XIV

### TENANT'S DUTIES AS TO PROJECT

Section 14.1        Repairs and Maintenance........................................................38
Section 14.2        Securing of Permits and Authorizations ................................38
Section 14.3        Mechanics' Liens ....................................................................38

### ARTICLE XV

### FURTHER COVENANTS OF TENANT

Section 15.1        Maintenance of Existence and Ownership of Tenant .............39
Section 15.2        Investment of Construction Fund and Bond Fund Moneys .....39
Section 15.3        Additional Instruments............................................................39
Section 15.4        Opinion to be Provided ...........................................................39
Section 15.5        Indemnity ................................................................................40
Section 15.6        Tenant's Performance Under Bond Purchase Agreement, Mortgage
                    and Indenture ..........................................................................41
Section 15.7        Books and Records: Financial Statements...............................41
Section 15.8        Litigation Notice .....................................................................42

### ARTICLE XVI

### LANDLORD'S RIGHTS AS TO PROJECT

Section 16.1        Access to Premises and Records..............................................43
Section 16.2        Conveyance of Project by Landlord ........................................43
Section 16.3        Priority of Lease......................................................................43

# ARTICLE XVII

## FURTHER COVENANTS OF LANDLORD

Section 17.1       Quiet Enjoyment and Possession...................................................45
Section 17.2       Duty to Cooperate in Condemnation Proceedings...........................45

# ARTICLE XVIII

## DEFAULTS AND REMEDIES

Section 18.1       Default Provisions......................................................................46
Section 18.2       Performance of Tenant's Obligations by Landlord ........................49
Section 18.3       Attorneys' Fees and Expenses ....................................................49
Section 18.4       Notice of Default........................................................................50

# ARTICLE XIX

## MISCELLANEOUS

Section 19.1       Notices .....................................................................................51
Section 19.2       Amendments, Supplements, Changes and Modifications...............52
Section 19.3       Covenants Run With Leased Property and Premises.....................52
Section 19.4       Rights and Remedies..................................................................52
Section 19.5       Waiver of Breach........................................................................52
Section 19.6       Construction and Enforcement ....................................................53
Section 19.7       Amounts Remaining in Funds .....................................................53
Section 19.8       Invalidity of Provisions of Lease ................................................53
Section 19.9       Captions ...................................................................................53
Section 19.10      Execution of Counterparts ..........................................................53
Section 19.11      References to Attorneys' Fees .....................................................53
Section 19.12      Waiver of Jury Trial....................................................................53
Section 19.13      Relationship to Construction Loan Agreement and Mortgage .......53

Signatures.....................................................................................................55
Acceptance Of Assignment.............................................................................56
Acknowledgments...........................................................................................57
Exhibit A ......................................................................................................58
Exhibit B ......................................................................................................59

√C3596Pg **189**

## AMENDED AND RESTATED AGREEMENT OF LEASE

This Amended and Restated Agreement of Lease (as the same may be amended or supplemented, the "Agreement" or "Lease"), is made as of December 1, 2007, between the CITY OF CRESCENT SPRINGS, KENTUCKY, a City and political subdivision organized and existing under the laws of the Commonwealth of Kentucky (the "Landlord" or, sometimes the "Issuer"), and BUTTERMILK TOWNE CENTER, LLC, an Ohio limited liability company (the "Tenant").

WHEREAS, pursuant to the provisions of 103.200 to 103.285 of the Kentucky Revised Statutes, in order to promote the economic development of the Commonwealth, to relieve conditions of unemployment and to encourage the increase of industry in the Commonwealth of Kentucky, the Issuer may borrow money and issue negotiable bonds for the purpose of defraying the cost of acquiring any industrial building, as defined in 103.200 of the Kentucky Revised Statutes, either by purchase or construction; and

WHEREAS, pursuant to 103.200 to 103.285, the legislative body of the Issuer has adopted a Resolution (defined herein as the "Bond Legislation") authorizing the issuance of its Maximum Aggregate Principal Amount Taxable Industrial Building Revenue Bonds, Series 2007 (Buttermilk Towne Center Project) (the "Series 2007 Bonds"), with a maximum indebtedness, exclusive of interest, of $56,000,000 and with a final maturity of December 1, 2032; and

WHEREAS, Buttermilk Towne Center, LLC has certified to the Issuer that the Project (as hereinafter defined) is an "Industrial Building" as that term is defined in 103.200(l)(e) of the Kentucky Revised Statutes, consisting of a building suitable for use as facilities for retail/commercial revitalization; and

WHEREAS, the Issuing Authority has found and determined, and hereby finds and determines, that the economic development of the Issuer and the Commonwealth will be promoted, conditions of unemployment will be relieved and industry will be increased in the Commonwealth by the Project, and negotiations have been carried on between the Issuer and the Tenant in respect of the issuance by the Issuer of the Bonds for the purpose of defraying the cost of the acquisition, construction, equipping and installation of such industrial building comprising the Project, which will purchased, constructed, installed and owned by the Issuer at the Project Site and will be leased to the Tenant, and that such financing, owning and leasing of the Project is authorized by, and will be consistent with and in furtherance of, the provisions of 103.200 to 103.285 of the Kentucky Revised Statutes; and

WHEREAS, the Tenant and the Issuer each have full right and lawful authority to enter into this Lease and to perform and observe the provisions hereof on their respective parts to be performed and observed;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto covenant, agree and bind themselves as follows, (provided that any

√C3596Pg **190**

obligation of the Issuer created by or arising out of this Agreement shall not be a general debt on its part but shall be payable solely out of Revenues, as defined herein):

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1    Definitions. In addition to the words and terms defined in the recitals and elsewhere in this Lease, the words and terms defined in this Article I shall, for all purposes of this Lease, have the meanings herein specified, except as otherwise expressly provided or unless the context otherwise requires. Those words and terms not expressly defined herein and used herein with initial capitalization where rules of grammar do not otherwise require capitalization shall have the meanings set forth in the Bond Legislation or the Indenture, as defined herein.

"Act" means 103.200 to 103.285 of the Kentucky Revised Statutes, as amended, and in full force on the date of execution of the Agreement.

"Additional Bonds" means Additional Bonds as defined in the Indenture.

"Additional Rent" means the rent payable pursuant to Section 4.2 hereof.

"Authorized Tenant Representative" means the person at the time designated to act on behalf of the Tenant by written instrument furnished to the Landlord and the Trustee, containing the specimen signature of such person and signed on behalf of the Tenant by an officer of the Tenant. Such instrument may designate an alternate or alternates.

"Basic Rent" means rent payable pursuant to Section 4.1 hereof.

"Bond Counsel" means an attorney-at-law (other than an employee of the Tenant) satisfactory to the Trustee and nationally recognized as experienced in matters relating to the bonds of states and political subdivisions.

"Bond Fund" means the Bond Fund created in the Indenture.

"Bondholder," "Holder" or "holder" means the person in whose name a Bond is registered.

"Bond Legislation" means the resolution providing for the issuance of the Bonds and approving this Agreement, the Indenture, the Bond Purchase Agreement and related matters, as amended or supplemented from time to time.

"Bond Purchase Date" means Bond Purchase Date as defined in the Indenture.

"Bonds" means the Series 2007 Bonds and any Additional Bonds.

2

vC3596Pg **191**

"Bond Service Charges" means, for any period or payable at any time, the principal of, premium, if any, and interest on the Bonds for that period or payable at that time whether due at maturity as scheduled or upon acceleration or redemption.

"Business Day" means a day of the year, other than a Saturday or Sunday, on which commercial banks located in the city in which the principal corporate trust office of the Trustee is located is not required or authorized to remain closed and on which The New York Stock Exchange is not closed.

"Commonwealth" means the Commonwealth of Kentucky.

"Completion Date" means September 30, 2006.

"Construction Costs" means those costs identified in Section 8.2 hereof.

"Construction Loan Agreement" shall mean the Construction Financing Agreement between the Tenant and LaSalle Bank National Association dated and effective as of August 1, 2004.

"Construction Period" means the period between the earlier of (a) the date of this Lease or (b) the beginning of the acquisition, construction, installation and equipping of the Project, and the Completion Date.

"Cumulative Aggregate Disbursements to Date" means the same as that term is defined in the Indenture.

"Eligible Investments" means Eligible Investments as defined in the Indenture.

"Event of Default" means any of the events described in Section 18.1 hereof.

"Grid Bonds" means the same as that term is defined in the Indenture.

"Floating Rate" shall mean, for any day, a rate per annum equal to the Prime Rate for such day, changing when and as the Prime Rate changes.

"Floating Rate Advance" shall mean that portion of the outstanding principal balance of the Bonds that bears interest at the Floating Rate.

"Guarantors" means Mr. Matthew C. Daniels and Mr. Timothy S. Baird.

"Guaranty Agreement" means the Guaranty of Payment and Completion dated and effective as of December 1, 2007 from the Guarantors to the Trustee, and any permitted amendments or supplements thereto.

"Impositions" means all taxes, levies, assessments and any other charges laid upon the Project by any governmental authority.

3

vC3596Pg **192**

"Indenture" means the Trust Indenture of even date herewith between the Issuer and the Trustee, as amended or supplemented from time to time.

"Interest Period" means the same as that term is defined in the Indenture.

"Interest Payment Date" means the first (1st) day of each month and, if any Interest Payment Date is not a Business Day, then the next Business Day.

"Interest Rate" means the Optional Interest Rate or the Floating Rate, as applicable.

"Interest Rate for Advances" means the Default Interest Rate as that term is defined in the Construction Loan Agreement.

"Landlord" means the City of Crescent Springs, Kentucky, and its successors and assigns.

"Lease" or "Agreement" means this Agreement of Lease as it now exists and as it may hereafter be amended.

"Lease Payments" means Basic Rent and Additional Rent.

"Optional Rate Advance" means the same as that term is defined in the Indenture.

"LIBOR Rate" means the same as that term is defined in the Indenture.

"Mortgage" means the Leasehold Mortgage of even date with this Lease, relating to the Project, the Bonds and this Lease, among the Tenant, the Landlord and the Trustee, as amended or supplemented from time to time.

"Net Proceeds" means, any insurance proceeds or any condemnation award, the amount remaining after deducting therefrom all expenses (including attorneys' fees and expenses of Landlord or Trustee) incurred in the collection of such proceeds or award, plus any interest earned on the investment thereof.

"Optional Interest Rate" means the same as that term is defined in the Indenture.

