## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | : | Case No. 10-21162 |
| | : | |
| **BUTTERMILK TOWNE CENTER, LLC,** | : | Chapter 11 |
| | : | |
| **Debtor** | : | Honorable Judge Wise |
| | : | |

---

### DEBTOR'S MOTION FOR ORDERS (A) APPROVING BID PROCEDURES, NOTICE OF SALE, AND NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (B) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

---

Buttermilk Towne Center, LLC, as debtor and debtor-in-possession (the "Debtor"), pursuant to Sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, moves the Court for entry of orders authorizing and approving an auction process for the sale of substantially all of the Debtor's assets. Specifically, the Debtor requests entry of orders: (a) approving the Debtor's proposed Bid Procedures, notice of sale, and notice of assumption and assignment of executory contracts and unexpired leases (the "Bid Procedures Order"); and (b) approving the sale of substantially all of the Debtor's assets, the Debtor's assumption and assignment of executory contracts and unexpired leases, and the Debtor's maintenance of the Tax Abatement (the "Sale Order"). The Debtor believes the process described in this Motion and the resulting Transaction will maximize the value of its estate for the benefit of all of its constituents.

**Jurisdiction and Venue**

1.      The Court has jurisdiction over this Motion and this Chapter 11 case under

28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2)(A), (N), and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3.      On April 28, 2010 (the "Petition Date"), the Debtor filed a voluntary

petition for relief with this Court under Chapter 11 of Title 11 of the United States Code

(the "Bankruptcy Code").  The Debtor operates its business as a debtor in possession

pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has

been appointed in this Chapter 11 case, and no creditors' committee or other official

committee has been appointed.

4.      The Debtor is the owner and operator of a commercial real estate

development (the "Project"), known as Buttermilk Towne Center, located in Crescent

Springs, Kenton County, Kentucky.[1]

5.      The City of Crescent Springs, Kentucky (the "City") is the fee owner of

the real estate (the "Land") upon which the Project's improvements are constructed.  The

City issued Taxable Industrial Building Revenue Bonds, Series 2007 (the "Bonds") to

finance the acquisition of the Land and the construction of the Project.  Pursuant to an

Amended and Restated Agreement of Lease (the "Lease") dated December 1, 2007,

amending and restating an Agreement of Lease dated August 1, 2004, the City leased the

---

[1] A more detailed overview of the Debtor's business and the events leading to the commencement of this
Chapter 11 case can be found in the Affidavit of Timothy S. Baird in Support of Chapter 11 Petition and
First Day Motions (Doc. No. 9).

Land to the Debtor.   The Lease has a 25-year term, coterminous with the term of the Bonds, expiring December 31, 2032.

6.      The City and Bear Creek Capital, LLC are parties to a Development Agreement dated May 4, 2004 related to the Project, the Land, and the development of the Land.

7.      Provided that the Bonds remain outstanding, the leasehold interest in the Land and the Project is exempt from City, Kenton County School District (the "School District") and Kenton County Public Library (the "Library") real estate ad valorem taxes pursuant to Kentucky law (the "Tax Exemptions").

8.      Simultaneously with the issuance of the Bonds by the City for the benefit of the Debtor, the Debtor agreed to make annual PILOT payments (payments in lieu of taxes) for the term of the Bonds to (i) the City and School District, pursuant to the Agreement in Lieu of Taxes dated November 19, 2007 by and among the Debtor, the City and the School District and (ii) the Library, pursuant to the Agreement in Lieu of Taxes dated December 17, 2007 by and between the Debtor and the Library (collectively, the "PILOT Agreements").  The Tax Exemptions and the PILOT Agreements at their current assessment levels are collectively referred to as the "Tax Abatement."

9.      Bank of America, N.A. (the "Bondholder") purchased the Bonds.  The Bonds are secured by an Amended and Restated Trust Indenture dated December 1, 2007 between the City and U.S. Bank, N.A., as trustee for the holders of the Bonds (the "Indenture Trustee").

10.      Since the Petition Date, the Debtor has operated its business by using cash collateral pursuant to orders of this Court.   The Debtor originally intended to formulate a

plan of reorganization that would pay its creditors over time.  However, following significant negotiations with the Bondholder, the Debtor determined that a sale process will maximize the estate's value for the benefit of all of the Debtor's creditors and interest-holders.

## The Proposed Transaction

11.     The Debtor proposes to sell substantially all of its assets and/or Bonds (the "Purchased Assets") consistent with the terms set forth in the form of asset purchase agreement (the "APA") attached to this Motion as Exhibit A.  Any capitalized terms not otherwise defined in this Motion have the meanings set forth in the APA.

12.     The APA contemplates the Debtor's sale of the Purchased Assets, the maintenance of the Tax Abatement, and the assumption and assignment of the Assumed Contracts and Leases identified in the APA (collectively, the "Transaction").

13.     To maximize the Assets' value, the APA requires a sale process to solicit offers for the Assets.  The Debtor seeks approval of the Bid Procedures described in the APA and in this Motion to solicit such offers.  The Debtor will conduct an auction (the "Auction") to determine the highest, best offer.

### *The Bid Procedures*

14.     The Debtor has summarized its proposed bid procedures (the "Bid Procedures") in this section.  The Bid Procedures are more specifically described in Schedule 1.6 to the APA.  The Debtor believes these Bid Procedures will ensure that the Debtor has the opportunity to consider all reasonable offers and to select the highest, best offer.

15.     In order to interpose a bid for the Assets, a potential bidder must become a

"Qualified Bidder" by delivering an executed confidentiality agreement in the form

attached to the APA and any financial information the Debtor reasonably requests,

including information establishing the potential bidder's ability to place and consummate

a Qualified Bid.

16.     Qualified Bidders shall be entitled to participate in the bidding and auction

process, as follows:

    a.   Qualified Bidders must deliver all Qualified Bid Documents to the
Debtor and the Bondholder on or before 5:00 p.m. (EST) on October 14, 2011 (the "Bid
Deadline").

    b.   The Debtor shall conduct an Auction at the offices of Taft
Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202 at
10:00 a.m. (EST) on October 17, 2011 (the "Auction Date").  The Auction Date may be
extended by the Debtor and the Bondholder.

    c.   During the Auction, bidding will begin at the purchase price stated
in the Auction Starting Bid, and the first bid thereafter shall be at least $100,000 higher
than the starting bid.  All subsequent bids will be made in increments of at least
$100,000.

    d.   Bondholder shall have the right but not the obligation pursuant to
Section 363(k) of the Bankruptcy Code to credit bid up to $23 million.

    e.   As soon as practicable after the Auction, the Debtor and the
Bondholder shall review and evaluate each Qualified Bid on the basis of the financial and
contractual terms and factors relevant to the sale process, including those factors
affecting the speed and certainty of consummating the Sale.  The highest and best bid
shall be referred to as the "Successful Bid," and the bidder making such bid shall be
referred to as the "Successful Bidder."  The second best bid shall be referred to as the
"Runner-up Bid," and the bidder making such bid shall be referred to as the "Runner-up
Bidder."  The Debtor shall present the Successful Bid and the Runner-up Bid to the
Bankruptcy Court for approval; provided, however, that if Bondholder is the Successful
Bidder, Bondholder, in lieu of closing the purchase, may elect relief from the automatic
stay by filing with the Bankruptcy Court a notice of its election, and, upon filing notice of
this election, Bondholder shall be granted relief from the automatic stay effective
immediately upon filing and without further order of the Bankruptcy Court.  In the event
that the Successful Bidder or Runner-up Bidder shall fail to consummate the Sale, the
respective Transaction Deposit shall be forfeited to Bondholder and unrefundable.

f.    If (a) no Qualified Bids are received in accordance with the Bid Procedures by October 15, 2011, or (b) the Successful Bidder or Runner-up Bidder fail to consummate the Sale, Bondholder shall have the option of either being deemed the purchaser of the Purchased Assets by making a credit bid in the amount of $18,000,000 or proceeding by way of relief from stay by filing with the Bankruptcy Court a notice of its election to proceed by way of stay relief, and upon filing notice of this election, Bondholder shall be granted relief from the automatic stay effective immediately upon filing and without further order of the Court.

17.    The Debtor requests that the Court schedule a hearing to approve the sale (the "Sale Hearing") on October 19, 2011 or such date thereafter that is convenient for the Court.  The Debtor believes that the schedule it proposes will permit potential bidders to conduct reasonable due diligence and interpose competitive bids for the Purchased Assets.

18.    The Debtor believes the Bid Procedures are fair and reasonable and will ensure that the sale process maximizes the value of the Debtor's estate.  Accordingly, the Debtor requests that the Court enter the Bid Procedures Order.

### *Executory Contracts and Unexpired Leases*

19.    No later than seven days prior to the Sale Hearing, the Debtor shall provide notice to all counterparties to executory contracts and unexpired leases that may be assumed and assigned to the Purchaser (the "Assumption and Cure Notice").  The Assumption and Cure Notice shall provide counterparties notice of the amount the Debtor believes must be cured upon assumption and assignment pursuant to Section 365 of the Bankruptcy Code.  A copy of the proposed Assumption and Cure Notice is attached to this Motion as Exhibit B.

20.    The proposed form and manner of the Assumption and Cure Notice is reasonably calculated to provide interested parties with timely, proper notice of (i) the title of the contract or lease to be assumed and assigned; (ii) the name of the counterparty

12330868.1

6

to such contract or lease; (iii) any applicable cure amount; and (iv) the deadline by which the counterparty must object.  The Debtor submits that no other notice is required.

21.    Except as otherwise provided in the APA or agreed to by the parties to an assumed contract or lease, the Purchaser shall pay the cure amounts in cash.  In the event of a dispute regarding the cure amount for an assumed contract or lease, the Purchaser shall make any required payments as soon as practicable after entry of a final order resolving the dispute.

22.    The Debtor requests the Court require objections, if any, to the proposed Transaction, including objections to the Debtor's proposed assumption and assignment of contracts and leases objections and the proposed cure amounts and adequate assurances of future performance, (a) be in writing; (b) state with specificity the nature of the objection and the alleged cure amount; (c) include any documentation supporting the alleged cure amount; and (d) be filed with the Court and served on counsel to the Debtor (Taft Stettinius & Hollister LLP, Attn: Timothy J. Hurley, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202), counsel to the Bondholder (Buchanan Ingersoll & Rooney PC, Attn: Timothy P. Palmer, One Oxford Centre, 301 Grant Street, 20th Floor, Pittsburgh, PA 15219), and counsel to the United States Trustee (Office of the United States Trustee, Attn: Philip Hanrahan, 100 E. Vine Street, Suite 500, Lexington, KY 40507) by October 17, 2011.  The Debtor requests that any counterparty to an assumed contract or lease who fails to timely file an objection in accordance with this paragraph be deemed to consent to the Transaction and the assumption and assignment of its lease or contract on the terms proposed by the Debtor.