"Original Purchaser" means the Person or Persons identified as the purchaser in the Purchase Agreement and as to Additional Bonds, the Person or Persons identified as the purchaser or purchasers in the applicable Purchase Agreement; the term Original Purchaser shall also include any New Purchaser, as that term is defined in the Indenture, unless the context indicates otherwise.

"Paying Agent" means any paying agent designated under the Indenture.

"Payment in Full of the Bonds" means the first date when (i) the Bonds are no longer deemed to be outstanding under the provisions of the Indenture and (ii) all Ordinary Expenses and Extraordinary Expenses shall have been paid in full by Tenant.

4

"Permitted Encumbrances" means as of any particular time:

(i)     the right reserved to or vested in any municipality or public authority by the terms of any provision of law to terminate any right, power, franchise, grant, license or permit, provided that the exercise of such right would not materially impair the use of the Project for the purposes for which it is held by Tenant or materially adversely affect its value;

(ii)    the right reserved to or vested in any municipality or public authority to purchase, condemn or appropriate all or any part of the Project or Project Site;

(iii)   liens for the taxes, assessments, levies, fees, charges, duties, imposts, claims and demands referred to in this Lease which are not at the time due and payable, or the validity or amount of which is being contested in compliance with the provisions of this Lease;

(iv)    easements, rights of way, licenses, restrictions and other defects, encumbrances and irregularities in the title to the Project or Project Site which in the opinion of the Original Purchaser do not materially impair the use thereof for the purposes for which it is held by Tenant or materially adversely affect its value;

(v)     rights reserved to or vested in any municipality or public authority to control or regulate the Project or Project Site or to use the Project or Project Site in any manner which does not materially impair the use thereof for the purposes for which it is held by Tenant or materially adversely affect its value;

(vi)    the leasehold estate created by and under the Lease and the statutory mortgage lien created upon issuance of the Bonds and the recording of the Lease;

(vii)   the lien of the Mortgage;

(viii)  those exceptions contained in the commitment for title insurance, as amended on the date of delivery of the Series 2007 Bonds, relating to the Project and the Project Site.

"Person" or words importing persons mean firms, associations, partnerships (including without limitation, general and limited partnerships), joint ventures, societies, estates, trusts, corporations, public or governmental bodies, other legal entities and natural persons.

"Prime Rate" means the Prime Rate as defined in the Construction Loan Agreement.

"Project" means the real, personal, or real and personal property, including undivided interests or other interests therein as described on Exhibit A attached hereto as a part hereof, or acquired, constructed or installed as a replacement or substitution therefor or an addition thereto,

5

vC3596Pg **194**

or as may result from a revision of the plans and specifications therefor in accordance with the provisions of this Lease.

"Project Costs" means costs of the Project specified in Section 8.2 hereof.

"Project Site" means the real estate and interests in real estate constituting the site of the Project, as described in Exhibit B attached hereto as a part hereof.

"Purchase Agreement" means, as to the Series 2007 Bonds, the Bond Purchase Agreement dated as of or after the date of the Bond Legislation for the Series 2007 Bonds but prior to the initial delivery of the Series 2007 Bonds, among the Issuer, the Original Purchaser and the Tenant; and as to any Additional Bonds, the Bond Purchase Agreement providing for the purchase of the Additional Bonds.

"Construction Fund" means the Construction Fund as created in the Indenture.

"Registrar" means Registrar as defined in the Indenture.

"Rent Payment Date" means each Interest Payment Date and each date on which Series 2007 Bonds are required to be redeemed under the Indenture.

"Revenues" means (a) the Lease Payments, (b) all other moneys received or to be received by the Landlord or the Trustee in respect of the Agreement, including without limitation, moneys and investments in the Bond Fund, (c) any moneys and investments in the Construction Fund, and (d) all income and profit from the investment of the foregoing moneys.

"Series 2007 Bonds" means the $56,000,000 Maximum Aggregate Principal Amount City of Crescent Springs, Kentucky Taxable Industrial Building Revenue Bonds, Series 2007 (Buttermilk Towne Center Project) authorized in the Bond Legislation and Section 2.02 of the Indenture.

"Tenant" means Buttermilk Towne Center, LLC, an Ohio limited liability company, its successors and assigns.

"Total Aggregate Disbursements at Final Disbursement Date" means the same as that term is defined in the Indenture.

"Trustee" means the Trustee at the time serving as such under the Indenture, originally LaSalle Bank National Association, Chicago, Illinois, and any successor Trustee as determined or designated under or pursuant to the Indenture.

"Unassigned Issuer's Rights" means all of the rights of the Landlord to receive Additional Rent under Section 4.2 hereof, to be held harmless under Section 15.5 hereof, to be reimbursed for Attorney's fees and expenses under Section 18.3 hereof and to give or withhold consent to amendments, changes, modifications, alterations and termination of this Lease under Section 19.2 hereof.

vC3596Pg **195**

7

vC3596Pg **196**

Section 1.2     Rules of Construction.

(a)     Unless the context clearly indicates to the contrary, the words "herein", "thereby", "hereunder", "hereof, "hereinbefore", "hereinafter" and other equivalent words refer to this Lease and not solely to the particular portion thereof in which any such word is used. Words importing the singular number shall include the plural number and vice versa, and any pronoun used herein shall be deemed to cover all genders.

(b)     Any reference herein to the Landlord or any officer of the Landlord shall include those which succeed to their respective functions, duties or responsibilities pursuant to or by operation of law or who are lawfully performing such functions. Any reference herein to any other person or entity shall include his or its respective successors and assigns. Any reference herein to a section or provision of the Code or to a section, provision or chapter of the Kentucky Revised Statutes shall include such section or provision or chapter as from time to time amended, modified, revised, supplemented or superseded; provided that no such change shall be deemed applicable by reason of this provision if such change would in any way constitute an impairment of the rights of the Landlord, the Tenant, or the Trustee under this Lease.

[End of Article I]

8

√C3596Pg **197**

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1    <u>Representations and Warranties by the Landlord</u>. The Landlord represents and warrants that:

(a)    It is a city and political subdivision of the Commonwealth of Kentucky organized and existing under the laws of the Commonwealth of Kentucky and the United States of America.

(b)    It has the power to issue the Bonds, to enter into this Lease, the Bond Purchase Agreement, the Mortgage and the Indenture, and to carry out its obligations hereunder and thereunder, and neither the execution and delivery of any such agreements or instruments nor performance by the Landlord of any of its obligations hereunder or thereunder will violate or constitute a default under any provision of law or regulation, or any writ, order or decree of any court or governmental agency, or any indenture, agreement or other undertaking to which the Landlord is a party or by which it is bound.

(c)    It has duly accomplished all conditions necessary to be accomplished by it prior to issuance and delivery of the Series 2007 Bonds and execution and delivery of this Lease, the Mortgage, the Bond Purchase Agreement and the Indenture.

(d)    It has been duly authorized to execute and deliver this Lease, the Mortgage, the Bond Purchase Agreement and the Indenture and to issue the Series 2007 Bonds.

(e)    Neither the Project, this Lease nor the Revenues have been mortgaged, pledged or hypothecated in any manner or for any purpose other than as provided in the Indenture and the Mortgage as security for the payment of the Bonds.

(f)    This Lease, the Bond Purchase Agreement, the Mortgage and the Indenture have been duly executed and delivered by the Issuer and constitute legal, valid and binding obligations of the Issuer enforceable in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors rights in general. The enforceability of the Landlord's obligations under said documents is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

Section 2.2    Representations and Warranties by the Tenant.

The Tenant represents and warrants that:

(a)    It is a limited liability company, duly organized and validly existing under the laws of the State of Ohio, is authorized to transact business in the Commonwealth, and has the power and authority to carry on its business as presently conducted and to

9

VC3596Pg 198

enter into and perform its obligations under this Lease. The execution, delivery and performance by Tenant of this Lease, the Mortgage and the Bond Purchase Agreement have been duly authorized by all necessary action on the part of the Tenant, and do not and will not contravene any law or any governmental rule, regulation or order presently binding on the Tenant or the organizational or governing agreements of the Tenant in any material respect.

(b)    It has the power and has been duly authorized to enter into this Lease, the Mortgage and the Bond Purchase Agreement and to perform all of its obligations hereunder and thereunder.

(c)    The Tenant is not subject to any contractual or other limitation or provision of any nature whatsoever which in any way limits, restricts or prevents the Tenant from entering into this Lease, the Mortgage or the Bond Purchase Agreement, or performing any of its obligations hereunder or thereunder; and the execution and delivery of this Lease, the Mortgage and the Bond Purchase Agreement, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of or compliance with the terms and conditions of this Lease, the Mortgage and the Bond Purchase Agreement will not conflict with or result in a breach of the terms, conditions or provisions of any restriction, agreement or instrument to which the Tenant is a party or by which it is bound, or constitute a default under any of the foregoing, and will not violate any provision of law or regulation applicable to the Tenant or any court or administrative order or decree.

(d)    To the best of Tenant's knowledge, the acquisition, construction and equipping of the Project comply or will comply with all applicable zoning, planning, building, environmental and other regulations of all of the governmental authorities having jurisdiction of the Project, and all necessary permits, licenses, consents and permissions necessary for the construction and operation of the Project have been obtained or will be obtained on or before the Completion Date, and all necessary utilities are available to the Project or will be available on the Completion Date.

(e)    To the best of Tenant's knowledge, the acquisition, construction and equipping of the Project as well as its intended use and operation are in complete conformance with the purposes and provisions of the Act.

(f)    To the best of Tenant's knowledge, the execution, delivery and performance by the Tenant of this Lease, the Mortgage and the Bond Purchase Agreement do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in the respect of, any federal, state or other governmental authority or agency, not previously obtained or performed.

(g)    This Lease, the Mortgage and the Bond Purchase Agreement have been duly executed and delivered by the Tenant and constitute the legal, valid and binding agreements of the Tenant.

√C3596Pg **199**

(h)    There are no actions, suits or proceedings pending or to the knowledge of the Tenant, threatened, before any court, administrative agency or arbitrator which, individually or in the aggregate, might result in any material adverse change in the financial condition of the Tenant or might impair the ability of the Tenant to perform its obligations under this Lease, the Mortgage or the Bond Purchase Agreement.

(i)    No event has occurred and is continuing which with the lapse of time or the giving of notice would constitute an Event of Default under this Lease, the Mortgage or the Bond Purchase Agreement.

(j)    To the best of Tenant's knowledge, Tenant has a good and marketable leasehold interest in the Project Site, free, clear and unencumbered, except for Permitted Encumbrances.