23.     Except as otherwise provided in the APA, the Debtor requests that the Purchaser have ten days following the Court's resolution of any disputes with respect to assumed contracts and leases to determine whether a contract or lease will be assumed and assigned.

### *Effect of the Transaction*

24.     Following the Sale Hearing, the Debtor requests that the Court enter the Sale Order.  Among other things, the Sale Order approves the form and manner of notice of the Transaction, authorizes the Debtor to enter into the APA, approves the Debtor's assumption and assignment of the Assumed Contracts and Leases, and directs the Debtor, the Purchaser, and all parties in interest to take steps reasonably necessary to effectuate the APA, including those steps necessary to maintain the Tax Abatement.

25.     Subject to the terms set forth in the agreed orders granting the Debtor's Fifth and Sixth Motions for Cash Use, the Bondholder has agreed to a "carve out" from its Cash Collateral to pay professional fees and expenses in an amount not to exceed $840,000 (the "Professional Fee Carve-Out") and to release its interest in certain "excess" Cash Collateral (i.e., Cash Collateral after payment of ordinary operating expenses and interest to the Bondholder less the Professional Fee Carve-Out) to be used for the benefit of the estate (the "Excess Cash Collateral") in an amount not to exceed $105,000.

26.     The proceeds from the Sale will, in accordance with the Bankruptcy Code, be paid first to the Bondholder.  Additionally, the APA contemplates the Purchaser paying any cure amounts owed to counterparties of assumed contracts and leases, including amounts owed under the PILOT Agreements.  By negotiating the Excess Cash

12330868.1

Collateral agreement with the Bondholder, the Debtor has attempted to increase the likelihood that other creditors will receive some distribution from the estate, no matter the amount of the Successful Bid.  Accordingly, the Debtor believes the process described in this Motion will generate a fair outcome for all of the Debtor's creditors.

### Relief Requested

27.    The Debtor requests entry of the Bid Procedures Order and the Sale Order substantially in the form attached to this Motion.

### Argument

28.    Section 363 of the Bankruptcy Code permits a debtor in possession to sell property other than in the ordinary course of business following notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts approve the sale of a debtor's assets under Section 363(b) "when a sound business purpose dictates such action."  *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389-390 (6th Cir. 1986).  In making this determination, the Court should consider whether the terms of the proposed sale reflect the highest, best offer for the assets; whether the negotiations for the sale were conducted at arm's length, and whether the sale is in the best interests of the estate.  *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 210 (Bankr. S.D Ohio 2008).

29.    Similarly, a debtor may assume an executory contract where assumption is a reasonable exercise of the debtor's business judgment.  11 U.S.C. § 365(a); *In re Hurricane Elkhorn Coal Corp. II,* 15 B.R. 987, 989 (Bankr. W.D.K.Y. 1981) (stating that the business judgment test requires courts to examine "the impact continued performance under the contract will have on the reorganization attempt of the debtor-in-possession").

### The Sale Process

30.    The proposed Transaction, including the Sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts and Leases, is justified by the circumstances of the Debtor's case.  The Transaction will enable the Debtor to maximize the value of the Project, thus allowing the Debtor to maximize distributions to creditors.

31.    The Debtor believes the process described in this Motion balances the need for an expedient and efficient sale process that maximizes the value of the estate with the need to provide parties in interest ample opportunity to be heard with respect to all aspects of the contemplated Transaction.  The Bid Procedures ensure that the sale of the Purchased Assets will be an arms-length transaction.  With this Court's approval, the Debtor has previously engaged a broker to undertake significant marketing efforts.  The Debtor believes the proposed process will ensure that the price obtained for the Purchased Assets will be fair, will capture the Purchased Assets' value, and will take full advantage of the potential buyer pool.  Accordingly, the Debtor submits that the Transaction contemplated by this Motion serves a sound business purpose and represents a valid exercise of the Debtor's business judgment.

32.    If the Court enters the Bid Procedures Order, the Debtor proposes to serve a copy of the Bid Procedures Order to all parties on the Master Service List filed in this case.  The Debtor believes this notice, along with the Assumption and Cure Notice, will provide sufficient notice to parties in interest of the proposed Transaction.

### The Assumption and Assignment of Contracts and Leases

33.    The Assumed Contracts and Leases are integral to the Transaction.  The Debtor submits that it is an exercise of sound business judgment to assume and assign the

Assumed Contracts and Leases to the Purchaser.  Such assumption and assignment of the

Assumed Contracts and Leases is in the best interests of the Debtor, the estate, and the

Debtor's creditors.  The Debtor further submits that its proposed assumption and

assignment of the Assumed Contracts and Leases satisfies the requirements contained in

Section 365 of the Bankruptcy Code.

34.    Section 365 of the Bankruptcy Code requires a debtor to cure all existing

defaults prior to assuming and assigning an executory contract or unexpired lease.

11 U.S.C. § 365(b)(1), (f)(2).  Additionally, a debtor must provide adequate assurance of

future performance under the assumed contract if the debtor has defaulted under such

contract.  *Id.*  The requirements of "adequate assurance" depend on the facts of a

particular case.  *See, e.g., In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 719 (Bankr.

S.D.N.Y. 2011).

35.    The Bid Procedures require any Qualified Bidder to demonstrate its

financial wherewithal to consummate the Sale—including the payment of cure amounts

owed to counterparties of assumed leases and contracts.  If a party requires it, the

Purchaser will, at the Sale Hearing, demonstrate that its proposed assumption and

assignment of contracts and leases will satisfy Section 365's requirements.

### The "Free and Clear" Sale

36.    The Debtor's proposed Sale Order authorizes the sale of the Assets free

and clear of any interest, including liens, claims, and encumbrances under Section 363(f)

of the Bankruptcy Code, whether such interests are known or unknown, choate or

inchoate, scheduled or unscheduled, recorded or unrecorded, perfected or unperfected,

allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured

or unmatured, material or non-material, disputed or undisputed, whether arising prior or

subsequent to the Petition Date, whether imposed by agreement, understanding, law,

equity or otherwise, including claims otherwise arising under doctrines of successor

liability.  Such interests shall attach to the cash proceeds of the Sale in order of their

priority and with the same validity, force, and effect which they now have, subject to the

Debtor's or any party's claims or defenses with respect to such interests.

37.    Section 363(f) permits a debtor to sell property free and clear of interests

if (a) applicable nonbankruptcy law permits such a sale; (b) the entity with the interest in

property consents; (c) the interest is a lien and the price of the property is greater than the

aggregate value of liens on the property; (d) the interest is in *bona fide* dispute; or (e) the

entity could be compelled to accept a money satisfaction of its interest in a legal or

equitable proceeding.  If a debtor satisfies any one of these factors, a debtor may sell

property free and clear of interests.

38.    The Debtor believes creditors with interests in the Purchased Assets will

consent to the proposed Transaction.  The auction should enable the Debtor to realize the

highest and best offer for the Purchased Assets.  To the extent that creditors do not

consent, the Debtor believes that the proposed Transaction will satisfy one or more of the

other factors enumerated by Section 363(f).

### *Protections Afforded to the Purchaser*

39.    Section 363(m) protects good faith purchasers from untimely reversals or

modifications of transactions with debtors.  The process described in this Motion will

ensure that any purchaser of the Debtor's Purchased Assets will have engaged in an arms-

length transaction with the estate and will therefore be entitled to the protections of

Section 363(m).

### Conclusion

40.     The Debtor submits that the sale process will maximize the value of the

Debtor's estate and that the Transaction furthers the estate's best interest.

**WHEREFORE,** the Debtor requests that the Court enter the Bid Procedures

Order and the Sale Order and grant to the Debtor such other relief as is just.

Dated:  September 2, 2011                    Respectfully submitted,

                                             **TAFT STETTINIUS & HOLLISTER LLP**

                                             By: /s/ Timothy J. Hurley
                                             Timothy J. Hurley (OH 0006458 *Pro Hac Vice*)
                                             Paige Leigh Ellerman (KY 88172)
                                             Beth A. Silvers (KY 92202)
                                             425 Walnut Street, Suite 1800
                                             Cincinnati, OH  45202
                                             (513) 381-2838 (Telephone)
                                             (513) 381-0205 (Facsimile)
                                                       - and -
                                             1717 Dixie Highway, Suite 910
                                             Covington, KY  41011-4704
                                             (859) 331-2838 (Telephone)
                                             hurley@taftlaw.com
                                             ellerman@taftlaw.com
                                             silvers@taftlaw.com

                                             **ATTORNEYS FOR DEBTOR AND
                                             DEBTOR-IN-POSSESSION**

12330868.1                                   13

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing Motion was served on September 2,

2011 via ECF or electronic mail and on September 6, 2011 via first-class mail, postage

prepaid to the parties on the Master Service List.


/s/ Timothy J. Hurley

**Exhibit A: Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of _____, 2011, between _____, a _____or its nominee ("Purchaser"), Buttermilk Towne Center, LLC an Ohio limited liability company ("BTC"), and Bank of America, N.A. ("Bondholder").