(k)    The Tenant restates and confirms by reference the representations and warranties that it has made in the Construction Loan Agreement.

(l)    All tax returns and reports of Tenant required to be filed by it have been timely filed, and all taxes, assessments, fees and other governmental charges upon Tenant and upon its properties, assets, income and franchises which are due and payable have been paid when due and payable. Tenant knows of no proposed tax assessment against it that would be material to the condition (financial or otherwise) of Tenant, and Tenant has not contracted with any government entity in connection with such taxes.

(m)    The Tenant is solvent as of the closing date and will be solvent after giving effect to the transaction contemplated by this Lease Agreement, including all obligations incurred thereby, the security interests granted therein and the payment of all fees related thereto.

(n)    To the best of Tenant's knowledge, Tenant is in compliance with ERISA.

(o)    All insurance policies and bonds furnished by the Tenant are valid and in full force and effect. No notice has been given or claim made and, to the best of Tenant's knowledge, no grounds presently exist to cancel or void any of such policies or bonds or to reduce the coverage provided thereby. In Tenant's reasonable judgment, such policies and bonds provide adequate coverage in amounts sufficient to insure the assets and risks of Tenant in accordance with prudent business practices.

(p)    There exists no material violation of or material default by Tenant or any Guarantor with respect to (and, to the best knowledge of Tenant, no event has occurred which, upon the giving of notice or the passage of time, or both, would constitute a material default with respect to): (a) the terms of any instrument evidencing or securing any indebtedness of Tenant or any Guarantor; (b) any lease or other agreement to which the Tenant or any Guarantor is a party or which affects their properties or assets; (c) any license, permit, statute, ordinance, law, judgment, order, writ, injunction, decree, rule or regulation of any governmental authority, or any determination or award of any

11

vC3596Pg **200**

arbitrator, to which Tenant or any Guarantor may be bound; or (d) and deed of trust, mortgage, instrument, agreement or document by which Tenant, any Guarantor or any of their respective properties or assets are bound, which would have a material adverse effect on Tenant or a Guarantor, the Project, or the ability of Tenant or such Guarantor to perform its obligations under the Agreement.

(q)     Tenant is not engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock (as defined within Regulations G, T, and U of the Board of Governors of the Federal Reserve System), and not more than twenty-five percent (25%) of the value of Tenant's assets consists of such margin stock. No part of the proceeds from the Series 2007 Bonds will be used to purchase or carry any margin stock or to extend credit to others for that purpose or for any other purpose that violates the provisions of Regulations U or X of said Board of Governors.

(r)     The execution, delivery and performance of the Agreement by Tenant will not: (i) violate (A) Tenant's organizational documents, (B) any legal requirement affecting Tenant or any of its properties or assets or (C) any agreement to which Tenant is bound or to which it is a party; or (ii) result in or require the creation (except as provided in or contemplated by this Agreement) of any lien upon any such Tenant's properties or assets.

(s)     No condemnation proceedings or moratorium is pending or, to the best of Tenant's knowledge, threatened against the Project or the Project Site (or any portion thereof) which would impair the use, occupancy or full operation of the Project in any manner whatsoever.

(t)     The Project and the Project Site, and the uses to which the Project and the Project Site will be put, comply or will comply fully with: (a) all laws, ordinances, rules, regulations and requirements of all governmental authorities having jurisdiction over the Project and the Project Site, including all applicable building, zoning and land use laws, ordinances, requirements, rules and regulations; and (b) all applicable restrictive covenants and obligations created by private contracts, leases, and tenant leases which affect the ownership, construction, equipping, affixing of fixtures, use or operation of the Project or Project Site.

(u)     Telephone services, electric power, storm sewers, sanitary sewer, portable water facilities and all other utilities and services necessary for the construction, use, operation, and maintenance of the Project are available to the Project Site, are adequate to serve the Project, and are not subject to any conditions limiting the use of such utilities, other than normal charges to the utility supplier. All streets and easements necessary for the operation and maintenance of the Project are or will be available to the boundaries of the Project Site.

(v)     All governmental or regulatory orders, consents, permits, authorizations, licenses and approvals required for the construction and, to the extent available given the status of construction, the use, occupancy and operation of the Project have been obtained

12

√**C3596**Pg **201**

and are in full force and effect. No additional governmental or regulatory actions, filings or registrations with respect to the Project, and no approvals, authorizations or consents of any trustee or holder of any indebtedness or obligation of Tenant or any Guarantor, are required for the due execution, delivery and performance by Tenant or any Guarantor of the Agreement to be executed by them respectively.

(w)    The Project is or will be comprised of one or more tax parcels that are separately identified from and assessed separately from any other real property.

[End of Article II]

√**C3596**Pg **202**

## ARTICLE III

## GRANTING OF LEASEHOLD

Section 3.1    <u>Granting of Leasehold</u>. Landlord by these presents hereby demises, rents, leases and lets unto Tenant and Tenant hereby rents, leases and hires from Landlord, for the rentals and upon and subject to the terms and conditions hereinafter set forth, the Project, including the Project Site, as now existing and as may be hereafter acquired, constructed and installed pursuant to this Lease, for a term of 25 years, unless sooner terminated as hereinafter permitted, commencing on the date of this Lease and ending at 11:59 p.m. prevailing time in the City of Crescent Springs, Kentucky on December 1, 2032.

[End of Article III]

14

vC3596Pg 203

## ARTICLE IV

## RENTALS

Section 4.1   Basic Rent. Landlord reserves and Tenant covenants and agrees to pay to the Trustee for the account of Landlord during the term of this Lease, Basic Rent payable as follows:

(a)   On or before each Rent Payment Date, the amount necessary, together with any moneys then on deposit with the Trustee and available for that purpose, to pay an amount equal to the interest payable on the Bonds on such Interest Payment Date; and

(b)   On or before each Rent Payment Date, the amount necessary, together with any moneys then on deposit with the Trustee and available for that purpose, to pay an amount equal to the next installment of principal due on the Bonds, either at maturity or by mandatory sinking fund redemption.

Time is of the essence with respect to this Lease.

All payments of Basic Rent must be received by the Trustee by 10:00 a.m. on the date due in same day funds and shall be deposited in the Bond Fund. Notwithstanding the foregoing, Tenant's obligation to make payments of Basic Rent shall cease upon Payment in Full of the Bonds.

Section 4.2   Additional Rent. Tenant shall pay as Additional Rent (a) all customary fees and reasonable charges and expenses (including without limitation attorneys' fees) of the Trustee, and Paying Agent and any Authenticating Agent and the Bond Registrar in connection with the Bonds; (b) all Impositions; (c) any and all reasonable costs and expenses incurred or to be paid by the Landlord in connection with the issuance and delivery of the Series 2007 Bonds and Additional Bonds or otherwise related to actions taken by the Issuer under this Lease or the Indenture; and (d) Additional Rent under Section 5.4 hereof.

If, due to (a) the introduction of or any change in or in the interpretation of any law or regulation, or (b) the compliance with any guideline or request from any central bank or other public authority (whether or not having the force of law), there shall be any loss or increase in the cost to a Holder of holding the Bonds, except any loss or increase in cost due to a change in any federal or state income tax law, rule, regulation or interpretation, then the Tenant agrees that it shall, from time to time, upon demand by such Holder, pay to Trustee for transfer to the Holder, as Additional Rent, amounts sufficient to compensate such Holder for such loss or increased cost. A certificate as to the amount of such loss or increased cost, submitted to the Tenant and the Trustee by such Holder, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

Section 4.3   Rent Payable Without Abatement or Set-Off. Tenant covenants and agrees with and for the express benefit of the Trustee and the holders of the Bonds, that until Payment in Full of the Bonds, Tenant shall make all payments of Basic Rent and Additional Rent on or

## vC3596Pg 204

before the dates the same become due, and that Tenant shall perform all of its other obligations, covenants and agreements hereunder without notice or demand, and without abatement, deduction, set-off, counterclaim, recoupment or defense arising from any circumstance whatsoever whether now existing or hereafter arising, including, without limiting the generality of the foregoing, defenses based on alleged failure of consideration, eviction, or constructive eviction, commercial frustration of purpose, or any changes in the tax or other laws or regulations of the United States of America or of the Commonwealth or any political subdivision or agency of either, and irrespective of whether Landlord's title to the Project, or to any part thereof, is defective or nonexistent, and notwithstanding any damage to, loss, theft or destruction of the Project or any part thereof, the taking of title to or of the right of temporary use of all or any part of the Project by eminent domain, legal curtailment of Tenant's use thereof, change in Landlord's legal organization or status, or any default of Landlord hereunder, and regardless of the invalidity of any action of Landlord, and regardless of the invalidity of all or any portion of this Lease, and Tenant hereby waives, to the extent permitted by law, the provisions of any constitutional provision, any statute or other law now or hereafter in effect contrary to any of its obligations, covenants or agreements under this Lease or which releases or purports to release Tenant therefrom. Nothing in this Lease shall be interpreted or construed as a waiver by Tenant of any rights or claims Tenant may have against Landlord, the Trustee, or any third party under this Lease or otherwise, but any recovery upon such rights and claims shall be had from such persons by virtue of Tenant's independent actions, separate and apart from any proceedings under this Lease, it being the intent of this Lease that until Payment in Full of the Bonds, Tenant shall be unconditionally and absolutely obligated to perform fully all of its obligations, agreements and covenants under this Lease (including the obligation to pay Basic Rent and Additional Rent) for the benefit of the holders of the Bonds.

Section 4.4    Use of Rents. Landlord covenants that all revenues derived by Landlord under this Lease shall be used exclusively for the purposes therefor set forth herein.

Section 4.5    Prepayment of Bonds. In the event at any time during the life of this Lease there should cease to be any Bonds outstanding, then, subject to its obligation to purchase the Project pursuant to Section 11.5 hereof, Tenant shall be entitled to the use and occupancy of the Project from such time until the expiration of this Lease without the payment of any further Basic Rent, but otherwise on all of the same terms and conditions hereof, except that Tenant shall not be required by this Lease to carry any insurance other than the public liability insurance and the worker's compensation insurance described in Section 9.1 hereof.