WHEREAS, on April 28, 2010, BTC commenced voluntary proceedings in that certain Case No. 10-21162 (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Kentucky, Covington Division (the "Bankruptcy Court"); and

WHEREAS, the City of Crescent Springs, Kentucky (the "City") is the fee owner of that certain parcel of real estate located in Crescent Springs, Kentucky, and more particularly described in Exhibit A hereto (the "Land"); and

WHEREAS, pursuant to an Amended and Restated Agreement of Lease (the "Lease") dated as of December 1, 2007 between the City and BTC, amending and restating an Agreement of Lease dated as of August 1, 2004,  the City leased the Land to BTC; and

WHEREAS, BTC constructed improvements on the Land, known as the Buttermilk Towne Center project (the "Project"); and

WHEREAS, the City issued Taxable Industrial Building Revenue Bonds, Series 2007 (the "Bonds") to finance the acquisition of the Land and the construction of the Project; and

WHEREAS, the Lease has a 25 year term, coterminous with the term of the Bonds, expiring December 31, 2032; and

WHEREAS, the City and Bear Creek Capital, LLC are parties to a Development Agreement dated May 4, 2004 (the "Development Agreement") related to the Project, the Land and the development of the Land; and

WHEREAS, provided that the Bonds remain outstanding, the leasehold interest in the Land and the Project is exempt from City, Kenton County School District (the "School District"), and Kenton County Public Library (the "Library") real estate ad valorem taxes pursuant to Kentucky law (the "Tax Exemptions"); and

WHEREAS, simultaneously with the issuance of the Bonds by the City for the benefit of BTC, BTC agreed to make annual PILOT payments (payments in lieu of taxes) for the term of the Bonds to (i) the City and School District, pursuant to that certain Agreement in Lieu of Taxes dated November 19, 2007 by and among BTC, the City, and the School District, and (ii) the Library, pursuant to that certain Agreement in Lieu of

Taxes dated December 17, 2007 by and between BTC and the Library (collectively, the "PILOT Agreements"); and

WHEREAS, Purchaser may potentially obtain the benefit of the Tax Exemptions and the PILOT Agreements upon assignment by BTC to, and assumption by Purchaser of, BTC's right, title, and interest in and to the Bonds, Lease, and PILOT Agreements; and

WHEREAS, BTC desires to sell, assign, and transfer, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below), which are substantially all of the assets used in its Buttermilk Towne Center Development located in Crescent Springs, Kentucky; and

WHEREAS, Bondholder is willing to sell, assign and transfer to Purchaser all of Bondholder's interest in the Bonds, in accordance with the terms of this Agreement, at Purchaser's option.

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE I

PURCHASE AND SALE

Section 1.1    Purchased Assets.    Subject to the terms and conditions set forth herein, BTC agrees to sell, transfer, assign, and deliver to Purchaser, free and clear of any charge, claim, legal and/or equitable interest, lien, option, pledge, security interest, mortgage, right of first refusal, encumbrance, or other similar restriction (collectively, "Encumbrance") pursuant to Sections 363 and 365 of the Bankruptcy Code, all of BTC's right, title, and interest in and to all of the Purchased Assets.  Subject to the terms and conditions set forth herein, Purchaser agrees to purchase, acquire and accept the Purchased Assets on an "as is, where is" basis and without any representation or warranty on the part of BTC, except as provided in Article IV of this Agreement.  For purposes of this Agreement, "Purchased Assets" means:

(a)    all equipment and machinery, and other tangible assets owned by BTC listed on Exhibit 1.1(a) attached hereto;

(b)    each of those executory contracts and unexpired leases listed on Exhibit 1.1(b) attached hereto (collectively, the "Assumed Contracts and Leases");

(c)    all post-Closing rents, accounts receivable (other than past-due rents), trade accounts and other amounts receivable (other than past-due rents) owed with respect to the Assumed Contracts and Leases and any other post-Closing rights to

payment with respect to the Assumed Contracts and Leases and the full benefit of all security for such post-Closing rents, accounts or rights to payment, and all claims, remedies or other rights relating to any of the foregoing;

(d)    all goodwill and intangible assets owned by BTC;

(e)    all rights to any insurance benefits, including any future proceeds, from any and all BTC policies existing as of the Closing arising from or relating to the Purchased Assets either before or after the Closing;

(f)    all claims of BTC relating to its business and the Purchased Assets prior to Closing, whether known or unknown, contingent or noncontingent, and any counterclaims, setoffs or defenses that BTC may have with respect to the Assumed Liabilities and/or the Purchased Assets except claims against Bondholder, if any;

(g)    all rights of BTC under the Assumed Contracts and Leases relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof;

(h)    all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and similar documents and authorizations issued by any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature to BTC and used, or held for use, in connection with BTC its business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities;

(i)    all documents used in or relating to BTC's business (except the Excluded Assets) or in respect of the Purchased Assets or Assumed Liabilities, including but not limited to, the Assumed Contracts and Leases, marketing, advertising and promotional activities, supplier lists, vendor lists, records, literature and correspondence which is reasonably available;

(j)    any avoidance claims and/or causes of action with respect to the Assumed Contracts and Leases including but not limited to, those arising under Chapter 5 of the Bankruptcy Code; and

(k)    all of BTC's right, title and interest in and to any intellectual property, including all trade names, trademarks, copyrights, domain names, proprietary software and other intellectual property.

Section 1.2    Excluded Assets.    Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of BTC (the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, shall

not be deemed to be Purchased Assets, and shall remain the property of BTC after the Closing:

(a)    all cash on hand as of the Closing including, without limitation, rents and all "cash collateral" of the Bondholder as such term is defined under Section 363 of the Bankruptcy Code, and all past due rents as of Closing;

(b)    all receivables, including trade accounts and other amounts receivable (including overdue accounts receivable) due from any affiliate of BTC or BTC's members, and the full benefit of all security for such, accounts or rights to payment, and all claims, remedies or other rights relating to any of the foregoing;

(c)    all corporate records such as articles of organization, operating agreements, employment records; files and records relating to the Excluded Assets, bank statements and bank records, litigation records, bankruptcy related records, copies of any records BTC needs to prepare tax returns, and files, correspondence, documents and materials relating to the foregoing;

(d)    with the exception of any avoidance claims and/or causes of action with respect to the Assumed Contracts and Leases, all avoidance claims and causes of action with the respect to the  Purchased Assets under the Bankruptcy Code or applicable state law, including without limitation, all rights and avoidance claims of BTC arising under Chapter 5 of the Bankruptcy Code; and

(e)    all rights of BTC under this Agreement.

Section 1.3    Assumed Liabilities of BTC.  Except as expressly set forth in this Section 1.3, Purchaser is not assuming any liability or obligation of BTC of any nature whatsoever (absolute, contingent, known or unknown), including, without limitation, any liability of BTC with respect to federal, state, or local income, sales, use, property, workers compensation or other taxes of BTC, or taxes arising from or related to the transfer of the Purchased Assets; any liability or obligation of BTC related to any employees of BTC; any trade account payable; or any liability or obligation arising during or relating to any time before the Closing Date.  Purchaser is not and shall not, be deemed a successor to BTC by its assumption of the Assumed Liabilities or otherwise. On the Closing Date, subject to the terms hereof, pursuant to Sections 363 and 365 of the Bankruptcy Code, BTC agrees to transfer and assign, and Purchaser agrees to pay the Cure Amount, if any, set forth in Schedule 6.2(k) with respect to the Assumed Contracts and Leases; and to assume and discharge when due only BTC's liabilities under all of the Assumed Contracts and Leases (the "Assumed Liabilities").

Section 1.4    Retained Liabilities.  All Retained Liabilities shall remain the sole responsibility of BTC.  "Retained Liabilities" shall mean every liability or obligation of BTC other than the Assumed Liabilities.  After the Closing, BTC shall have no further liability or obligations with respect to the Assumed Liabilities.

Section 1.5    <u>Purchase of Bonds</u>.  Subject to the terms and conditions set forth herein, at the Closing simultaneously with Purchaser's purchase of the Purchased Assets, Bondholder, at Purchaser's option, agrees to sell, transfer, assign, and deliver to Purchaser (or one or more of Purchaser's Qualified Assignees, as defined in Section 9.2), as-is where-is and without representation or warranty of any kind, all of Bondholder's right, title, and interest in and to the Bonds.

Section 1.6    <u>Deposit</u>.  In accordance with the bid procedures set forth on Schedule 1.6 attached hereto and incorporated by reference (the "Bid Procedures"), upon execution of this Agreement by all parties, Purchaser will deliver a deposit (the "Deposit") in the amount of $250,000 to _____, as escrow agent.  Prior to the Bankruptcy Court's entry of a sale order substantially in the form attached hereto as Exhibit 5.1(a)(iii), which shall be a final, non-appealable order and, if appealed, not stayed, approving the sale of the Purchased Assets to Purchaser in accordance with the terms of this agreement (the "Final Sale Order"), the Purchaser shall deliver to ____, as escrow agent, additional funds in an amount sufficient to increase the Deposit  to 10% of the Cash Purchase Price (defined below).  The Deposit will be credited against the Cash Purchase Price (defined below) at the Closing and will otherwise be held and disbursed as provided in the Bid Procedures and this Agreement.

Section 1.7    <u>Closing</u>.  Except as otherwise mutually agreed upon by all parties hereto, the consummation of the transactions contemplated herein (the "Closing") shall occur as soon as reasonably practical after satisfaction of the conditions set forth in Article VI hereof or the waiver thereof by the party entitled to waive the applicable conditions, but in no event later than the Definitive Closing Date (as defined below in Section 8.1(d)).  The Closing shall be held in the Cincinnati offices of Taft Stettinius & Hollister LLP, or at such place and in such manner as the parties hereto may agree.

ARTICLE II

<u>CONSIDERATION</u>

Section 2.1    <u>Consideration for Purchase of the Purchased Assets</u>.    The consideration for the acquisition of the Purchased Assets and the Bonds (at Purchaser's option) hereunder shall be Purchaser's assumption as of the Closing of the Assumed Liabilities pursuant to an assignment and assumption agreement executed by BTC in the form of <u>Exhibit 2.1</u> attached hereto (the "Assignment and Assumption Agreement") and Purchaser's payment of $_____ by wire transfer to Bondholder in immediately available funds at the Closing the ("Cash Purchase Price").

Section 2.2    <u>Allocation of Purchase Price</u>.  The parties agree to allocate the Cash Purchase Price among the Purchased Assets as set forth in <u>Exhibit 2.2</u> attached hereto or as otherwise agreed to by the parties post-Closing.  The parties also each agree to complete and file with the Internal Revenue Service Form 8594, Asset Acquisition Statement under Section 1060 (the "Form"), in a manner that is consistent with their

allocation and to cooperate in providing information necessary to complete the Form. The parties further agree that (i) all federal, state and local tax returns, including any schedules or exhibits thereto, will reflect, and in all respects be consistent with, the agreed upon allocation set forth in <u>Exhibit 2.2</u> and (ii) neither party will take any action or maintain any position inconsistent with the allocation set forth in <u>Exhibit 2.2</u>.

ARTICLE III

<u>DELIVERIES</u>

Section 3.1    <u>Deliveries by BTC</u>.    At the Closing and except as otherwise provided herein, BTC shall deliver:

(a)    an assignment of the Lease in proper form for recording and otherwise reasonably acceptable to Purchaser assigning BTC's interest under the Lease to the Purchaser;

(b)    possession of the Purchased Assets to Purchaser;

(c)    a bill of sale executed by BTC in the form of <u>Exhibit 3.1(c)</u> attached hereto;

(d)    the Assignment and Assumption Agreement executed by BTC; and

(e)    a certified copy of the Final Sale Order.