[End of Article IV]

√C3596Pg **205**

## ARTICLE V

## IMPOSITIONS AND UTILITIES

Section 5.1     Duty to Pay Impositions. Tenant shall, during the life of this Lease, bear, pay and discharge, or cause to be born, paid and discharged before the delinquency thereof, all Impositions, including, but not limited to, taxes and assessments, general and special, if any, which may be lawfully taxed, charged, levied, assessed or imposed upon or against or be payable with respect to the Project, or any part thereof, or any improvements at any time thereon or Tenant's interest in the Project under this Lease, including any new lawful taxes and assessments that may be lawfully taxed, charged, levied, assessed or imposed in lieu of or in addition to taxes or assessments now customarily levied against real and personal property, and further including all water and sewer service charges, assessments and other governmental charges and impositions whatsoever, foreseen or unforeseen, which if not paid when due would encumber Landlord's title to the Project, and any taxes levied upon or with respect to the income or profits of Landlord from the Project which, if not paid, will become a lien on the Project prior to or on a parity with this Lease or with the security interest created by the Act or granted by the Mortgage or a charge on the revenues and receipts from the Project prior to or on a parity with the charge thereon and the pledge or assignment thereof created or made in the Indenture. In the event any special assessment taxes are lawfully levied and assessed which may be paid in installments, Tenant shall be required to pay only such installments thereof as become due and payable during the life of this Lease as and when the same become due and payable. Landlord shall not, in its capacity as owner of the fee title to the Project but without restriction to its freedom to act in other capacities, consent to or vote in favor of any special tax or assessment affecting the Project or any portion thereof without the prior written consent of Tenant. The Landlord shall notify the Tenant annually of the appraised value of the Project and the taxes and assessments which would be due but for the issuance of the Bonds, and Tenant's rigt to contest the valuation of the Project shall remain regardless of whether the Project is subject to ad valorem tax.

Section 5.2     Contest of Impositions. Tenant shall have the right, in its or Landlord's name, to contest in good faith the validity or amount of any Imposition which Tenant is required to bear, pay and discharge pursuant to the terms of this Article by appropriate legal or administrative proceedings instituted before the Imposition contested becomes delinquent if, and provided, Tenant, before instituting any such contest, gives Landlord, the Trustee written notice of its intention so to do and, if requested in writing by the Landlord or the Trustee, deposits with the Trustee for the benefit of the Landlord and the Trustee a letter of credit or bond in the amount required for the payment thereof, then the Tenant shall not be required to pay the item or to produce the required receipts while the amount is maintained and so long as the contest operates to prevent collection, is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to the Tenant. Notwithstanding the foregoing, if either the Landlord or the Trustee notifies the Tenant that, in the opinion of counsel selected by the Landlord, the Trustee, by nonpayment of any such item the priority of this Lease as to any part of the Project will be materially affected or the Project or any part thereof will be subject to imminent loss or forfeiture, the Tenant shall promptly pay such item. Tenant shall hold Landlord

17

∨**C3596**Pg **206**

whole and harmless from and shall promptly pay any reasonable costs and expenses Landlord may incur related to any such contest.

Section 5.3     Utilities. All utilities and utility services used by Tenant in, on or about the Project and all utility taxes, foreseen and unforeseen, in connection therewith shall be promptly paid for by Tenant and shall be contracted for by Tenant in Tenant's own name and Tenant shall, at its sole cost and expense, procure any and all permits, licenses or authorizations necessary in connection therewith.

Section 5.4     Net Lease. The parties hereto further agree (a) that this Lease is intended to be a "net lease", (b) that the payments of Basic Rent are designed to provide Landlord and the Trustee with funds adequate in amount to pay all principal of, premium, if any, and interest on the Bonds as the same become due and payable, and (c) that to the extent the payments of Basic Rent are not sufficient to provide Landlord and the Trustee with funds sufficient for the purposes aforesaid, Tenant shall be obligated to pay to the Trustee, and it does hereby covenant and agree to pay, upon demand therefor by Landlord or the Trustee, as Additional Rent, such further sums of money, in cash as may from time to time be required for such purposes. Additional Rent so paid shall be deposited in the Bond Fund by the Trustee.

[End of Article V]

18

# ARTICLE VI

## SALE OF THE BONDS

Section 6.1     Sale of the Bonds. Landlord shall issue and sell, in accordance with the terms of the Bond Purchase Agreement, the Series 2007 Bonds in the maximum aggregate principal amount of $56,000,000.

At the request of the Tenant and with the consent of the Original Purchaser, and for the purposes and upon fulfillment of the conditions specified in the Indenture, the Landlord may provide for the issuance, sale and delivery of Additional Bonds.

Section 6.2     Bond Proceeds. The proceeds received by the Landlord from the sale of the Bonds shall be paid over to the Trustee to be deposited and disbursed as provided in the Indenture and herein.

[End of Article VI]

vC3596Pg **208**

## ARTICLE VII

## ASSIGNMENT OF LEASE TO TRUSTEE

Section 7.1     Assignment of Lease to Trustee; Other Security. Except for Unassigned Issuer's Rights, Landlord hereby assigns this Lease to the Trustee for the benefit of the holders of the Bonds and as security for the Bonds under the Indenture, free and clear of all liens and encumbrances save for Permitted Encumbrances and with special warranties of title and quiet enjoyment.

Landlord agrees, in connection with the foregoing assignment, that notwithstanding any other provision of this Lease to the contrary, Landlord shall not, so long as the Construction Loan Agreement shall be in full force and effect, terminate this Lease, re-enter the Premises or take any other action which would reasonably be expected to deprive Tenant of its leasehold interest without the express prior written consent of the Original Purchaser.

Landlord and Tenant further recognize that pursuant to 103.250 of the Kentucky Revised Statutes, a statutory mortgage lien shall exist upon the Project in favor of the holders of the Bonds. The Project shall remain subject to the statutory mortgage lien until the Payment in Full of the Bonds. Said statutory mortgage lien shall be effective from and after the recording of this Lease and the Mortgage, and said lien shall attach to all of the property described herein, including machinery, equipment and appurtenances described herein in either general or specific terms.

Section 7.2     Amendment of the Indenture. The Indenture constitutes a contract between the Issuer and the Trustee which specifies, inter alia, the terms of the Bonds, the uses of the Lease Payments and other amounts payable hereunder, and which contains a provision that following Payment in Full of the Bonds or proper provision therefor, certain unexpended funds held by the Trustee shall be returned to Tenant. The Issuer agrees that it will not, without the prior written consent of Tenant and the Trustee, enter into any amendment to the Indenture that would increase the rents or other amounts payable by Tenant hereunder or prejudice its rights to the return of such unexpended funds.

[End of Article VII]

20

## ARTICLE VIII

## ACQUISITION, CONSTRUCTION, EQUIPPING
## AND INSTALLATION OF PROJECT

Section 8.1    Acquisition, Construction, Equipping and Installation of the Project. The Tenant represents that the acquisition, construction and installation of the Project will be completed substantially in accordance with the plans and specifications therefor (if any) now on file with the Landlord and the Original Purchaser, subject to such changes in such plans and specifications as the Original Purchaser may approve and as do not change the character of the Project as an industrial building facility or cause the Project or the purpose thereof to be in nonconformance with the purposes and provisions of the Act. The Tenant hereby accepts the Project, as is, from the Landlord and warrants that it will complete the Project with reasonable dispatch in accordance with such plans and specifications, so that it will be suitable for its intended use.

Section 8.2    Disbursements from the Construction Fund. The Trustee is authorized to disburse the moneys in the Construction Fund for payment of, or reimbursement to the Landlord or the Tenant for payment of, the following Construction Costs:

(a)    costs incurred directly in connection with the acquisition, construction, equipping and installation of the Project, including, but not limited to, the costs of land, labor, services, materials, equipment, architectural, engineering, consultants, legal and supervisory services;

(b)    expenses incurred in connection with the authorization, sale, issuance and delivery of the Bonds and the preparation and delivery of all agreements, instruments and documents related thereto, including, but not limited to, all financial, legal, administrative, accounting, printing and engraving fees, expenses and charges and all recording, filing, title examination or insurance, surety bond and any other fees, expenses or charges relating to the Project or the Series 2007 Bonds;

(c)    premiums attributable to any surety bonds and insurance required to be taken out and maintained during the Construction Period with respect to the Project Site and the Project Facilities;

(d)    taxes, assessments and other governmental charges in respect of the Project that may become due and payable during the Construction Period;

(e)    costs incurred directly or indirectly in seeking to enforce any remedy against any contractor or subcontractor in respect of any actual or claimed default under any contract relating to the Project;

(f)    any other costs, expenses, fees and charges properly chargeable to the cost of acquisition, construction, installation, equipment or improvement of the Project; and

21

(g) any other costs, expenses, fees and charges, including but not limited to payments in respect of the "Interest Reserve", as defined in the Construction Loan Agreement, permitted by the Construction Loan Agreement.

Any disbursements from the Construction Fund for the payment of Construction Costs shall be made by the Trustee in accordance with the provisions of the Construction Loan Agreement, and shall be subject in each case to the satisfaction of the application conditions and procedures (including but not limited to the Funding Conditions, as defined in the Construction Loan Agreement) provided for in the Construction Loan Agreement (it being understood that the Original Purchaser shall have the sole right to determine, in each instance, whether and such conditions and procedures have been satisfied or may be waived).

Any moneys in the Construction Fund remaining after the payment, or provision for payment, in full of the costs of the Project, at the direction of the Authorized Tenant Representative, promptly shall be:

(a) used to redeem Series 2007 Bonds,

(b) used to acquire, construct, install, equip and improve such additional real or personal property in connection with the Project as is designated by the Authorized Tenant Representative and approved by the Original Purchaser and the acquisition, construction, installation, equipment and improvement of which will be permitted under the Act.

Section 8.3  Protection of Landlord with Respect to Construction Fund Disbursements. The Tenant shall be solely responsible for the accuracy and completeness of all requisitions furnished pursuant to the provisions of Section 8.2 hereof, and the Tenant shall indemnify and save the Landlord, its officials, employees and agents harmless from and against any and all claims, damages, expenses, costs and liabilities arising out of any disbursement from the Construction Fund made in violation of any provision of this Lease, except to the extent due to the gross negligence or willful misconduct of Landlord or Trustee.

Section 8.4  Project Property of Landlord. All work and materials on the buildings and improvements as currently existing and all furnishings, machinery and equipment installed in or on the Project, the Project as fully completed, anything under this Lease which becomes, is deemed to be, or constitutes a part of the Project, and the furnishings, machinery and equipment as repaired, rebuilt, rearranged, restored or replaced by Tenant under the provisions of this Lease, except as otherwise specifically provided herein, shall immediately when erected or installed be deemed to be attached to and part of the freehold and become the absolute property of Landlord, subject, however, to this Lease. All of Tenant's own furnishings, machinery and equipment hereafter installed which remain the property of the Tenant pursuant to Sections 10.1 or 10.2 hereof shall be and remain identified as such.