Section 3.2    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered:

(a)    the    Assignment and Assumption Agreement executed by Purchaser;

(b)    a certificate executed by Purchaser as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing.

(c)    the Cash Purchase Price to Bondholder; and

(d)    any other documents that may be reasonably required by BTC's attorney to ensure the effectuation of the terms of this Agreement.

Section 3.3    <u>Deliveries by Bondholder</u>. At the Closing, if the Purchaser shall have elected to purchase the Bonds, Bondholder shall deliver or cause to be delivered:

(a)    a certificate of the Secretary attaching (i) certified copies of documents authorizing Bondholder to enter into the Agreement and the sale of the Bonds to Purchaser and (ii) certified copies of a document or documents granting signing authority to the officers of Bondholder who execute this Agreement; and

(b)    any other documents that may be reasonably required by BTC's or Purchaser's attorneys to ensure the effectuation of the terms of this Agreement including without limitation an assignment of the Bonds.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of BTC.    BTC hereby represents and warrants to Purchaser and Bondholder as follows, which representations and warranties shall be true and accurate in all respects as of the Closing Date as if such representations and warranties had been made at the Closing Date as follows:

(a)    Organization.  BTC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio and is authorized to conduct business in the Commonwealth of Kentucky.

(b)    Validity and Execution of Agreement.  BTC has the legal right and corporate power to enter into and consummate the transactions contemplated by this Agreement, subject to approval of the Bankruptcy Court.  BTC's members have approved this Agreement and the transactions contemplated pursuant to this Agreement and each of the other agreements required to be entered into pursuant hereto by BTC.  This Agreement has been duly executed and delivered by BTC and constitutes the valid and binding obligation of BTC enforceable against BTC in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally, subject to the approval of the Bankruptcy Court.

(c)    Permitted Encumbrances.  There are no encumbrances to the Land other than those set forth on Schedule 4.1(c).

(d)    No Other Representations.  Except for the representations and warranties contained in this Section 4.1 of this Agreement, neither BTC nor any of its affiliates, officers, directors, employees, agents, representatives, nor any other person, makes or shall be deemed to make any representation or warranty to the Purchaser, express or implied, at law or in equity, on behalf of BTC, and BTC hereby disclaims any such representation or warranty whether by BTC or any of its affiliates, officers, directors, employees, agents, representatives or any other person.

Section 4.2    Representations and Warranties of Bondholder.  Bondholder hereby represents and warrants to Purchaser and BTC as follows, which representations and warranties shall be true and accurate in all respects as of the Closing

Date as if such representations and warranties had been made at the Closing Date as follows:

        (a)    <u>Validity and Execution of Agreement</u>.  Bondholder has the legal right and corporate power to enter into and consummate the transactions contemplated by this Agreement.  This Agreement has been duly authorized, executed and delivered by Bondholder and constitutes the valid and binding obligation of Bondholder enforceable against Bondholder in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally.

        Section 4.3    <u>Representations and Warranties of Purchaser</u>.  Purchaser hereby represents and warrants to Bondholder and BTC as follows, which representations and warranties shall be true and accurate in all respects as of the Closing Date as if such representations and warranties had been made at the Closing Date as follows:

        (a)    <u>Organization</u>.  Purchaser is a _____ duly organized, validly existing and in good standing under the laws of _____.

        (b)    <u>Validity and Execution of Agreement</u>.  Purchaser has the full legal right and corporate power to enter into and consummate the transactions contemplated by this Agreement.  The board of directors of Purchaser has approved this Agreement and the transactions contemplated pursuant to this Agreement and each of the other agreements required to be entered into pursuant hereto by Purchaser.  This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally.

        (c)    <u>Litigation</u>.  There is no litigation or legal or other actions, suits, or proceedings at law or in equity, or before any federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, in which Purchaser is engaged, or, to the best knowledge of Purchaser, with which Purchaser is threatened, which could materially adversely affect the Purchaser's performance of its obligations under this Agreement, or the enforceability of this Agreement or of the other transaction documents contemplated hereby.

        (d)    <u>Non-Contravention</u>.  The execution, delivery and performance by Purchaser of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate or be in conflict with any terms or provisions of the articles of incorporation or code of regulations of Purchaser.  No consent, approval, authorization, declaration, filing or registration with any federal, state or local governmental or regulatory authority (other than appropriate document recordation) or any person is required in connection with the execution, delivery and performance by Purchaser of this Agreement and the other documents and instruments contemplated hereunder.

(e)      Solvency.  Purchaser is not now insolvent and will not be rendered insolvent by the transactions contemplated by this Agreement. As used in this section, "insolvent" means that the sum of the debts and other probable liabilities of Purchaser exceed the present fair saleable value of Purchaser's assets.

(f)      Non-Registration of Bonds.  Purchaser acknowledges and agrees that the Bonds are not registered under the Securities Act of 1933 (the "Securities Act"); and Purchaser agrees that such Bonds will not be sold without registration under the Securities Act or an exemption there-from.

(g)      Brokerage.  Purchaser hereby agrees to indemnify, defend, and hold harmless BTC and Bondholder from and against any claim for a brokerage commission or finders fee in connection with the transactions contemplated hereby, to the extent asserted by a party engaged or claiming to have been engaged by or on behalf of Purchaser.

PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT NEITHER BTC NOR BONDHOLDER MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESSED OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE PURCHASED ASSETS, THE BONDS, THE ASSUMED LIABILITIES OR BTC'S BUSINESS, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.

ARTICLE V

COVENANTS

Section 5.1    363 Milestones

(a)    The parties hereto agree that:

(i)    All Qualified Bidders (as defined in the Bid Procedures) shall have until 5:00 p.m. (EST) on October 14, 2011 to deliver Qualified Bid Documents (as defined in the bid procedures) to BTC.

(ii)    BTC shall conduct an auction at the offices of Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202 on October17, 2011 at 10:00 a.m. (EST).

(iii)    BTC shall present the Successful Bid (as defined in the Bid Procedures) and the Runner-Up Bid (as defined in the Bid Procedures) to the Bankruptcy Court for approval on October 19, 2011, or such time thereafter as scheduled by the Bankruptcy Court.

(iv)    The parties anticipate that the Closing shall take place within 14 days of the Bankruptcy Court's entry of the Final Sale Order and in advance of the Definitive Closing Date (defined below).

Section 5.2    BTC's Pre-Closing Covenants.

(a)    BTC covenants and agrees with respect to the Purchased Assets that, between the date hereof and the Closing Date, in order that Purchaser may have a reasonable opportunity to make an investigation of the Purchased Assets, BTC shall give Purchaser and Purchaser's counsel, accountants, and other representatives, reasonable access to the Land, the Project, and BTC records relating to the Purchased Assets.  The rights of Purchaser under this section shall be exercised at Purchaser's sole expense.

(b)    BTC shall promptly notify Purchaser of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against BTC which challenges the transactions contemplated hereby; and BTC shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of BTC contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.3    Purchaser's Pre-Closing Covenants.    Purchaser shall promptly notify BTC of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Purchaser which challenges the transactions contemplated

hereby; and Purchaser shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of Purchaser contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.4    Bondholder's Pre-Closing Covenants.  In the event that Purchaser shall have elected to purchase the Bonds:

(a)    Bondholder covenants and agrees with respect to the Bonds that, between the date hereof and the Closing Date, Bondholder will neither solicit nor accept, the sale of Bonds to a party other than Purchaser independent of the sale process set forth herein.

(b)    Bondholder shall promptly notify Purchaser of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Bondholder which challenges the transactions contemplated hereby; and Purchaser shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of Bondholder contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.5    Cooperation and Further Assurances.    This Agreement is a transaction in which Purchaser, or its assignee, pursuant to Section 1.5 of this Agreement has the option to elect to become the owner of 100% of the Bonds outstanding.  If such election is exercised, Purchaser and Bondholder shall provide each other with reasonable cooperation from the date hereof through and following the Closing, and Bondholder agrees to promptly take all such actions as reasonably requested by Purchaser to give effect to the transactions contemplated by this Agreement.

ARTICLE VI

CONDITIONS TO CLOSING

Section 6.1    Bondholder's Conditions to Close.  The obligation of Bondholder to sell and deliver the Bonds to Purchaser at the Closing is subject to the satisfaction (or waiver by Bondholder) on or prior to the Closing Date of each of the following conditions:

(a)    Representations and Warranties.  All of the representations and warranties of Purchaser and BTC contained in this Agreement shall be true and correct on and as of the Closing Date.

(b)    Compliance with Agreement.  Purchaser and BTC shall have performed and complied in all material respects with all their respective obligations and covenants under this Agreement required to be performed or complied with prior to the Closing.

(c)    <u>No Litigation</u>.   As of the Closing, no litigation, proceeding, investigation or inquiry shall be pending or threatened by any third party seeking to enjoin or prevent the consummation of the transactions contemplated by this Agreement or to obtain damages or other relief by reason of such consummation.

(d)    <u>Closing Deliveries</u>.   Purchaser and BTC shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(e)    <u>Sale Order</u>.   The Bankruptcy Court shall have entered the Final Sale Order.

Section 6.2    <u>Purchaser's Conditions to Close</u>.   The obligation of Purchaser to purchase the Purchased Assets at the Closing is subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of each of the following conditions:

(a)    <u>Representations and Warranties</u>.   All of the representations and warranties of Bondholder and BTC contained in this Agreement shall be true and correct in all material respects as of the Closing.

(b)    <u>Compliance with Agreement</u>.   Bondholder and BTC shall have performed and complied in all material respects with all their respective obligations and covenants under this Agreement required to be performed or complied with prior to the Closing.

(c)    <u>No Litigation</u>.   At the Closing Date, no litigation, proceeding, investigation or inquiry shall be pending or threatened by any third party seeking to enjoin or prevent the consummation of the transactions contemplated by this Agreement or to obtain damages or other relief by reason of such consummation.

(d)    <u>Closing Deliveries</u>.   BTC and Bondholder shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(e)    <u>Sale Order</u>.   The Bankruptcy Court shall have entered the Final Sale Order.