√C3596Pg **211**

Section 8.5    No Warranty of Suitability or Habitability. Tenant acknowledges that since the Project will be constructed, installed, furnished and equipped by contractors and suppliers selected by it in accordance with plans and specifications prepared by architects or engineers selected by it, LANDLORD MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE HABITABILITY, MERCHANTABILITY, CONDITION OR WORKMANSHIP OF ANY PART OF THE PROJECT OR ITS SUITABILITY OR FITNESS FOR TENANT'S PURPOSES OR THE EXTENT TO WHICH PROCEEDS DERIVED FROM THE SALE OF THE BONDS WILL PAY THE COSTS TO BE INCURRED IN CONNECTION THEREWITH.

[End of Article VIII]

vC3596Pg 212

## ARTICLE IX

## INSURANCE

Section 9.1 <u>Insurance</u>. Except as may be otherwise provided in the Bond Purchase Agreement, Tenant shall obtain or cause to be obtained, and continuously maintain or cause to be maintained, insurance with respect to the Project, as provided in the Construction Loan Agreement.

Any insurance policy issued pursuant to the preceding paragraph shall conform to the requirements of the Construction Loan Agreement.

Subject to the provisions of the Construction Loan Agreement and Section 12.1 hereof, each insurer is hereby authorized and directed to make payment of any amount under the insurance described in this Section (except liability insurance), including return of unearned premiums, directly to the Trustee instead of to the Tenant and the Trustee jointly, and the Tenant hereby appoints the Trustee, irrevocably, as Tenant's attorney-in-fact to endorse any draft therefor for application as herein provided; provided that the foregoing provisions of this paragraph shall not limit Tenant's right, in conjunction with the Trustee, to negotiate or agree to settlement of any claim under the insurance described in this Section.

Tenant shall comply with all applicable workers' compensation laws.

Section 9.2 <u>Other Insurance</u>. The parties hereto recognize that continued inflation, the emergence of new risks, and various other factors foreseeable or unforeseeable may at some future time cause the insurance coverages required by this Article to become inadequate in face amount or the type of risks insured against. Tenant hereby covenants with Landlord that throughout the life of this Lease, Tenant shall keep the Project, or cause the Project to be kept continuously insured against such risks as are customarily insured against, and in such amounts as would be customarily maintained, by businesses of like size and type. Nothing herein shall release Tenant from its obligation to maintain, or cause to be maintained the insurance coverages required by other sections of this Article.

[End of Article IX]

√C3596Pg **213**

## ARTICLE X

## CHANGES IN PROJECT

Section 10.1 <u>Removal, Disposition and Substitution of Furnishings, Machinery and Equipment</u>. Landlord shall not be under any obligation to inspect, renew, repair or replace any inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary furnishings, machinery and equipment. In any instance where Tenant in its sound discretion determines that any items of furnishings, machinery and equipment which constitute a part of the Project have become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary, Tenant may, provided it is not in default under this Lease, remove such items of furnishings, machinery and equipment from the Project and (on behalf of Landlord) sell, trade-in, exchange or otherwise dispose of them provided that in the event any of the Bonds are outstanding at the time of such removal, Tenant shall either:

(a)     Purchase with its own funds (as defined in clause (b) below) within a reasonable time and install within a reasonable time thereafter anywhere in the Project other furnishings, machinery and equipment having equal or greater fair market value and utility (but not necessarily having the same function) in the operation of the Project, all of which substituted furnishings, machinery and equipment shall be free of all liens and encumbrances (other than Permitted Encumbrances) and shall be conveyed promptly to Landlord and become a part of the Project, provided, however, that Tenant may not proceed under this clause (a) if such removal and substitution would impair operating unity or otherwise adversely affect the fair market value of the Project; or

(b)     Not make any such substitution and installation, provided that Tenant shall promptly deposit into the Bond Fund cash in an amount equal to the proceeds of the sale or scrapping of the furnishings, machinery and equipment so removed or the credit received for the trade-in thereof, or the fair market value thereof, whichever is higher, for the benefit of the Bondholders and for redemption of the maximum possible portion of the aggregate principal amount of the Bonds then outstanding and redeemable with such amount, pursuant to the Tenant's obligation to prepay Basic Rent in part under the terms of the last two paragraphs at Section 11.2 hereof. Tenant shall not be required to replace any furnishings, machinery and equipment which constitute a part of the Project and which are removed from the Project after compliance by Tenant with the provisions of this subsection, and so long as Tenant complies with the provisions of this subsection with respect to the removal from the Project of any furnishings, machinery and equipment constituting a part of the Project, any furnishings, machinery and equipment which Tenant purchases and installs in or on the Project with its own funds (i.e. funds other than the Construction Fund) shall be and remain the property of Tenant even though such furnishings, machinery and equipment might replace furnishings, machinery and equipment so removed and may be removed by Tenant at any time during the life of this Lease unless such furnishings, machinery and equipment are necessary for an "industrial building" under the Act; provided further, however, that all such new furnishings, machinery and equipment which remain on the Project Site on the date of termination of

25

this Lease for any cause other than the purchase of the Project pursuant to Section 11.4.1 11.5 or 11.6 hereof shall, upon and in the event of such termination, become the separate and absolute property of Landlord, subject, however, to the lien of the Indenture. Landlord agrees to execute or cause to be executed any bills of sale necessary to effectuate a sale under this subsection.

Not later than one hundred-twenty (120) days following the end of each fiscal year of Tenant, Tenant shall furnish the Trustee a certificate, summarizing the action taken by Tenant pursuant to this Section during the preceding twelve (12) months, but the establishment of such dates shall not limit the provisions herein for substitution and installation of other furnishings, machinery and equipment within a reasonable time.

Tenant shall pay all the costs and expenses of any such removal and shall immediately repair at its own expense all damage to the Project caused thereby.

The removal from the Project of any portion of the furnishings, machinery and equipment pursuant to the provisions of this Section shall not entitle Tenant to any abatement or diminution of the rents payable under this Lease or any reimbursement from Landlord, the Trustee or the holders of the Bonds.

Tenant will cause, at its sole cost and expense, any items of furnishings, machinery and equipment that under the provisions of this Section are to become a part of the Project to be subjected to the lien of the Mortgage and the security interest of the Trustee therein to be perfected.

Tenant will not remove, or permit the removal of, any of the furnishings, machinery and equipment from the Project, except in accordance with the provisions of the Construction Loan Agreement, this Section or Section 10.2 hereof.

Tenant's right under this Section to remove from the Project furnishings, machinery and equipment constituting a part of the Project is intended only to permit Tenant to maintain the Project in an efficient condition by the removal of such furnishings, machinery and equipment no longer suitable to Tenant's use of the Project for any of the reasons set forth in this Section, and such right is not to be construed to permit a removal under any other circumstances and specifically is not to be construed to permit Tenant to make a wholesale removal of such furnishings, machinery and equipment. In addition, to the extent any provision of this Article X hereof conflicts with a similar provision of the Construction Loan Agreement or the Mortgage, the provisions of the Construction Loan Agreement or Mortgage shall be controlling.

Section 10.2    Alteration of Project. Tenant shall have and is hereby given the right at its sole cost and expense, to make such additions, changes and alterations in and to any part of the Project as Tenant from time to time may deem necessary or advisable; provided, however, Tenant shall not make any addition, change or alteration which will adversely affect the structural strength of any part of the Project; and provided further that Tenant shall not make any addition, change or alteration which would change the character of the Project so that the Project would no longer qualify as an "industrial building" under the Act. All additions, charges and

26

√C3596Pg 215

alterations involving an amount in excess of $250,000 must have the prior written consent of the Original Purchaser. All additions, changes and alterations made by Tenant pursuant to the authority of this Section shall (a) be made in a workmanlike manner and in compliance with all laws and ordinances applicable thereto, (b) when commenced, be prosecuted to completion with due diligence without delay or abatement in Tenant's payment of Lease Payments due hereunder, and (c) when completed, be deemed a part of the Project; provided, however, that additions by Tenant to the Project of furnishings, machinery and equipment purchased and installed by Tenant with its own funds (i.e., funds other than the Construction Fund) and not constituting repairs, renewals, or replacements of items constituting a part of the Project shall remain the property of Tenant and may be removed by Tenant at any time during the term of this Lease; provided further, however, that all such additional furnishings, machinery and equipment which remain on the Project Site on the date of termination of this Lease for any cause other than the purchase of the Project pursuant to Section 11.4, 11.5 or 11.6 hereof shall, upon and in the event of such termination, become the separate and absolute property of Landlord.

Section 10.3    Additional Improvements. With the prior written consent of the Original Purchasers, Tenant shall have and is hereby given the right at its sole cost and expense to construct on that portion of the Project Site not occupied by buildings or improvements as of the Completion Date such additional buildings and improvements as Tenant from time to time may deem necessary or advisable, provided, however such additions shall not be made unless the Trustee and the Original Purchaser shall have received a certificate of an independent engineer acceptable to the Trustee stating that such addition or additions will not impair the usefulness of the Project or interfere with ingress thereto or egress therefrom. All additional buildings and improvements constructed on the Project Site by Tenant pursuant to the authority of this Section shall, during the term of this Lease, remain the property of Tenant and may be added to, altered or razed and removed by Tenant at any time during the term of this Lease. Tenant covenants and agrees (a) to make all repairs and restorations, if any, required to be made to the Project because of the construction of, addition to, alteration or removal of such additional buildings or improvements, (b) to keep and maintain such additional buildings and improvements in good condition and repair, ordinary wear and tear and damage by fire or other casualty excepted, (c) to promptly and with due diligence either raze and remove from the Project Site in a good and workmanlike manner, or repair, replace or restore such additional buildings or improvements as may from time to time be damaged by fire or other casualty, and (d) that all additional buildings and improvements constructed by Tenant on the Project Site pursuant to this Section which remain in place on the Project Site on the date of termination of this Lease for any cause other than the purchase of the Project pursuant to Section 11.4, 11.5 or 11.6 hereof shall, upon and in the event of such termination, become the separate and absolute property of Landlord.