(f)    <u>LAF Agreement</u>.   Purchaser (except in the case where Bondholder is Purchaser) shall have reached an agreement with LAF International LLC on substantially the terms set forth in Schedule 6.2(f), to be documented in form and substance acceptable to LAF International LLC.

(g)    <u>Amended Development Agreement</u>.   The City shall have approved an agreement between Purchaser  and the City regarding an amendment to the Development Agreement on terms and conditions acceptable to Purchaser or Purchaser shall elect in writing to proceed without an Amended Development Agreement.

12330868.1                                    27

(h)    <u>No Material Adverse Change</u>.    No material adverse change shall have occurred after the date of this Agreement with respect to the Purchased Assets.

(i)    <u>Cures</u>.    The Cure Amounts due with respect to the Assumed Contracts shall not exceed the amounts set forth in the attached Schedule 6.2(i).

Section 6.3    <u>BTC's Conditions to Close</u>.    The obligation of BTC to sell the Purchased Assets at the Closing is subject to the satisfaction (or waiver by BTC) on or prior to the Closing Date of each of the following conditions:

(a)    <u>Closing Deliveries</u>.    Purchaser and Bondholder shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(b)    <u>Sale Order</u>.    The Bankruptcy Court shall have entered the Final Sale Order.

## ARTICLE VII

## SURVIVAL

Section 7.1    <u>Survival</u>.    All representations and warranties contained in this Agreement shall expire at the Closing.    All covenants and agreements of BTC and the Purchaser that require by their terms performance after the Closing shall survive the Closing.

## ARTICLE VIII

## TERMINATION

Section 8.1    <u>Termination Events</u>.    By notice given prior to or at the Closing, subject to <u>Section 8.2</u>, this Agreement may be terminated as follows:

(a)    by Purchaser if a material breach of any provision of this Agreement has been committed by Bondholder or BTC and such breach has not been cured with 5 days of written notice or waived by Purchaser;

(b)    by Bondholder if a material breach of any provision of this Agreement has been committed by Purchaser, and such breach has not been cured with 5 days written notice or waived by Bondholder;

(c)    by mutual consent of Purchaser, BTC and Bondholder;

(d)    by Purchaser if the Closing has not occurred on or before November 12, 2011 (the "Definitive Closing Date"), or such later date as the parties may agree upon, unless the Purchaser or BTC is in material breach of this Agreement; or

(e)    by Bondholder if the Closing has not occurred on or before the Definitive Closing Date, or such later date as the parties may agree upon, unless Bondholder is in material breach of this Agreement;

Section 8.2    <u>Automatic Termination</u>.    This Agreement will automatically terminate upon the closing of the sale of the Purchased Assets or the Bonds to any party other than the Purchaser.

Section 8.3    <u>Effect of Termination</u>.

(a)    Purchaser's right of termination under Section 8.1(a) is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 8.1(a), all obligations of the parties under this Agreement will terminate, except that the obligations of the parties in this Section 8.3 will survive; provided, however, that, if this Agreement is terminated because of a breach of this Agreement by Bondholder or because one or more of the conditions to the Purchaser's obligations under this Agreement is not satisfied as a result of Bondholder's failure to comply with its obligations under this Agreement, the Purchaser's right to pursue all legal remedies will survive such termination unimpaired.

(b)    In the event this Agreement is terminated by Bondholder under Section 8.1(b), Bondholder shall be immediately entitled to payment of the entire Deposit as its sole remedy in the event of any such breach and termination event, which the parties agree is fair and reasonable.

ARTICLE IX

<u>MISCELLANEOUS</u>

Section 9.1    <u>Further Assurances</u>.    After the Closing, Purchaser shall from time to time, at the request of and without further cost or expense to BTC, execute and deliver such other instruments and take such other actions as may reasonably be requested in order more effectively to relieve BTC of any obligations being assumed by Purchaser hereunder.

Section 9.2    <u>Benefit and Assignment</u>.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.   Neither party may voluntarily or involuntarily assign its interest under this Agreement to any person other than a Qualified Assignee, without the prior written consent of the other parties hereto.  For purposes of this Agreement "Qualified Assignee" means any third party assignee of Purchaser; provided, however, that Purchaser shall not be relieved of any of its obligations under this Agreement as a result of any assignment permitted hereunder.

Section 9.3    <u>Amendments</u>.    No amendment, waiver of compliance with any provision or condition hereof or consent pursuant to this Agreement shall be effective

unless evidenced by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, extension or discharge is sought.

Section 9.4    <u>Headings</u>.    The headings set forth in this Agreement are for convenience only and will not control or affect the meaning or construction of the provisions of this Agreement.

Section 9.5    <u>Governing Law</u>.    The construction and performance of this Agreement shall be governed by the laws of the State of Ohio without giving effect to the choice of law provisions thereof.  Any action, suit or proceeding brought by any party to this Agreement relating to or arising out of this Agreement or any other agreement, instrument, certificate or other document delivered pursuant hereto (or the enforcement hereof or thereof) must be brought and prosecuted as to all parties in, and each of the parties hereby consents to service of process, personal jurisdiction and venue in, the state and Federal Court of general jurisdiction located in Kenton County, Kentucky or, if applicable, the Bankruptcy Court.

Section 9.6    <u>Notices</u>.    Any notice, demand or request required or permitted to be given under the provisions of this Agreement shall be in writing, including by facsimile, and shall be deemed to have been duly delivered and received on the date of personal delivery, on the third day after deposit in the U.S. mail if mailed by registered or certified mail, postage prepaid and return receipt requested, on the day after delivery to a nationally recognized overnight courier service if sent by an overnight delivery service for next morning delivery or when dispatched by facsimile transmission (with the facsimile transmission confirmation being deemed conclusive evidence of such dispatch) and shall be addressed to the following addresses, or to such other address as any party may request, in the case of BTC, by notifying Purchaser, and in the case of Purchaser, by notifying BTC:

| | |
|---|---|
| If to BTC: | Buttermilk Towne Center, LLC |
| | Taft Stettinius & Hollister LLP |
| | Attn: Timothy J. Hurley |
| | 425 Walnut Street, Suite 1800 |
| | Cincinnati, OH 45202 |
| | |
| If to Purchaser: | [Name and Address] |
| | |
| | |
| If to Bondholder: | Bank of America, N.A. |
| | Buchanan Ingersoll & Rooney PC |
| | One Oxfort Centre |
| | 301 Grant Street, 20th Floor |
| | Pittsburgh, PA 15219 |

Section 9.7    Counterparts.  This Agreement may be executed in one or more counterparts (including faxed or e-mail counterpart images), each of which will be deemed an original and all of which together will constitute one and the same instrument.

Section 9.8    No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 9.9    Severability.  The parties agree that if one or more provisions contained in this Agreement shall be deemed or held to be invalid, illegal or unenforceable in any respect under any applicable law, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted, and the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

Section 9.10.    Time is of the Essence.  The parties agree that time is of the essence of this Agreement.

Section 9.11.    Entire Agreement.  This is the entire agreement between the parties. All previous communications between the parties, either oral or written, not contained herein are hereby withdrawn and annulled.

**IN WITNESS WHEREOF**, the parties hereto, through their duly authorized representatives, as applicable, have hereunto set their hands and caused this Agreement to be duly executed on the date and year first above written.

[Signature Page Immediately Follow]

**Purchaser:**

By: _____
Name: _____
Its: _____

**BTC:**

By: _____
Name: _____
Its: _____

**Bondholder:**

By: _____
Name: _____
Its: _____

## SCHEDULE 1.6

## Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the sale (the "Sale") of substantially all of the assets of Buttermilk Towne Center LLC ("BTC") in the Chapter 11 case pending in the United States Bankruptcy Court for the Eastern District of Kentucky, Covington Division (the "Bankruptcy Court"), pursuant to Case No. 10-21162  (the "Bankruptcy Case").

The Bankruptcy Court has approved the form of asset purchase agreement attached to the Debtor's motion seeking approval of the Bid Procedures (the "APA") Capitalized terms not otherwise defined in these Bid Procedures have the meanings set forth in the APA.

### 1. Bid Procedures; Timetable, Clarifications

A.  The Bid Procedures have been approved by the Bankruptcy Court, by order dated _____, 2011 (docket no. __) (the "Bid Procedures Order").

B.   Qualified Bidders (as defined below) must deliver all Qualified Bid Documents (as defined below) to BTC and Bondholder on or before 5:00 p.m. (Eastern Standard Time) on October 14, 2011 (the "Bid Deadline").

C.  The auction (the "Auction") shall be held on October 17, 2011 (the "Auction Date"), as such date may be extended by BTC and Bondholder.

D.  The hearing to approve the Sale shall be held on October 19, 2011, or such time thereafter as scheduled by the Bankruptcy Court.

### 2. Bid Process

BTC and Bondholder shall determine whether any Person is a Qualified Bidder; provided that each Qualified Bidder must satisfy the criteria set forth in paragraph 3 below. BTC, Bondholder and their advisors shall (i) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, and (ii) receive offers from Qualified Bidders.

### 3. Qualified Bidders

A.  In order to participate in the Bid Process, a potential bidder (a "Potential Bidder") must deliver to BTC and Bondholder: (i) an executed confidentiality agreement in the form attached hereto as Exhibit __ ("Confidentiality Agreement"); and (ii) such financial and other information (the "Financial Information") as BTC shall reasonably request of such Potential Bidder including but not limited to, information establishing the

Potential Bidder's ability to place and consummate a Qualified Bid (collectively the "Participation Documentation").

B.    A "Qualified Bidder" is a Potential Bidder that has duly submitted its Participation Documentation and which BTC and Bondholder, in their business judgment, determine is financially able to consummate the purchase of the Purchased Assets specified in its expression of interest in a time frame consistent with the APA. Within two (2) Business Days after the later of (i) receipt of the Participation Documentation or (ii) the entry of orders of the Bankruptcy Court approving these Bid Procedures, BTC shall notify the Potential Bidder whether such Potential Bidder is a Qualified Bidder.  Only Qualified Bidders shall be permitted to conduct reasonable due diligence with respect to the Purchased Assets during the period prior to the Bid Deadline.  Bondholder shall be deemed to be a Qualified Bidder, and any bids made by Bondholder at the Auction shall be deemed to be Qualified Bids.

C.    BTC and Bondholder shall be entitled to request due diligence from each Qualified Bidder upon execution of a Confidentiality Agreement.  Notwithstanding any other provision herein, failure by a Qualified Bidder to fully comply with reasonable due diligence requests and requests for additional information made by BTC or Bondholder shall be a basis for BTC or Bondholder to revoke such bidder's status as a Qualified Bidder.