Section 10.4    Granting of Easements. At the request of Tenant, if it is not in default under this Lease beyond any applicable grace period, Landlord will grant such easements, licenses, rights-of-way (including the dedication of public highways) and other rights or privileges in the nature of easements with respect to real estate constituting part of the Project Site, free from any statutory mortgage lien or the lien of the Mortgage, or release such existing easements, licenses, rights-of-way and other rights or privileges, with or without consideration, as may be requested by Tenant, provided that Tenant files with Landlord the following:

27

vC3596Pg **216**

(a)      A copy of the instrument of grant or release;

(b)      A written application signed by the Authorized Tenant Representative requesting such instrument;

(c)      Written consent of the Original Purchaser to such grant or release;

(d)      A certificate signed by the Authorized Tenant Representative stating that no Event of Default has occurred; and

(e)      A certificate, dated within thirty (30) days of the filing of the application required by subsection (b) hereof, of an architect or engineer reasonably acceptable to the Landlord and the Trustee expressing the opinion that such grant or release will not interfere with or impair the effective use of or interfere with the operation of the Project, will not destroy or materially impair the means of ingress to and egress from the Project Site and the Project and will not materially adversely affect the value of the Project or the Project Site.

Thereupon Landlord will promptly execute and deliver and cause and direct the Trustee to execute and deliver any and all instruments necessary or appropriate to confirm and grant any such easement, license, right-of-way or other right or privilege and to release the same from any lien with respect thereto.

Unless Tenant, with consent of Trustee and Original Purchaser, elects otherwise, all consideration paid by the grantee of such easements for same shall be deposited in the Bond Fund for the benefit of the Bondholders and for redemption of the maximum possible portion of the aggregate principal amount of the Bonds then outstanding and redeemable with such amount, pursuant to the Tenant's obligation to prepay Basic Rent in part under the terms of the last two paragraphs of Section 11.2 hereof.

[End of Article X]

## ARTICLE XI

## OPTIONS AND OBLIGATIONS TO COMPEL REDEMPTION OR
## PURCHASE OF BONDS AND TO PURCHASE PROJECT

Section 11.1  Option of Tenant to Compel Redemption of Bonds. The Tenant shall have, and is hereby granted, the option to prepay the Basic Rent in full or in part in the amounts and at the times permitted for the optional redemption of Series 2007 Bonds set forth in Section 4.01(c) of the Indenture. To exercise the option granted in this paragraph, the Tenant shall, on or before the 10th Business Day preceding the date established for prepayment, give written notice to the Landlord and the Trustee of its intention to prepay the Basic Rent in full or in part on such Interest Payment Date pursuant to this paragraph, and shall specify therein the principal amount of the Bonds to be redeemed with the moneys received upon such prepayment and the applicable prepayment price as provided in the Indenture. The exercise of such option to prepay the Basic Rent in full or in part shall also constitute an election by the Landlord to call for redemption, on the same date as the Basic Rent prepayment date, an equivalent portion of the principal amount of the Bonds outstanding on such date. The prepayment price which shall be paid to the Trustee by the Tenant in the event of its exercise of the option granted in this paragraph shall be an amount equal to the principal amount of the Bonds to be redeemed, plus accrued interest thereon to the redemption date, plus any premium required under the Indenture, plus (in the case of prepayment of the Basic Rent in full) all fees and expenses of the Trustee, the Registrar and any Paying Agents accrued and to accrue through such redemption date.

Section 11.2  Option of Tenant to Compel Extraordinary Redemption of Bonds. The Tenant shall have, subject to the conditions hereinafter imposed, the option to prepay the Basic Rent in full and to direct the prepayment of the entire unpaid principal balance of the Series 2007 Bonds in accordance with the applicable provisions of the Indenture if as a result of any changes in the Constitution of the Commonwealth of Kentucky, the Constitution of the United States of America, or state or Federal laws or as a result of legislative or administrative action (whether state or Federal) or by final decree, judgment or order of any court or administrative body (whether state or Federal) entered after the contest thereof by the Landlord or the Tenant in good faith, this Lease shall have become void or unenforceable or impossible of performance in accordance with the intent and purpose of the parties as expressed in this Lease, or if unreasonable burdens or excessive liabilities shall have been imposed with respect to the Project or the operation thereof, including, without limitation, Federal, state or other ad valorem, property, income or other taxes not being imposed on the date of this Lease other than ad valorem taxes presently levied upon privately owned property used for the same general purpose as the Project.

To exercise that option, the Tenant shall, within ninety (90) days following the event authorizing the exercise of such option, give notice to the Landlord and to the Trustee specifying the date on which the Tenant will deliver the funds required for that redemption which date shall be not more than ninety (90) days from the date that notice is mailed and shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption. The giving of such prepayment notice shall also constitute giving of notice by the Landlord of its call

29

√C3596Pg 218

for redemption. The foregoing option may be exercised whether or not the Tenant is in default hereunder; provided, that such default will not relieve the Tenant from performing those actions which are necessary to exercise any such right or option granted hereunder.

The amount payable by the Tenant in the event of its exercise of the option granted in this Section shall be the sum of the following:

(i)     An amount of money which, when added to the moneys and investments held to the credit of the Bond Fund, will be sufficient pursuant to the provisions of the Indenture to pay, at par, and discharge all then outstanding Series 2007 Bonds on the earliest applicable redemption date that amount to be paid to the Trustee, plus

(ii)     An amount of money equal to the Additional Rent relating to the Series 2007 Bonds accrued and to accrue until actual final payment and redemption of the Series 2007 Bonds, that amount or applicable portion thereof to be paid to the Trustee or to the Persons to whom those Additional Rent payments are or will be due.

The requirement of (ii) above with respect to Additional Rent to accrue may be met if provisions satisfactory to the Trustee and the Landlord are made for paying those amounts as they accrue.

The Tenant also shall have the option, exercisable as provided above in this Section, in the event that title to or the temporary use of a portion of the Project shall be taken under the exercise of the power of eminent domain, even if the taking is not of such nature as to permit the exercise of the redemption option upon an event specified in Section 11.4(b) hereof, to direct the redemption, at a redemption price of 100% of the principal amount thereof prepaid, plus accrued interest to the redemption date, of that part of the outstanding principal balance of the Series 2007 Bonds as may be payable from the proceeds (after the payment of costs and expenses incurred in the collection thereof) received in the eminent domain proceeding, provided, that, the Tenant shall furnish to the Landlord, the Original Purchaser and the Trustee a certificate of an independent architect or engineer stating that (1) the property comprising the part of the Project taken is not essential to continued operations of the Project in tile manner existing prior to that taking, (2) the Project has been restored to a condition substantially equivalent to that existing prior to the taking, or (3) other improvements have been acquired or made which are suitable for the continued operation of the Project, which, in the opinion of counsel to the Tenant, are subject to the lien of the Mortgage and which are included in the opinion of title delivered to the Trustee.

The Tenant shall be deemed to have prepaid the Basic Rent in part upon and in the amount of (a) the election by the Tenant to deposit into the Bond Fund the proceeds of the sale of furnishings, machinery or equipment pursuant to Section 10.1(b) hereof, (b) the deposit into the Bond Fund of consideration received for the granting of easements pursuant to Section 10.4 hereof, or (c) the deposit into the Bond Fund of the purchase price upon the Tenant's exercise of any of the options to purchase the Project pursuant to Section 11.4 hereof within thirty (30) days after the event giving rise to such prepayment, the Tenant shall give written notice to the

30

## vC3596Pg 219

Landlord, the Original Purchaser and the Trustee, and shall specify therein the event giving rise to such prepayment, the prepayment price as provided in this Section and the date of such prepayment, which date shall be not less than ten (10) Business Days nor more than sixty (60) calendar days from the date such notice is mailed to the Trustee, the Original Purchaser and the Landlord. The giving of such prepayment notice shall also constitute the giving of notice by the Landlord of its call for redemption, on the same date as the Basic Rent prepayment date, of an equivalent portion of the principal amount of the Bonds outstanding on such date. If the Tenant fails to give any notice required to be given by it under this Section, the Trustee may specify the date for prepayment of the Basic Rent and redemption of such portion of the Bonds.

The prepayment price which shall be paid to the Trustee by the Tenant under the preceding paragraph shall be an amount of money equal to that amount which will redeem the maximum portion of the principal amount of the Bonds outstanding out of such proceeds, plus accrued interest thereon to the redemption date.

Section 11.3    Options to Terminate the Lease. Notwithstanding any other provisions of this Lease, Tenant shall have the following options to terminate the Lease:

(a)    before Payment in Full of the Bonds, Tenant may terminate this Lease, subject to any limitations on optional prepayment under Section 11.1 hereof, by giving the Landlord notice in writing of such termination and by paying to the Trustee an amount of money which, when added to the moneys in the Bond Fund will be sufficient to pay, retire and redeem all of the outstanding Bonds in accordance with the provisions of the Indenture (including, without limiting the generality of the foregoing, principal, interest to maturity or earliest applicable redemption date, as the case may be, redemption premium (if any), expenses of redemption and the Trustee's and paying agents' fees and expenses), and, in case of redemption, making arrangements satisfactory to the Trustee for the giving of the required notice of redemption; or

(b)    after Payment in Full of the Bonds, the Tenant may terminate the Lease by giving the Landlord notice in writing of such termination and such termination shall forthwith become effective.

Section 11.4    Option to Purchase Project Under Certain Conditions. Tenant shall have, and is hereby granted, the option to purchase the Project prior to the expiration of the Lease and prior to Payment in Full of the Bonds, if any of the following events shall have occurred:

(a)    the Project shall have been damaged or destroyed to such an extent that, in the judgment of the Tenant, (i) it cannot be reasonably restored within a period of twelve (12) consecutive months to the condition thereof immediately preceding such damage or destruction, or (ii) Tenant is thereby prevented from carrying on its normal operations at the Project for a period of twelve (12) consecutive months;

(b)    Title to, or the temporary use of, all or a substantial portion of the Project shall have been taken under the exercise of the power of eminent domain by any governmental authority, or person, firm or corporation acting under governmental

31

## vC3596Pg 220

authority, (i) to such extent that the Project cannot reasonably be restored within a period of twelve (12) months to a condition of usefulness comparable to that existing prior to such taking, or (ii) if such taking results in the Tenant being thereby prevented from carrying on its normal operations at the Project for a period of twelve (12) months.