## 4. Qualified Bids

A.    In order for a Qualified Bidder to be permitted to participate in the Auction, such bidder will be required to deliver the following documents (collectively, the "Qualified Bid Documents") to BTC and Bondholder by no later than the Bid Deadline:

i.    A written offer stating that such Qualified Bidder's offer is irrevocable through and including the earliest of:  (w) its receiving notice from BTC that such Qualified Bidder's bid does not constitute a Qualified Bid, (x) its receiving notice from BTC that such Qualified Bidder is neither the Runner-Up Bidder nor the Successful Bidder (each as defined below), (y) the date of the consummation of the Sale or (z) the date such bidder's Qualified PA (as defined below) terminates in accordance with its terms; and

ii.    In respect of such bid, a good faith deposit equal to $250,000 (the "Transaction Deposit") shall be wired, in immediately available funds, to an escrow agent of BTC's choosing pursuant to an escrow agreement substantially in the form of Exhibit ___ hereto.  The Transaction Deposit shall not be subject to any claims, liens, security interests, or encumbrances, except as provided herein, and such funds shall be disbursed in accordance with these Bid Procedures.

iii.    An executed clean copy of a purchase agreement (and related exhibits and completed schedules thereto) (each such agreement (together with such exhibits and schedules) from a Qualified Bidder, a "Qualified PA") together with a

red-line copy of such agreement marked to show changes to the APA. The Qualified PA(s) must provide for the payment of cash consideration at closing in immediately available funds that is equal to or greater than $18,000,000.00, not including liabilities to be assumed under the Qualified PA, and if the Qualified Bidder is an entity formed for the purpose of purchasing Purchased Assets, contain a commitment, acceptable to BTC and Bondholder in their business judgment, of the equity holder(s) of the Qualified Bidder to be responsible for the Qualified Bidder's obligations in connection with the purchase of Purchased Assets and, if applicable, the Bonds and contain terms (including the amount of cash consideration and provisions relating to assumption of liabilities and payment of costs and expenses) or other documentation evidencing such Qualified Bidder's ability to close on the transactions contemplate hereby.

B. In addition to the foregoing, in order for a bid submitted by a Qualified Bidder to be considered a Qualified Bid hereunder, it must satisfy the following requirements (collectively, the "Qualified Bid Requirements"):

i.    Such Qualified Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation.

ii.    Such Qualified Bidder must acknowledge that: (w) it had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to submitting such bid; (x) it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making such bid; (y) except for the representations and warranties contained in its Qualified PA, it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the Bonds or the completeness of any information provided in connection therewith or the Auction; and (z) its bid is not contingent upon completing due diligence, financing or any condition not contained in the APA.

iii.    Such Qualified Bidder must provide written evidence acceptable to BTC and Bondholder, in their business judgment, of such Qualified Bidder's financial ability to (x) consummate the transactions contemplated by its Qualified PA (including, without limitation, any debt or equity financing commitment) and (y) provide adequate assurance of future performance with respect to any executory contracts or unexpired leases it is seeking to have assumed by BTC and assigned to it under its Qualified PA.

C. A bid received from a Qualified Bidder that includes all of the Qualified Bid Documents and satisfies all of the Qualified Bid Requirements is a "Qualified Bid." To the extent BTC receives more than one Qualified Bid (including the Stalking Horse Bid), BTC and Bondholder shall, in their business judgment, determine which Qualified Bid constitutes the highest and best offer (the "Auction Starting Bid").

D. BTC and Bondholder shall reject any bid that, in their sole discretion, BTC and Bondholder determine: (i) is inadequate or insufficient; (ii) does not conform to the

requirements of applicable bankruptcy laws or these Bid Procedures; or (iii) is contrary to the best interests of BTC, its estate and its creditors.

### 5. Due Diligence

A.  Qualified Bidders that express an interest in obtaining information relevant to the Purchased Assets for the purposes of conducting a due diligence investigation will be provided access to all of the books and records of BTC, significant agreements, and other financial and/or operational information which shall include, without limitation, (1) financial statements for the prior 24 months, (2) all leases, vendor contracts and other material contracts, (3) federal state and local tax returns, (4) environmental reports, (5) surveys, (6) PILOT Agreements, (7) zoning information, (8) real estate tax assessment information, (9) rent rolls for the prior 24 months, (10) tenant estoppel certificates, (11) documents related to the construction, permanent, and other financing of BTC, and (12) all records relating to the payment of rent and additional rent from the tenants of the Project under their leases, including but not limited to basic rent, additional rent, common area maintenance, real estate tax, and insurance, and the calculation, payment, and audit of such amounts.

B.  Every Qualified Bidder shall be permitted to negotiate directly with LAF International, LLC, the City, the Library and the School District with respect to the Purchased Assets, BTC's business and tax matters relating to BTC including but not limited to the PILOT Agreements.

C.  Qualified Bidders will be provided access to the Buttermilk Towne Center during normal business hours for purposes of conducting property and/or environmental inspections.

### 6. Auction

A.  BTC shall conduct the Auction at the offices of Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202 at 10:00 a.m. (EST) on October 17, 2011.

B.  Only representatives of BTC, Bondholder, Qualified Bidders that submitted Qualified Bids on or before the Bid Deadline (the "Participating Qualified Bidders"), and a representative from the Office of the United States Trustee for the Eastern District of Kentucky will be entitled to attend, participate and be heard at the Auction. Only Participating Qualified Bidders will be entitled to make subsequent Qualified Bids at the Auction.

C.  During the Auction, bidding will begin at the purchase price stated in the Auction Starting Bid, and the first bid thereafter shall be at least $100,000 higher than the Auction Starting Bid.  All subsequent bids will be made at least in increments of $100,000 ("Minimum Bid Increments").

D.    Bondholder shall have the right but not the obligation pursuant to Section 363(k) of the Bankruptcy Code to credit bid up to $23 million.

E. As soon as practicable after the conclusion of the Auction, BTC and Bondholder shall (i) review each Qualified Bid on the basis of the financial and contractual terms and the factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the overall highest and best offers for Purchased Assets (the highest and best bid shall be referred to as, the "Successful Bid" and the bidder making such bid, the "Successful Bidder" and the second highest and best bid shall be referred to as, the "Runner-up Bid" and the bidder making such bid, the "Runner-up Bidder").  Prior to the Bankruptcy Court's entry of the Final Sale Order, the Successful Bidder shall deliver to ____, as escrow agent, additional funds in an amount sufficient to increase the Transaction Deposit  to 10% of the amount of the Successful Bid.  BTC shall present the Successful Bid and the Runner-Up Bid to the Bankruptcy Court for approval; provided, however, that if Bondholder is the Successful Bidder, Bondholder, in lieu of closing the purchase, may elect relief from the automatic stay by filing with the Bankruptcy Court a notice of its election, and, upon filing notice of this election, Bondholder shall be granted relief from the automatic stay effective immediately upon filing and without further order of the Bankruptcy Court.  In the event that the Successful Bidder or Runner-up Bidder shall fail to consummate the Sale, the respective Transaction Deposit shall be forfeited to Bondholder and unrefundable.

F.    If (a) no Qualified Bids are received in accordance with the Bid Procedures by October 15, 2011, or (b) the Successful Bidder or Runner-up Bidder fail to consummate the Sale, Bondholder shall have the option of either being deemed the purchaser of the Purchased Assets by making a credit bid in the amount of $18,000,000 or proceeding by way of relief from stay by filing with the Bankruptcy Court a notice of its election to proceed by way of stay relief, and upon filing notice of this election, Bondholder shall be granted relief from the automatic stay effective immediately upon filing and without further order of the Court.

G.    In the event BTC and Bondholder cannot agree as to any decision to be made as required by these Bid Procedures, any such disagreement shall be submitted promptly to the Bankruptcy Court for resolution.

## 6. Approval and Closing of the Sale

BTC will be deemed to have accepted and to be legally bound by a Qualified Bid only when such Qualified Bid has been approved by the Bankruptcy Court pursuant to the Sale Order.

## 7. Objections to the Sale of the Business

Any objection to the entry of the Sale Order must: (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Kentucky; (iii) set forth the name of the objectant, the nature and amount of claims or interests held or asserted by the objectant against BTC's estate or property, the basis for the objection, and the specific grounds therefor; (iv) be filed with the Bankruptcy Court; and (v) be further served so that it is received on or before October 17, 2011 by (a) counsel for BTC, Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202 (Attn: Timothy J. Hurley, Esq.), (b) counsel for Bondholder, Buchanan Ingersoll & Rooney PC, One Oxford Centre, 301 Grant Street, 20th Floor, Pittsburgh, PA 15219 (Attn: Timothy P. Palmer, Esq.); and (c) the Office of the United States Trustee (Attn: Philip Hanrahan), 100 E. Vine Street, Suite 500, Lexington, KY 40507.

**ANY OBJECTION TO THE PROPOSED ENTRY OF THE SALE ORDER NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH ABOVE MAY NOT BE CONSIDERED AND MAY BE OVERRULED BY THE BANKRUPTCY COURT AT THE SALE HEARING.**

## SCHEDULE 4.1(c)

## Permitted Encumbrances

1.  Taxes or assessments approved, levied or enacted by a State, County, Municipality, Township or similar taxing authority, but not yet certified to the tax duplicate of the County in which the land is situated.

2.  Taxes and assessments, if any, for the year 2011 and subsequent years which are a lien, but not yet due and payable.

3.  Tax additions or abatements, if any, which may hereafter be made by legally constituted authorities.

4.  Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky for the use and benefit of the Transportation Cabinet, Department of Highways, recorded in Deed Book 1075, Page 305 of the Kenton County, Kentucky Records.

5.  Permanent easement for construction and maintenance of drainage structures by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1080, Page 220 of the Kenton County, Kentucky Records.

6.  Easements to the Union Light, Heat, and Power Company recorded in Deed Book 491, Page 423, Deed Book 502, Page 156, Deed Book 509, Page 548, Deed Book 516, Page 307, Deed Book 517, Page 18, Deed Book 520, Page 676, Deed Book 526, Page 124, Deed Book 529, Page 356, Deed Book 642, Page 73, Deed Book 670, Page 218, and Deed Book 623, Page 73, of the Kenton County, Kentucky Records.

7.  Easements for Sewer to the Sanitation District No. 1 recorded in Deed Book 544, Page 538, Deed Book 480, Page 402 of the Kenton County, Kentucky Records.