To exercise any such option, the Tenant shall within ninety (90) days following the event giving rise to such option, give written notice to the Landlord, the Original Purchaser and the Trustee, and shall specify therein the date of closing such purchase, which date shall be not less than ten (10) Business Days nor more than ninety (90) days from the date such notice is mailed, and shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption. The purchase price which shall be paid to the Trustee by the Tenant upon its exercise of the option granted in this Section shall be an amount of money equal to the principal amount of the Bonds outstanding, plus accrued interest thereon to the redemption date, plus all fees and expenses of the Trustee and any paying agents accrued and to accrue through such redemption date.

Section 11.5 <u>Obligation to Purchase Project</u>. Anything herein to the contrary notwithstanding, Tenant agrees to purchase, and the Landlord agrees to sell, the Project for ONE DOLLAR ($1.00) at the expiration of this Lease as provided in Section 3.1 hereof or upon sooner termination of this Lease, whether by reason of an Event of Default pursuant to Article XVII hereof or otherwise, following Payment in Full of the Bonds. The obligation and right of Tenant specified in this Section may be exercised whether or not there exists an Event of Default hereunder, provided that the existence of such Event of Default and/or termination will not result in nonfulfillment of any condition to this right and obligation.

Section 11.6 <u>Conveyance on Purchase</u>. At the closing of the purchase pursuant to the exercise of any option or obligation to purchase set forth herein, the Landlord will upon receipt of the purchase price deliver to the Tenant the following:

(a)   A release by the Trustee, pursuant to Section 7.1 hereof, from any lien or security interest Landlord has in the property with respect to which such purchase is being consummated; and

(b)   Documents conveying to the Tenant good and marketable fee simple title in and to the property with respect to which such purchase is being consummated, as such property then exists, subject to the following: (i) those liens, security interests and encumbrances (if any) to which such title in and to said property was subject when conveyed to the Landlord, (ii) those liens, security interests and encumbrances created by the Tenant or to the creation or suffering of which the Tenant consented, (iii) those liens, security interests and encumbrances resulting from the failure of the Tenant to perform or observe any of its agreements contained herein, (iv) Permitted Encumbrances, and (v) if such purchase is consummated pursuant to the exercise of an option granted in Section 1 1.4(b), the rights and title of the condemning authority;

provided that, title to the Project and shall be transferred to the Tenant as provided in Section 6.3 of the Mortgage.

√C3596Pg **221**

Section 11.7   <u>Relative Position of Options and Indenture</u>. The options granted to the Tenant in this Article may be exercised whether or not there exists an Event of Default hereunder; provided that (i) if an Event of Default has occurred hereunder or under the Construction Loan Agreement, the option to purchase shall be exercisable only by the Trustee; and (ii) the existence of such Event of Default will not result in nonfulfillment of any condition to the exercise of any such option and that exercise of such option will not relieve the Tenant from performing those actions which are necessary to exercise such option.

Section 11.8   <u>Actions by Issuer</u>. At the request of the Tenant or the Trustee, the Landlord shall take all steps required of it under the applicable provisions of the Indenture or the Series 2007 Bonds to effect the redemption of all or a portion of the Series 2007 Bonds pursuant to this Article XI.

[End of Article XI]

√C3596 Pg222

## ARTICLE XII

## DAMAGE, DESTRUCTION AND CONDEMNATION

Section 12.1   <u>Damage and Destruction</u>. Unless Tenant shall have elected to exercise its option to purchase the Project pursuant to the provisions of Section 11.4(a) hereof, if prior to Payment in Full of the Bonds, the Project is destroyed (in whole or in part) or is damaged by fire or other casualty and Tenant is not in default hereunder, Tenant (i) shall promptly replace, repair, rebuild or restore the property damaged or destroyed to substantially the same condition as existed prior to the event causing such damage or destruction, with such changes, alterations and modifications (including the substitution and addition of other property) as Tenant may deem necessary with the prior approval of the Trustee, for proper operation of the Project, and (ii) Tenant and Trustee will apply for such purpose so much as may be necessary of any Net Proceeds of insurance resulting from claims for losses, under the insurance policies required to be carried herein, resulting from such damage, subject to the approval of the Original Purchaser so long as the Construction Loan Agreement shall be in full force and effect, and upon and subject to the disbursement procedure and conditions provided in the Construction Loan Agreement. In the event that the Tenant is in default hereunder, all proceeds of insurance, at the election of the Trustee, shall be applied to prepay Basic Rent as the Trustee in its sole discretion and in accordance with related documents, may determine.

All Net Proceeds of insurance resulting from claims for losses not in excess of $300,000 shall be paid to the Tenant by the Trustee, assuming the Tenant acts to promptly repair, replace, rebuild or restore the damaged property. All Net Proceeds of insurance resulting from claims for losses in excess of $250,000 shall be paid to and held by the Trustee in a separate disbursement account, and the Trustee will apply so much as may be necessary of the Net Proceeds of such insurance to payment of the costs incurred by the Tenant for the replacement, repair, rebuilding or restoration of the Project, either on completion thereof or as the work progresses, as directed by the Tenant and approved by the Original Purchaser in writing. Disbursements will be made in the same manner as disbursements from the Construction Fund under Section 8.1 hereof. In the event any Net Proceeds of insurance will be insufficient to pay in full the costs of replacement, repair, rebuilding or, restoration under this Section, as determined by an independent architect or engineer approved by the Trustee, then the Tenant prior to commencing such replacement, repair, rebuilding or restoration shall pay to the Trustee for deposit in a separate disbursement account an amount equal to such deficiency, which deposit shall first be exhausted before any disbursement of the Net Proceeds of insurance. Tenant shall not, by reason of the payment of such deficiency, be entitled to any reimbursement from the Trustee or the Landlord or any abatement or diminution of payments under this Lease or the Reimbursement Agreement.

Any moneys held by the Trustee in the separate disbursement account under the provisions of the preceding paragraph shall, at the written request of the Authorized Tenant Representative, be invested by Trustee in Eligible Investments, as provided in the Indenture; provided however that Tenant shall be solely responsible for any losses resulting from any such investments.

34

vC3596Pg 223

Any balance of such Net Proceeds remaining after payment of all the costs of replacement, repair, rebuilding or restoration under this Section shall be deposited in the Bond Fund, provided no Event of Default has been declared hereunder.

If upon any damage to or destruction of the Project Tenant elects pursuant to the provisions of Section 11.4(a) to purchase the Project rather than replace, repair, rebuild or restore the property damaged or destroyed, all Net Proceeds of insurance shall be applied to prepayment of the Basic Rent, and any balance remaining after such prepayment shall be paid to Tenant.

Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default under this Lease, Trustee may apply any Net Proceeds of insurance received by it pursuant to the provisions of this Lease to partial or full prepayment of the Basic Rent, or to costs of replacement, repair, rebuilding or restoration of the Project, or to any combination of the foregoing, as Trustee, may elect.

Section 12.2    Condemnation. Unless Tenant shall exercise its option to purchase the Project pursuant to the provisions of Section 11.4(b), if the title in and to, or the temporary use of, the Project or any part thereof shall be taken under the exercise of the power of eminent domain by any governmental body or by any other person acting under governmental authority, Tenant shall be obligated to continue to pay the Lease Payments required to be paid by Tenant under Article IV hereof Landlord, Tenant and the Trustee will cause the Net Proceeds received by them or any of them, from any award made in such eminent domain proceedings, to be paid to and held by Trustee in a separate disbursement account to be applied in one or more of the following ways as shall be directed in writing by Tenant and approved in writing by the Original Purchaser:

(a)    The modification or restoration of the improvements located on the Project Site, or the acquisition, by construction, installation or otherwise, by Tenant of buildings, machinery, equipment, fixtures or other improvements on the Project Site, all to the extent deemed appropriate by Tenant for its uses and purposes; provided that, at a minimum, the Project as so modified, restored or acquired shall have a value, as reasonably determined by the Tenant, sufficient to fully secure the then outstanding principal amount of the Bonds, and provided further that the Project as so modified, restored or acquired shall be subject to no liens or encumbrances except Permitted Encumbrances.

(b)    Redemption of the Bonds, together with accrued interest thereon, to the date of redemption; provided, that no part of any such condemnation award may be applied for such redemption unless (i) all of the Bonds are to be redeemed in accordance with the Indenture upon exercise of the option to purchase the Project pursuant to the provisions of Section 11.4(b), or (ii) if less than all of the Bonds are to be redeemed, Tenant shall furnish to Landlord and the Trustee a certificate of the Authorized Tenant Representative stating (1) that the property forming a part of the Project that was taken in such eminent domain proceeding is not essential to Tenant's use or occupancy of the Project, or (2) that the Project has been restored to a condition substantially equivalent to

vC3596Pg **224**

its condition prior to the taking in such eminent domain proceeding, or (3) that improvements have been acquired which are suitable for Tenant's operations at the Project as contemplated by the foregoing subsection (a) of this Section.

(c)     Payment into the Bond Fund of an amount sufficient to permit Payment in Full of the Bonds.

If Tenant elects with the consent of the Original Purchaser to apply any Net Proceeds of any such award in the manner set forth in paragraph (a) above, and the amount of such Net Proceeds will be insufficient to pay in full the costs of such modification, restoration or acquisition, as determined by an independent architect or engineer approved by the Original Purchaser, then prior to commencing any such modification, restoration or acquisition Tenant will deposit the deficiency with Trustee in the separate disbursement account provided for in this Section. Such deposit shall first be applied to the costs of such modification, restoration or acquisition before any Net Proceeds of any such award are so applied. The Tenant will not, by reason of the payment of any excess costs of modification, restoration or acquisition be entitled to any reimbursement from the Tenant or any abatement or diminution of any Lease Payments.

Disbursements of all condemnation proceeds will be made in the same manner as disbursements from the Construction Fund under Section 8.1 hereof.

Within thirty (30) days from the date of entry of a final order in any eminent domain proceedings granting condemnation, Tenant and Original Purchaser shall direct Trustee and the Landlord in writing as to which of the ways specified in this Section Tenant elects to have the condemnation award applied. Any balance of the Net Proceeds of the award in such eminent domain proceedings shall be paid and applied in the same manner as specified in Section 12.1 hereof for excess Net Proceeds of insurance.

Any moneys held by Trustee under the provisions of the preceding paragraph shall, at the written request of the Authorized Tenant Representative, be invested or reinvested by Trustee in Eligible Investments, as provided in the Indenture; provided however that Tenant shall be solely responsible for any losses resulting from any such investments.

Notwithstanding anything herein to the contrary, upon the occurrence and continuance of an Event of Default under this Lease, Trustee may apply any Net Proceeds of condemnation awards received by it pursuant to the provisions of this Lease to partial or full prepayment of the Basic Rent, or to costs of modification, restoration or acquisition of the Project, or to any combination of the foregoing, as Trustee, may elect.