8.  Easement to the Citizens Telephone Company recorded in Deed Book 496, Page 456 of the Kenton County, Kentucky Records.

9.  Easement from Ignace F. Winterberg and Helen M. Winterberg, his wife, to Robert B. Loomis and Marjorie H. Loomis, his wife, recorded in Deed Book 531, Page 443 of the Kenton County, Kentucky Records.

10. Easement from Robert B. Loomis and Marjorie H. Loomis to Ignace F. Winterberg and Helen M. Winterberg recorded in Deed Book 545, Page 214 of the Kenton County, Kentucky Records.

11. Restriction and easement in Deed Book 545, Page 211 of the Kenton County, Kentucky Records.

12330868.1

12. Easement over fifty foot passway recorded in Deed Book 481, Page 589 of the Kenton County, Kentucky Records.

13. Rights of the public, if any, in, over and to that portion of the land which lies within the right-of-way of Beechwood Road, Crest Avenue and Anderson Road.

14. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1091, Page 6 of the Kenton County, Kentucky Records.

15. 20' permanent easement to Sanitation District No. 1 recorded in Deed Book 480, Page 385 of the Kenton County, Kentucky Records.

16. 5' wide easement for natural gas line recorded in Deed Book 545, Pages 211 and 214, and Deed Book 531, Page 443 of the Kenton County, Kentucky Records.

17. Easement for Benefit of Property recorded in Deed Book 545, Page 214 of the Kenton County, Kentucky Records.

18. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1083, Page 225 of the Kenton County, Kentucky Records.

19. Sewer Easement to Sanitation District No. 1 recorded in Miscellaneous Book 480, Page 383 and in Miscellaneous Book 540, Page 513 of the Kenton County, Kentucky Records.

20. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1073, Page 111 of the Kenton County, Kentucky Records.

21. The following matters shown or indicated on the ALTA Survey prepared by E.J. Foltz, P.E., L.S. KY LS 3322 of Cartec Engineering Corp. dated July 26, 2004:

   a. Existing sanitary sewer lines (the location of which is unknown), existing telephone utilities and existing electric utilities running throughout the Land.

   b. Adjoining lot owner appears to be using a gravel parking lot on the Land without the benefit of a recorded easement.

   c. Storm and sanitary sewers appear to drain onto or through adjoining property to the east without the benefit of an easement(s).

   d. Electric lines appearing to service the Land running across the adjoining property, to the northeast and west without the benefit of easements.

22. Terms and conditions of an unrecorded Parking License Agreement between Joseph A. Cleves, Jr., Trustee of WRR Trust and Bonefish/Crescent Springs, Limited Partnership, a Florida limited partnership dated June 26, 2003 for the purpose of parking motor vehicles.

23. Terms and conditions of an Agreement of Lease between City of Crescent Springs (Lessor) and Buttermilk Towne Center, LLC (Lessee) dated as of August 1, 2004 as recorded September 1, 2004 in Official Record Book C-2310, Page 274; and First Amendment to Lease dated October 7, 2004 and recorded February 16, 2005 in Official Record Book C-2501, Page 149 of the Kenton County, Kentucky Records.

Partial Assignment of Leasehold Interest related to the same from Buttermilk Towne Center, LLC to Home Depot U.S.A., Inc. as set forth in Official Record Book C-2873, Page 341 (as to Lot 8).

Assignment of Leasehold Interest related to the same from Buttermilk Towne Center, LLC to National City Bank as set forth in Official Record Book C-2874, Page 10 (as to Lot 2).

Amended and Restated Agreement of Lease between City of Crescent Springs, Kentucky and Buttermilk Towne Center, LLC as set forth in Official Record Book C-3596, Page 184.

24. Rights of sublessees, if any, pursuant to unrecorded sublease agreements.

25. Rights of the mobile home park tenants, if any, pursuant to unrecorded lease agreements.

26. Certificate of Land Use Restriction as to unrecorded subdivision plat as set forth in Official Record Book C-2437, Page 288.

27. Rights of Home Depot U.S.A., Inc. under the Ground Sublease referenced in the Memorandum of Ground Sublease set forth in Official Record Book C2487, Page 149 (as to Lot 8).

28. Terms and conditions of the Development Agreement between Buttermilk Towne Center, LLC, and Home Depot U.S.A., Inc. as referenced in the Memorandum of Development Agreement set forth in Official Record Book C2536, Page 183.

29. Terms and conditions and easements created under the Restriction Agreement and Grant of Easements as set forth in Official Record Book C2605, Page 42. Consent and subordination of Fee Owner related thereto set forth in Official Record Book C2605, Page 97. Consent and Subordination of Mortgage related thereto as set forth in Official Record Book C2605, Page 101.

30.     Terms and conditions and easements created under the Common Area
Maintenance Agreement set forth in Official Record Book C2609, Page 281.
Consent and Subordination of Fee Owner related thereto as set forth in Official
Record Book C2616, Page 147. Consent and Subordination of Mortgage related
thereto as set forth in Official Record Book C2616, Page 151.

31.     Matters as shown on the subdivision plat of Buttermilk Towne Center, LLC, as
set forth on Plat Slides 2034 and 2034A, 2034B and 2034C. Addendum to Plat of
Buttermilk Towne Center in Official Record Book C2983, Page 103.

32.     Right of Remke Markets, Inc. under the lease referenced in the Memorandum of
Lease set forth in Official Record Book C3252, Page 190 and again in Official
Record Book C3417, Page 102 as collaterally assigned by Remke Markets, Inc. to
SUPERVALU Holdings, Inc. in Official Record Book C3355, Page 299 (as to Lot
11).

33.     Rights of L.A. Fitness International, LLC  under the lease referenced in the
Memorandum of Lease set forth in Official Record Book C 3538, Page 44.

34.     Terms and conditions as contained in the Agreement in Lieu of Taxes between the
City of Crescent Springs, Kentucky, the Kenton County School District and
Buttermilk Towne  Center, LLC as referenced in the Memorandum of Agreement
Regarding Agreement in Lieu of Taxes set forth in Official Record Book C3735,
Page 64.

35.     Easement for utility purposes to Duke Energy of Kentucky, Inc. as set forth in
Official Record Book C3892, Page 242.

**SCHEDULE 6.2(f)**

**LAF Term Sheet**

**See attached.**

**SCHEDULE 6.2(i)**

**Cure Amounts**

| **ASSUMED CONTRACT** | **CURE AMOUNT** |
|---|---|
| Library PILOT Agreement | $ 111,606.00 |
| School/City PILOT Agreement (School Payment) | $ 453,648.00 |
| School/City PILOT Agreement (City Payment) | $ 188,889.23 |
| Advance America | $ 0 |
| Ashley Furniture | $ 0 |
| NKY Haircuts, LLC/Big League Haircuts | $ 0 |
| Cincinnati Tan | $ 0 |
| Remke Markets, Inc. Lease | $ 0 |
| Fit Envy of Florence, Inc. d/b/a Quiznos | $ 0 |
| NKY Haircuts, LLC | $ 0 |
| Fed Ex Office and Print Services, Inc. f/k/a Fed Ex Kinko's Office and Print Services, Inc. | $ 0 |
| City of Crescent Springs | $ 0 |
| Elegant Nails Spa | $ 0 |
| Empire Buffet | $ 0 |
| Home Depot | $ 0 |
| National City Bank | $ 0 |
| Papa Murphy's | $ 0 |
| Rhodes | $ 0 |
| Salsarita's | $ 0 |

Tower Wireless                                          $_____0_____

Verizon Wireless                                       $_____0_____

## <u>EXHIBIT 1.1(a)</u>

**Equipment, Machinery & Tangible Personal Property**

None.

### EXHIBIT 1.1(b)

### Assumed Contracts and Leases

1.    Amended and Restated Agreement of Lease between City of Crescent Springs, Kentucky and Buttermilk Towne Center, LLC $56,000,000 Maximum Aggregate Principal Amount Taxable Industrial Revenue Bonds, Series 2007 (Buttermilk Towne Center, LLC Project) Dated as of December 1, 2007 (as amended by agreement between Purchaser and City, which shall be approved by the City).

2.    Lease Agreement dated April 14, 2004 between Buttermilk Towne Center, LLC and Remke Markets, Inc., including:

    a.    Lease Guaranty Agreement dated June 2, 2004 between SUPERVALU Holdings, Inc. and Buttermilk Towne Center, LLC
    b.    Guarantor Substitution Agreement dated March 11, 2005 between Remke Markets, Inc. and Buttermilk Towne Center, LLC.

3.    Lease Agreement dated January 18, 2006 between Buttermilk Towne Center, LLC and Advance America, Cash Advance Centers of Kentucky, Inc., including:

    a.    Guaranty of Lease Agreement dated January 12. 2006 between Advance America, Cash Advance Centers of Kentucky, Inc. and Buttermilk Towne Center, LLC.
    b.    Amendment of Lease dated October 8, 2007 between Buttermilk Towne Center and Advance America, Cash Advance Centers of Kentucky, Inc.

4.    Lease Agreement dated August 12, 2005 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc., including:

    a.    First Amendment of Lease Agreement dated January 8, 2006 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc.

5.    Lease Agreement dated December 21, 2004 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC, including:

    a.    First Amendment to Lease dated February 20, 2006 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC.

6.    Lease Agreement dated July 11, 2007 between Buttermilk Towne Center, LLC and Cincinnati Tan Company, LLC.

7.    Agreement of Lease dated August 1, 2004 between Buttermilk Towne Center, LLC and City of Crescent Springs, Kentucky.

12330868.1

8.  Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Elegant Nail Spa, LLC, including:

    a.  Guaranty of Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Phuc Pham ("Guarantor").

9.  Lease Agreement dated November 16, 2007 between Buttermilk Towne Center, LLC and Empire Buffet of Kentucky, Inc.

10. Lease Agreement dated September 18, 2006 between Buttermilk Towne Center, LLC and FedEx Kinko's Office and Print Services, Inc.

11. Ground Sublease Agreement dated December 13, 2004 between Buttermilk Towne Center, LLC and Home Depot U.S.A., Inc., including:

12. Ground Lease dated May 16, 2005 between Buttermilk Towne Center, LLC and National City Bank, including:

    a.  Amendment to Ground Lease dated July 24, 2006 between Buttermilk Towne Center, LLC and National City Bank.