Section 12.3   Condemnation of Tenant-Owned Property. Tenant shall be entitled to the proceeds of any condemnation award or portion thereof made for damages to or taking of its own property, not purchased with the proceeds of the Bonds, or for damages on account of the taking of or interference with Tenant's rights to possession, use or occupancy of the Project.

[End of Article XII]

√C3596Pg 225

## ARTICLE XIII

### TENANT'S RIGHTS AS TO THE PROJECT

Section 13.1    Use of Premises. Subject to the provisions of this Article, Tenant shall have the right to use the Project for any and all purposes allowed by law and contemplated by the constitution of the Commonwealth and the Act. Tenant shall be treated as the owner of the Project for purposes of federal income taxation, including, without implied limitation, for the purposes of depreciation. Tenant shall comply with all statutes, laws, ordinances, orders, judgments, decrees, regulations, directions and requirements of all federal, state, local and other governments or governmental authorities or agencies, now or hereafter applicable to the Project or to any adjoining public ways, as to the manner of use or the condition of the Project or of adjoining public ways. Tenant shall comply with the mandatory requirements, rules and regulations of all insurers under the policies required to be carried under the provisions of Article IX. Tenant shall pay all costs, expenses, claims, fines, penalties and damages that may, in any manner, arise out of, or be imposed as a result of, the failure of Tenant to comply with the provisions of this Article.

Section 13.2    Assignment and Sublease By Tenant. Except for a Person which is wholly owned by the Tenant or is a successor to the Tenant, Tenant will not assign its rights under this Lease or sublease the Project in whole or in part unless Tenant shall have received the prior written consent of each Original Purchaser, except as permitted by the Construction Loan Agreement, and subject to each of the following conditions:

(a)    no such assignment or sublease shall relieve the Tenant from primary liability for any of its obligations hereunder and under the Bond Purchase Agreement or the Mortgage except for any assignment with respect to a consolidation, merger, dissolution, disposal of assets or transfer of assets, in accordance with the provisions of this Lease in which case the Tenant shall be relieved from liability for any of its obligations hereunder and under the Bond Purchase Agreement and the Mortgage;

(b)    the assignee or sublessee shall assume the obligations of the Tenant hereunder and under the Bond Purchase Agreement and the Mortgage to the extent of the interest assigned;

(c)    the Tenant shall, within ten (10) days after execution thereof, furnish or cause to be furnished to the Landlord and the Trustee a true and complete copy of each instrument evidencing such assignment or sublease;

(d)    the Tenant shall retain such rights and interests as will permit it to comply with its obligations under this Lease, the Mortgage and the Bond Purchase Agreement; and

(e)    no such assignment or sublease shall cause the Project to be in nonconformance with the purposes or provisions of the Act.

ᵥC3596ᴾg 226

[End of Article XIII]

## ARTICLE XIV

## TENANT'S DUTIES AS TO PROJECT

Section 14.1    <u>Repairs and Maintenance</u>. Tenant covenants and agrees with Landlord that Tenant shall during the term of this Lease keep and maintain the Project and all parts thereof in good condition and repair, ordinary wear and tear excepted, including, but not limited to, the furnishing of all parts, mechanisms and devices required to keep the furnishings, machinery and equipment constituting a part of the Project in good mechanical and working order, and that during such period of time it will exercise every reasonable effort to keep the Project and all parts thereof free from filth, nuisance or conditions unreasonably increasing the danger of fire. Tenant shall keep the Project in compliance with all applicable governmental regulations and requirements, and in each case Tenant shall make all replacements and repairs necessary in connection therewith.

Section 14.2    <u>Securing of Permits and Authorizations</u>. Tenant shall neither do nor consent to the performance by any other party of any work in or about the Project or related to any repair, rebuilding, restoration, replacement, alteration of or addition to the Project, or any part thereof, unless Tenant or such other party shall have first procured and paid for all requisite municipal and other governmental permits and authorizations. All such work shall be done in a good and workmanlike manner and in compliance with all applicable building, zoning, environmental and other laws, ordinances, governmental regulations and requirements and in accordance with the requirements, rules and regulations of all insurers under the policies required to be carried under the provisions of Article IX.

Section 14.3    <u>Mechanics' Liens</u>. Tenant shall not suffer or permit any mechanics' liens to be filed or exist against the Project, or against any payment to be made under this Lease, by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Project or the Project Site or any part thereof through or under Tenant. If any such mechanics' liens shall at any time be filed, Tenant shall, within thirty (30) days after notice of the filing thereof, cause or require the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise; provided that if Tenant in good faith and by appropriate legal action shall contest the validity of any such mechanic's lien, or the amount thereof, then Tenant shall not be required to discharge such mechanic's lien so long as the contest is maintained and prosecuted with diligence, and shall not have been terminated or discontinued adversely to Tenant. Notwithstanding the foregoing, if either the Landlord or the Original Purchaser notifies Tenant that, in the opinion of counsel selected by it, by nonpayment of or failure to bond off or discharge any such mechanic's lien, the statutory mortgage lien or the lien of the Mortgage as to any part of the Project will be materially affected or the Project or any part thereof will be subject to imminent loss or forfeiture, Tenant shall promptly discharge such mechanic's lien.

[End of Article XIV]

38

vC3596Pg 227

## ARTICLE XV

### FURTHER COVENANTS OF TENANT

Section 15.1  <u>Maintenance of Existence and Ownership of Tenant</u>. During the term of this Lease, the Tenant shall maintain its existence and will not consolidate with or merge into any other Corporation, or permit any other Corporation to consolidate with or merge into it, and shall not dissolve or otherwise dispose of or transfer all or a major portion of its assets without the consent of the Original Purchaser.

If a transfer of assets, consolidation or merger is made as provided in this Section, the provisions of this Section shall continue in full force and effect and no further such transfer of assets, consolidation or merger shall be made except in compliance with the provisions of this Section.

No transfer of assets, consolidation or merger shall be permitted hereunder unless the surviving entity shall assume all the obligations created hereunder and under all of the other documents relative to the Bonds in a manner satisfactory to the Trustee.

Section 15.2  <u>Investment of Construction Fund and Bond Fund Moneys</u>. Any moneys held as part of the Construction Fund or the Bond Fund shall, at the oral or written request of the Authorized Tenant Representative, be invested or reinvested by the Trustee in Eligible Investments, as specified in the Indenture. Any oral request for the investment of moneys shall be promptly confirmed in writing by the Authorized Tenant Representative.

Section 15.3  <u>Additional Instruments</u>. Tenant agrees to prepare, execute, submit to Landlord and the Trustee for execution by them where necessary, and record financing statements or amendments thereto with respect to all furnishings, machinery and equipment and meeting the requirements of the Uniform Commercial Code of the Commonwealth (a) prior to the issuance and sale of the Bonds, describing in detail the furnishings, machinery and equipment constituting a part of the Project, including the brand name, model number and serial number where available, and (b) from time to time thereafter following any material changes in the furnishings, machinery and equipment, describing such material changes.

Section 15.4  <u>Opinion to be Provided</u>. Prior to December 1, 2012 and December 1 of each fifth (5th) year thereafter until Payment in Full of the Bonds, and at such other times as the Trustee shall reasonably request, the Tenant shall on behalf of the Landlord cause to be delivered to the Trustee an opinion of counsel, who may be counsel for the Tenant, addressed to the Landlord and the Trustee and stating that based upon the law in effect on the date of such opinion, no filing, registration or recording and no refiling, reregistration or rerecording of the Indenture or any assignment or any amendments or supplements thereto, or any financing statement, amendments thereto, continuation statements or instruments of a similar character relating to the pledges and assignments made by the Landlord or the Tenant to secure the Bonds, is required by law during the one year period commencing, on the next following December 1, in order to fully preserve and protect the security of the Trustee and the rights of the Trustee under the Indenture, or if such filing, registration, recording, refiling, reregistration or rerecording is

39

√C3596Pg **228**

necessary, setting forth the requirements in respect thereto. The Tenant with such assistance and cooperation from the Landlord as the Tenant may reasonably request, shall take or cause to be taken all action necessary to satisfy any such requirements. Promptly after any filing, registration, recording, refiling, reregistration or rerecording of any such agreement or instrument, the Tenant on behalf of the Landlord will deliver to the Trustee an opinion of counsel, who may be counsel for the Tenant, to the effect that such filing, registration, recording, refiling, reregistration or rerecording has been duly accomplished and setting forth the particulars thereof.

Section 15.5   Indemnity. The Tenant releases the Landlord, the Original Purchaser, and the Trustee from, agrees that the Landlord, the Original Purchaser and the Trustee shall not be liable for, and indemnifies the Landlord, the Original Purchaser and the Trustee against, all liabilities, claims, costs and expenses imposed upon or asserted against any of them on account of:

(a)   any loss or damage to property or injury to or death of or loss by any person that may be occasioned by any cause whatsoever pertaining to the construction, maintenance, operation and use of the Project;

(b)   any breach or default on the part of the Tenant in the performance of any covenant or agreement of the Tenant under this Lease, the Mortgage, the Bond Purchase Agreement or any related document, or arising from any act or failure to act by the Tenant, or any of its agents, contractors, servants, employees or licensees;

(c)   the authorization, issuance and sale of the Series 2007 Bonds, and the provision of any information furnished in connection therewith concerning the Project or the Tenant, but excluding information furnished by the Landlord, the Trustee or the Original Purchaser; and

(d)   any claim, action or proceeding with respect to the matters set forth in (a), (b) and (c) above brought thereon; provided, however, that the Tenant shall not be required to indemnify the Landlord, the Original Purchaser or the Trustee for any such liability claims, costs and expenses which result from the negligence or willful misconduct of the Trustee or the Original Purchaser, or the gross negligence or willful misconduct of the Landlord, respectively.

The Tenant agrees to indemnify the Trustee for and to hold harmless against all liabilities, claims, costs and expenses incurred without negligence or willful misconduct on the part of the Trustee, on account of any action taken or omitted to be taken by the Trustee in accordance with the terms of this Lease, the Bonds, the Mortgage or the Indenture or any action taken at the request of or with the consent of the Tenant, including the costs and expenses of the Trustee in defending itself against any such claim, action or proceedings brought in connection with the exercise or performance of any of its powers or duties under this Lease, the Series 2007 Bonds, the Indenture or the Mortgage.

40