13. Lease Agreement dated January 6, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC, including:

    a.  Guaranty of Lease Agreement dated December 22, 2005 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").
    b.  First Amendment to Lease Agreement dated April 14, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC.
    c.  Assignment and Assumption of Lease dated June 18, 2007 between Papa Murphy's at Buttermilk Towne Center, LLC and Brojos, Inc.
    d.  Amendment to Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").
    e.  Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and  Bradley Joseph Jones and Tonya Lee Jones (collectively, the "Guarantors").

14. Lease Agreement dated September 15, 2005 between Buttermilk Towne Center, LLC and JP Bishop, Inc., including:

      a.    Guaranty of Lease Agreement dated August 10, 2005 between Buttermilk Towne Center, LLC and Robert Paul Bishop and Julie Frances Bishop.

15.    Lease Agreement dated May 20, 2004 between Buttermilk Towne Center, LLC and Rhodes, Inc. d/b/a Rhodes Furniture.

16.    Lease Agreement dated August 17, 2005 between Buttermilk Towne Center, LLC and Shivam Enterprises, Inc. d/b/a Salsarita's.

17.    Lease Agreement dated June 28, 2007 between Buttermilk Towne Center, LLC and Tower Wireless, Ltd.

18.    Lease Agreement dated March 3, 2006 between Buttermilk Towne Center, LLC and Wireless Venture Partners, LLC.

19.    Agreement in Lieu of Taxes dated November 19, 2007 among Buttermilk Towne Center, LLC, City of Crescent Springs, and Kenton County School District (the "School/City PILOT Agreement").

20.    Agreement in Lieu of Taxes dated December 17, 2007 between Buttermilk Towne Center, LLC and Kenton County Public Library (the "Library PILOT Agreement").

## **EXHIBIT 2.1**

**Form of Assignment & Assumption Agreement**

See attached.

## **EXHIBIT 2.2**

**Allocation of Purchase Price**

To be determined by parties.

## EXHIBIT 3.1(c)

**Bill of Sale**

See attached.

## **EXHIBIT 5.1(a)(iii)**

**Sale Order**

See attached.

**Exhibit B: Assumption and Cure Notice**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | : | Case No. 10-21162 |
| | : | |
| **BUTTERMILK TOWNE CENTER, LLC,** | : | Chapter 11 |
| | : | |
| **Debtor** | : | Honorable Judge Wise |
| | : | |

---

### NOTICE OF DEBTOR'S INTENT TO ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND SETTING FORTH CURE AMOUNTS

---

**Please take notice** that on September __, 2011, Buttermilk Towne Center, LLC, debtor and debtor in possession (the "Debtor"), filed a motion seeking the entry of an order approving the Debtor's proposed process for the sale of substantially all of its assets, the maintenance of the Tax Abatement, and the assumption and assignment of certain unexpired leases and executory contracts (the "Motion"). Capitalized terms not otherwise defined in this Notice have the meanings set forth in the Motion. By order dated _____, 2011, the Bankruptcy Court approved the Debtor's Bid Procedures (the "Bid Procedures Order"). On _____, 2011, the Debtor served its Notice of Auction and Transaction Hearing (the "Transaction Notice"). A copy of the Transaction Notice is attached to this Notice as Exhibit A.

**Please take further notice** that, pursuant to the timeline and procedures set forth in the Transaction Notice and the Bid Procedures Order, the Debtor intends to seek approval of its Transaction pursuant to the terms of an Asset Purchase Agreement between the Debtor and the Purchaser.

**Please take further notice** that the Debtor is a party to various unexpired leases and executory contracts (the "Contracts and Leases"). Pursuant to the Bid Procedures Order, the Debtor intends to seek the Bankruptcy Court's approval of its assumption and assignment to the Purchaser of the Leases and Contracts designated by the Purchaser (the "Assumed Contracts and Leases").

**Please take further notice** that you have been identified as a party to a Contract or Lease that the Debtor may seek to assume and assign. The Contracts and Leases that may be assumed and assigned by the Debtor, and the corresponding proposed cure amount (the "Cure Amount"), are set forth on Exhibit B to this Notice.

**Please take further notice** that the Debtor believes that any and all defaults (other than the filing of this Chapter 11 case) and actual pecuniary losses under the Assumed Leases and Contracts can be cured by the payment of the Cure Amounts.

**Please take further notice** that the assumption and assignment of any unexpired lease or executory contract will result in the full release and satisfaction of any claims or defaults, whether monetary or non-monetary, through the date of the assumption and assignment.

**Please take further notice** that any objections to the proposed assumption and assignment of the Assumed Contracts and Leases as designated by the Purchaser (including objections related to the Cure Amounts or adequate assurances of future performance) must (a) be in writing; (b) state with specificity the nature of the objection and the alleged cure amount; (c) include any documentation supporting the alleged cure amount; and (d) by October 17, 2011 at 5:00 p.m. (EST) (the "Objection Deadline"), be filed with the Court and served on counsel to the Debtor (Taft Stettinius & Hollister, LLP, Attn: Timothy J. Hurley, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202), counsel to the Bondholder (Buchanan Ingersoll & Rooney PC, Attn: Timothy P. Palmer, One Oxford Centre, 301 Grant Street, 20th Floor, Pittsburgh, PA 15219), and counsel to the United States Trustee (Office of the United States Trustee, Attn: Philip Hanrahan, 100 E. Vine Street, Suite 500, Lexington, KY 40507).

**Please take further notice** that if you fail to file and serve any objection by the Objection Deadline, you will be deemed to have waived your objection and to have consented to the Transaction and the proposed assumption and assignment of your lease or contract on the terms proposed by the Debtor.

**Please take further notice** that if you fail to file and serve any objection by the Objection Deadline, you will be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under Section 365 of the Bankruptcy Code or on account of any claims or defaults under your lease or contract through the date of the assumption and assignment, or otherwise from the Debtor, its estate, or the Purchaser and, upon approval by the Bankruptcy Court of the assumption and assignment, you will be deemed to have waived any right to object, consent, condition, or otherwise restrict such assumption and assignment.

**Please take further notice** that a hearing on the objections, if any, may be held at the Sale Hearing (described in the Transaction Notice) or on such other date before or after the Sale Hearing as the Bankruptcy Court may designate.

**Please take further notice** that the Debtor's decision to assume and assign Contracts and Leases is subject to consummation of the Transaction. Absent consummation of the Transaction, each Contract and Lease shall be subject to further administration under the Bankruptcy Code. The designation of any agreement as a Lease or Contract shall not constitute or be deemed to constitute a determination or admission by the Debtor that the agreement is an executory contract or unexpired lease under the Bankruptcy Code.

**Please take further notice** that the Debtor reserves the right to remove any Assumed Contract or Lease from any proposed Transaction and withdraw the request to assume and assign such Contract or Lease.

12330868.1                                      56

Dated:                                          Respectfully submitted by:

                                                **TAFT STETTINIUS & HOLLISTER LLP**

                                                By: /s/ Timothy J. Hurley
                                                Timothy J. Hurley (*Pro Hac Vice*)
                                                Paige Leigh Ellerman (KY 88172)
                                                Beth A. Silvers (KY 92202)
                                                425 Walnut Street, Suite 1800
                                                Cincinnati, OH  45202
                                                (513) 381-2838 (Telephone)
                                                (513) 381-0205 (Facsimile)
                                                and
                                                1717 Dixie Highway, Suite 910
                                                Covington, KY  41011-4704
                                                (859) 331-2838
                                                hurley@taftlaw.com
                                                ellerman@taftlaw.com
                                                silvers@taftlaw.com
                                                **ATTORNEYS FOR DEBTOR
                                                AND DEBTOR-IN-POSSESSION**

**Exhibit A – Transaction Notice**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF KENTUCKY
# COVINGTON DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 10-21162 |
| | : | |
| **BUTTERMILK TOWNE CENTER, LLC,** | : | Chapter 11 |
| | : | |
| **Debtor** | : | Honorable Judge Wise |
| | : | |

---

## NOTICE OF AUCTION AND HEARING IN CONNECTION
## WITH SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

---

**Please take notice** than on September __, 2011, Buttermilk Towne Center, LLC, debtor and debtor in possession (the "Debtor"), filed a motion seeking the entry of an order approving the Debtor's proposed process for the sale of substantially all of its assets and the assumption and assignment of certain unexpired leases and executory contracts (the "Motion"). Capitalized terms not otherwise defined in this Notice have the meanings set forth in the Motion. By order dated _____, 2011, the Bankruptcy Court approved the Debtor's Bid Procedures (the "Bid Procedures Order").

**Please take further notice** all interested parties are invited to become Qualified Bidders. The deadline to submit bids is October 14, 2011 at 5:00 p.m. (EST) (the "Bid Deadline"). The Debtor shall conduct an Auction at the offices of Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202 at 10:00 a.m. (EST) on October 17, 2011 (the "Auction Date"). The Auction Date may be extended by the Debtor and the Bondholder.

**Please take further notice** that the hearing to approve the Transaction (the "Sale Hearing") shall be held on October 19, 2011, or such date thereafter as scheduled by the Bankruptcy Court, in the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine St., Lexington, Kentucky 40507 at 9:30 a.m.

**Please take further notice** that objections, if any, to the Transaction must (a) be in writing; (b) state with specificity the nature of the objection; and (c) by October 17, 2011 at 5:00 p.m. (EST) (the "Objection Deadline") be filed with the Court and served on counsel to the Debtor (Taft Stettinius & Hollister, LLP, Attn: Timothy J. Hurley, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202), counsel to the Bondholder (Buchanan Ingersoll & Rooney PC, Attn: Timothy P. Palmer, One Oxford Centre, 301 Grant Street, 20th Floor, Pittsburgh, PA 15219), and counsel to the United States Trustee (Office of the United States Trustee, Attn: Philip Hanrahan, 100 E. Vine Street, Suite 500, Lexington, KY 40507).

12330868.1

Dated:

Respectfully submitted by:

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ Timothy J. Hurley
Timothy J. Hurley (*Pro Hac Vice*)
Paige Leigh Ellerman (KY 88172)
Beth A. Silvers (KY 92202)
425 Walnut Street, Suite 1800
Cincinnati, OH  45202
(513) 381-2838 (Telephone)
(513) 381-0205 (Facsimile)
and
1717 Dixie Highway, Suite 910
Covington, KY  41011-4704
(859) 331-2838
hurley@taftlaw.com
ellerman@taftlaw.com
silvers@taftlaw.com
**ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION**

12330868.1

**Exhibit B – Schedule of Leases and Contracts**