**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| IN RE: | : | Case No. 10-21162 |
| | : | |
| **BUTTERMILK TOWNE CENTER, LLC,** | : | Chapter 11 |
| | : | |
| **Debtor** | : | Honorable Judge Wise |
| | : | |

---

**NOTICE OF HEARING TO APPROVE SALE AND IDENTIFYING THE SUCCESSFUL BIDDER, TRANSMITTING EXECUTED ASSET PURCHASE AGREEMENT, AND SETTING FORTH CURE AMOUNTS FOR ASSUMED CONTRACTS AND LEASES**

---

PLEASE TAKE NOTICE that Buttermilk Towne Center, LLC, debtor and debtor in possession (the "Debtor") held an Auction on October 17, 2011 in accordance with the Court's Order Approving Bid Procedures, Notice of Sale, and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases entered on September 22, 2011 (Doc. No. 357) (the "Bid Procedures Order"). Capitalized terms not otherwise defined in this Notice have the meanings set forth in the Bid Procedures Order.

PLEASE TAKE FURTHER NOTICE that the Successful Bidder at the Auction was Visconsi Buttermilk Ltd. ("Purchaser"). A true copy of Purchaser's executed Asset Purchase Agreement (the "APA") is attached to this Notice as Exhibit A.

PLEASE TAKE FURTHER NOTICE that on October 12, 2011, the Debtor filed its Notice of Intent to Assume and Assign Certain Unexpired Leases and Executory Contracts (Doc. No. 361) (the "Assumption Notice"). As set forth in the Assumption Notice and the Bid Procedures Order, the Debtor will seek the Bankruptcy Court's approval of its assumption and assignment to Purchaser of the Assumed Leases and Contracts.

PLEASE TAKE FURTHER NOTICE that a list of the Assumed Leases and Contracts is attached as Exhibit 1.1(b) to the APA. The cure amounts to be paid with respect to the Assumed Leases and Contracts are set forth in Schedule 6.2(i) to the APA (the "Cure Amounts").

PLEASE TAKE FURTHER NOTICE that a hearing to approve the Transaction will take place on October 26, 2011 in the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine St., Lexington, Kentucky 40507 at 10:00 a.m. (EST).

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Transaction, including objections to the Debtor's assumption and assignment to Purchaser of the Assumed Contracts and Leases and the Cure Amounts, must be filed and served by 12:00 p.m. (EST) on October 24, 2011 on counsel to the Debtor (Taft Stettinius & Hollister, LLP, Attn: Timothy J.

Hurley, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202), counsel to the Bondholder (Buchanan Ingersoll & Rooney PC, Attn: Timothy P. Palmer, One Oxford Centre, 301 Grant Street, 20th Floor, Pittsburgh, PA 15219), and counsel to the United States Trustee (Office of the United States Trustee, Attn: Philip Hanrahan, 100 E. Vine Street, Suite 500, Lexington, KY 40507).  The failure of any objecting person or entity to timely file its objection in accordance with the Bid Procedures Order shall be a bar to the assertion of any objection to any aspect of the Transaction.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ Timothy J. Hurley
Timothy J. Hurley (*Pro Hac Vice*)
Beth A. Silvers (KY 92202)
425 Walnut Street, Suite 1800
Cincinnati, OH  45202
(513) 381-2838 (Telephone)
(513) 381-0205 (Facsimile)
and
1717 Dixie Highway, Suite 910
Covington, KY  41011-4704
(859) 331-2838
hurley@taftlaw.com
silvers@taftlaw.com

**ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Notice was served on October 19, 2011 via ECF or electronic mail or overnight mail to the parties on the Master Service List.

/s/ Timothy J. Hurley

October 17, 2011

Re:  Asset Purchase Agreement dated October 17, 2011 (the "APA") between Visconsi Buttermilk Ltd. ("Purchaser"), Buttermilk Towne Center LLC ("BTC") and Bank of America, N.A. ("BoA")

To BoA and BTC:

Pursuant to Section 5.6 of the APA, Purchaser covenants and agrees to proceed in an expeditious, diligent and commercially reasonable manner to obtain the City Approvals (as defined in the APA). Purchaser hereby acknowledges and agrees that a determination of what shall constitute "commercially reasonable" for purposes of Section 5.6 of the APA includes, but is not limited to, offering up to $600,000 to obtain the City Approvals.  In the event the Purchaser reasonably believes that condition set forth in Section 6.2(f) will not be satisfied despite Purchaser's compliance with Section 5.6 of the APA, Purchaser shall notify and confer with BOA and BTC with respect to attempting to satisfy such condition.

VISCONSI BUTTERMILK LTD.

By: _____
Its:_____

EXHIBIT A

12411245.1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of October 17, 2011, between Visconsi Buttermilk Ltd., an Ohio limited liability company or its nominee ("Purchaser"), Buttermilk Towne Center, LLC an Ohio limited liability company ("BTC"), and Bank of America, N.A. ("Bondholder").

WHEREAS, on April 28, 2010, BTC commenced voluntary proceedings in that certain Case No. 10-21162 (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Kentucky, Covington Division (the "Bankruptcy Court"); and

WHEREAS, the City of Crescent Springs, Kentucky (the "City") is the fee owner of that certain parcel of real estate located in Crescent Springs, Kentucky, and more particularly described in Exhibit A hereto (the "Land"); and

WHEREAS, pursuant to an Amended and Restated Agreement of Lease (the "Lease") dated as of December 1, 2007 between the City and BTC, amending and restating an Agreement of Lease dated as of August 1, 2004,  the City leased the Land to BTC; and

WHEREAS, BTC constructed improvements on the Land, known as the Buttermilk Towne Center project (the "Project"); and

WHEREAS, the City issued Taxable Industrial Building Revenue Bonds, Series 2007 (the "Bonds") to finance the acquisition of the Land and the construction of the Project; and

WHEREAS, Bondholder is the current holder of all right, title and interest in and to the Bonds; and

WHEREAS, the Lease has a 25 year term, coterminous with the term of the Bonds, expiring December 31, 2032; and

WHEREAS, the City and Bear Creek Capital, LLC are parties to a Development Agreement dated May 14, 2004 (the "Development Agreement") related to the Project, the Land and the development of the Land; and

WHEREAS, provided that the Bonds remain outstanding, the leasehold interest in the Land and the Project is exempt from City, Kenton County School District (the "School District"), and Kenton County Public Library (the "Library") real estate ad valorem taxes pursuant to Kentucky law (the "Tax Exemptions"); and

WHEREAS, simultaneously with the issuance of the Bonds by the City for the benefit of BTC, BTC agreed to make annual PILOT payments (payments in lieu of taxes) for the term of the Bonds to (i) the City and School District, pursuant to that certain Agreement in Lieu of Taxes dated November 19, 2007 by and among BTC, the City, and the School District, and (ii) the

Library, pursuant to that certain Agreement in Lieu of Taxes dated December 17, 2007 by and between BTC and the Library (collectively, the "PILOT Agreements"); and

WHEREAS, Purchaser may potentially obtain the benefit of the Tax Exemptions and the PILOT Agreements upon assignment by BTC to, and assumption by Purchaser of, BTC's right, title, and interest in and to the Bonds, Lease, and PILOT Agreements; and

WHEREAS, BTC desires to sell, assign, and transfer, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below), which are substantially all of the assets used in its Buttermilk Towne Center Development located in Crescent Springs, Kentucky; and

WHEREAS, Bondholder is willing to sell, assign and transfer to Purchaser all of Bondholder's interest in the Bonds, in accordance with the terms of this Agreement, at Purchaser's option.

NOW, THEREFORE, in consideration of the premises and mutual agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE I

PURCHASE AND SALE

Section 1.1    Purchased Assets. Subject to the terms and conditions set forth herein, BTC agrees to sell, transfer, assign, and deliver to Purchaser, free and clear of any charge, claim, legal and/or equitable interest, lien, option, pledge, security interest, mortgage, right of first refusal, encumbrance, or other similar restriction (collectively, "Encumbrance") pursuant to Sections 363 and 365 of the Bankruptcy Code, all of BTC's right, title, and interest in and to all of the Purchased Assets. Subject to the terms and conditions set forth herein, Purchaser agrees to purchase, acquire and accept the Purchased Assets on an "as is, where is" basis and without any representation or warranty on the part of BTC, except as provided in Article IV of this Agreement. For purposes of this Agreement, "Purchased Assets" means:

(a)    all equipment and machinery, signs and other tangible assets owned by BTC listed on Exhibit 1.1(a) attached hereto;

(b)    each of those executory contracts and unexpired leases listed on Exhibit 1.1(b) attached hereto (collectively, the "Assumed Contracts and Leases");

(c)    all post-Closing rents, accounts receivable (other than past-due rents), trade accounts and other amounts receivable (other than past-due rents) owed with respect to the Assumed Contracts and Leases and any other post-Closing rights to payment with respect to the Assumed Contracts and Leases and the full benefit of all security for such post-Closing rents,

2

accounts or rights to payment, and all claims, remedies or other rights relating to any of the foregoing;

(d)     all goodwill and intangible assets owned by BTC;

(e)     all rights to any insurance benefits, including any future proceeds, from any and all BTC policies existing as of the Closing arising from or relating to the Purchased Assets either before or after the Closing;

(f)     all claims of BTC relating to its business and the Purchased Assets prior to Closing, whether known or unknown, contingent or noncontingent, and any counterclaims, setoffs or defenses that BTC may have with respect to the Assumed Liabilities and/or the Purchased Assets except claims against Bondholder, if any;

(g)     all rights of BTC under the Assumed Contracts and Leases relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof;

(h)     all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and similar documents and authorizations issued by any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature to BTC and used, or held for use, in connection with BTC its business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities;

(i)     all documents used in or relating to BTC's business (except the Excluded Assets) or in respect of the Purchased Assets or Assumed Liabilities, including but not limited to, the Assumed Contracts and Leases, marketing, advertising and promotional activities, supplier lists, vendor lists, construction and tenant drawings, records, literature and correspondence which is reasonably available;

(j)     any avoidance claims and/or causes of action with respect to the Assumed Contracts and Leases including but not limited to, those arising under Chapter 5 of the Bankruptcy Code; and

(k)     all of BTC's right, title and interest in and to any intellectual property, including all trade names, trademarks, copyrights, domain names, proprietary software and other intellectual property.

Section 1.2    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of BTC (the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, shall not be deemed to be Purchased Assets, and shall remain the property of BTC after the Closing:

3

(a)    all cash on hand as of the Closing including, without limitation, rents and all "cash collateral" of the Bondholder as such term is defined under Section 363 of the Bankruptcy Code, and all past due rents as of Closing;

(b)    all receivables, including trade accounts and other amounts receivable (including overdue accounts receivable) due from any affiliate of BTC or BTC's members, and the full benefit of all security for such, accounts or rights to payment, and all claims, remedies or other rights relating to any of the foregoing;

(c)    all corporate records such as articles of organization, operating agreements, employment records; files and records relating to the Excluded Assets, bank statements and bank records, litigation records, bankruptcy related records, copies of any records BTC needs to prepare tax returns, and files, correspondence, documents and materials relating to the foregoing (other than copies of documents with respect to any matter which may continue to affect the Property or any of the Assumed Liabilities after the Closing, in which event such items shall be included in the Purchased Assets);

(d)    with the exception of any avoidance claims and/or causes of action with respect to the Assumed Contracts and Leases, all avoidance claims and causes of action with the respect to the Purchased Assets under the Bankruptcy Code or applicable state law, including without limitation, all rights and avoidance claims of BTC arising under Chapter 5 of the Bankruptcy Code; and

(e)    all rights of BTC under this Agreement.

Section 1.3    Assumed Liabilities of BTC. Except as expressly set forth in this Section 1.3, Purchaser is not assuming any liability or obligation of BTC of any nature whatsoever (absolute, contingent, known or unknown), including, without limitation, any liability of BTC with respect to federal, state, or local income, sales, use, property, workers compensation or other taxes of BTC, or taxes arising from or related to the transfer of the Purchased Assets; any liability or obligation of BTC related to any employees of BTC; any trade account payable; or any liability or obligation arising during or relating to any time before the Closing Date. Purchaser is not and shall not, be deemed a successor to BTC by its assumption of the Assumed Liabilities or otherwise. On the Closing Date, subject to the terms hereof, pursuant to Sections 363 and 365 of the Bankruptcy Code, BTC agrees to transfer and assign, and Purchaser agrees to (a) pay the Cure Amount, if any, set forth in Schedule 6.2(i) with respect to the Assumed Contracts and Leases; (b) assume and discharge when due only BTC's liabilities under all of the Assumed Contracts and Leases, and (c) assume any liabilities described in Section 5.7 below (collectively, the "Assumed Liabilities").

Section 1.4    Retained Liabilities.    All Retained Liabilities shall remain the sole responsibility of BTC. "Retained Liabilities" shall mean every liability or obligation of BTC other than the Assumed Liabilities. After the Closing, BTC shall have no further liability or obligations with respect to the Assumed Liabilities.

4

Section 1.5    Purchase of Bonds.  Subject to the terms and conditions set forth herein, at the Closing simultaneously with Purchaser's purchase of the Purchased Assets, Bondholder, at Purchaser's option, agrees to sell, transfer, assign, and deliver to Purchaser (or one or more of Purchaser's Qualified Assignees, as defined in Section 9.2), free and clear of any and all Encumbrances, and otherwise as-is where-is and without representation or warranty of any kind, all of Bondholder's right, title, and interest in and to the Bonds.

Section 1.6    Deposit.  In accordance with the bid procedures approved by the Bankruptcy Court (the "Bid Procedures"), upon execution of this Agreement by all parties, Purchaser will deliver a deposit (the "Deposit") in the amount of $250,000 to Lawyer's Title of Cincinnati, Inc. ("Escrow Agent"), as escrow agent pursuant to an escrow agreement substantially in the form attached as Schedule 1.6 (the "Escrow Agreement").  Prior to the Bankruptcy Court's entry of a sale order substantially in the form attached hereto as Exhibit 5.1(a)(iii), which shall be a final, non-appealable order and, if appealed, not stayed, approving the sale of the Purchased Assets to Purchaser in accordance with the terms of this agreement (the "Final Sale Order"), the Purchaser shall deliver to Escrow Agent additional funds in an amount sufficient to increase the Deposit  to 10% of the Cash Purchase Price (defined below).  The Deposit will be credited against the Cash Purchase Price (defined below) at the Closing and will otherwise be held and disbursed as provided in the Bid Procedures, the Escrow Agreement and this Agreement.

Section 1.7    Closing.  Except as otherwise mutually agreed upon by all parties hereto, the consummation of the transactions contemplated herein (the "Closing") shall occur as soon as reasonably practical after satisfaction of the conditions set forth in Article VI hereof or the waiver thereof by the party entitled to waive the applicable conditions, but in no event later than the Definitive Closing Date (as defined below in Section 8.1(d)).  The Closing shall be held in the Cincinnati offices of Taft Stettinius & Hollister LLP or through the Escrow Agent, or at such place and in such manner as the parties hereto may agree.

ARTICLE II

CONSIDERATION

Section 2.1    Consideration for Purchase of the Purchased Assets.    The consideration for the acquisition of the Purchased Assets and the Bonds (at Purchaser's option) hereunder shall be Purchaser's assumption as of the Closing of the Assumed Liabilities pursuant to an assignment and assumption agreement executed by BTC in the form of Exhibit 2.1 attached hereto (the "Assignment and Assumption Agreement") and Purchaser's payment of $18,300,000.00 by wire transfer to Bondholder in immediately available funds at the Closing, subject to credits and adjustments pursuant to Section 3.2(c) (the "Cash Purchase Price").

Section 2.2    Allocation of Purchase Price.  The parties agree to allocate the Cash Purchase Price among the Purchased Assets as set forth in Exhibit 2.2 attached hereto or as otherwise agreed to by the parties post-Closing. The parties also each agree to complete and file with the Internal Revenue Service Form 8594, Asset Acquisition Statement under Section 1060

5

(the "Form"), in a manner that is consistent with their allocation and to cooperate in providing information necessary to complete the Form. The parties further agree that (i) all federal, state and local tax returns, including any schedules or exhibits thereto, will reflect, and in all respects be consistent with, the agreed upon allocation set forth in Exhibit 2.2 and (ii) neither party will take any action or maintain any position inconsistent with the allocation set forth in Exhibit 2.2.

ARTICLE III

DELIVERIES

Section 3.1    Deliveries by BTC.    At the Closing and except as otherwise provided herein, BTC shall deliver:

(a)    an assignment of the Lease in proper form for recording and otherwise reasonably acceptable to Purchaser assigning BTC's interest under the Lease to the Purchaser;

(b)    possession of the Purchased Assets to Purchaser;

(c)    a bill of sale executed by BTC in the form of Exhibit 3.1(c) attached hereto;

(d)    the Assignment and Assumption Agreement executed by BTC;

(e)    a certified copy of the Final Sale Order; and

(f)    such other documents as may be reasonably required by Purchaser's attorney to ensure the effectuation of the terms of this Agreement.

Section 3.2    Deliveries by Purchaser.    At the Closing, Purchaser shall deliver or cause to be delivered:

(a)    the Assignment and Assumption Agreement executed by Purchaser;

(b)    a certificate executed by Purchaser as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing.

(c)    the Cash Purchase Price to Bondholder, less the amount of the Deposit and all interest earned thereon; and

(d)    any other documents that may be reasonably required by BTC's attorney to ensure the effectuation of the terms of this Agreement.

6

651978.9
12411232.3

Section 3.3    Deliveries by Bondholder. At the Closing, if the Purchaser shall have elected to purchase the Bonds, Bondholder shall deliver or cause to be delivered:

(a)    a certificate of the Secretary attaching (i) certified copies of documents authorizing Bondholder to enter into the Agreement and the sale of the Bonds to Purchaser and (ii) certified copies of a document or documents granting signing authority to the officers of Bondholder who execute this Agreement;

(b)    the originals of all of the Bonds, to the extent such originals are readily in the possession of the Bondholder; and

(c)    any other documents that may be reasonably required by BTC's or Purchaser's attorneys to ensure the effectuation of the terms of this Agreement including without limitation an assignment of the Bonds.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of BTC.    BTC hereby represents and warrants to Purchaser and Bondholder as follows, which representations and warranties shall be true and accurate in all respects as of the Closing Date as if such representations and warranties had been made at the Closing Date as follows:

(a)    Organization. BTC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio and is authorized to conduct business in the Commonwealth of Kentucky.

(b)    Validity and Execution of Agreement. BTC has the legal right and power to enter into and consummate the transactions contemplated by this Agreement, subject to approval of the Bankruptcy Court.  BTC's members have approved this Agreement and the transactions contemplated pursuant to this Agreement and each of the other agreements required to be entered into pursuant hereto by BTC.  This Agreement has been duly executed and delivered by BTC and constitutes the valid and binding obligation of BTC enforceable against BTC in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally, subject to the approval of the Bankruptcy Court.

(c)    Permitted Encumbrances. There are no encumbrances to the Land other than those set forth on Schedule 4.1(c).

(d)    Litigation. Other than the Bankruptcy Case, there is no litigation or legal or other actions, suits, or proceedings at law or in equity, or before any federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, in which BTC is engaged, or, to the best knowledge of BTC, with which BTC is threatened, which could materially adversely affect BTC's performance of its obligations under

7

this Agreement, or the enforceability of this Agreement or of the other transaction documents contemplated hereby.

(e)    <u>Non-Contravention</u>.  The execution, delivery and performance by BTC of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate or be in conflict with any terms or provisions of the articles of organization or operating agreement of BTC.    No consent, approval, authorization, declaration, filing or registration with any federal, state or local governmental or regulatory authority (other than appropriate document recordation) or any person is required in connection with the execution, delivery and performance by BTC of this Agreement and the other documents and instruments contemplated hereunder.

(f)    <u>No Other Representations</u>.  Except for the representations and warranties contained in this Section 4.1 of this Agreement, neither BTC nor any of its affiliates, officers, directors, employees, agents, representatives, nor any other person, makes or shall be deemed to make any representation or warranty to the Purchaser, express or implied, at law or in equity, on behalf of BTC, and BTC hereby disclaims any such representation or warranty whether by BTC or any of its affiliates, officers, directors, employees, agents, representatives or any other person.

Section 4.2    <u>Representations and Warranties of Bondholder</u>.    Bondholder hereby represents and warrants to Purchaser and BTC as follows, which representations and warranties shall be true and accurate in all respects as of the Closing Date as if such representations and warranties had been made at the Closing Date as follows:

(a)    <u>Validity and Execution of Agreement</u>.  Bondholder has the legal right and corporate power to enter into and consummate the transactions contemplated by this Agreement. This Agreement has been duly authorized, executed and delivered by Bondholder and constitutes the valid and binding obligation of Bondholder enforceable against Bondholder in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally.

(b)    <u>Bonds</u>.  Bondholder is the sole owner and holder of all right, title and interest in and to the Bonds, free and clear of any and all Encumbrances.

(c)    <u>Litigation</u>.  Other than the Bankruptcy Case, there is no litigation or legal or other actions, suits, or proceedings at law or in equity, or before any federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, in which Bondholder is engaged, or, to the best knowledge of Bondholder, with which Bondholder is threatened, which could materially adversely affect Bondholder's performance of its obligations under this Agreement, or the enforceability of this Agreement or of the other transaction documents contemplated hereby.

(d)    <u>Non-Contravention</u>.    The execution, delivery and performance by Bondholder of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate or be in conflict with any terms or provisions of the articles of incorporation or code of regulations of Bondholder.    No consent, approval, authorization, declaration, filing or registration with any federal, state or local governmental or regulatory

8

authority (other than appropriate document recordation) or any person is required in connection with the execution, delivery and performance by Bondholder of this Agreement and the other documents and instruments contemplated hereunder.

(e)     Broker Commission.    It shall be responsible for satisfaction of any broker's commission of Mid-America Real Estate Corp. in connection with this Agreement.

(f)     Non-Registration of Bonds.    The Bonds are not registered under the Securities Act (defined below).

Section 4.3    Representations and Warranties of Purchaser.    Purchaser hereby represents and warrants to Bondholder and BTC as follows, which representations and warranties shall be true and accurate in all respects as of the Closing Date as if such representations and warranties had been made at the Closing Date as follows:

(a)     Organization.    Purchaser or its Qualified Assignee is a limited liability company duly organized, validly existing and in good standing under the laws of Ohio.

(b)     Validity and Execution of Agreement.    Purchaser has the full legal right and corporate power to enter into and consummate the transactions contemplated by this Agreement.    The board of directors of Purchaser has approved this Agreement and the transactions contemplated pursuant to this Agreement and each of the other agreements required to be entered into pursuant hereto by Purchaser.    This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as limited by laws affecting creditors' rights or equitable principles generally.

(c)     Litigation.    There is no litigation or legal or other actions, suits, or proceedings at law or in equity, or before any federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign, in which Purchaser is engaged, or, to the best knowledge of Purchaser, with which Purchaser is threatened, which could materially adversely affect the Purchaser's performance of its obligations under this Agreement, or the enforceability of this Agreement or of the other transaction documents contemplated hereby.

(d)     Non-Contravention.    The execution, delivery and performance by Purchaser of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate or be in conflict with any terms or provisions of the articles of incorporation or code of regulations of Purchaser.    No consent, approval, authorization, declaration, filing or registration with any federal, state or local governmental or regulatory authority (other than appropriate document recordation) or any person is required in connection with the execution, delivery and performance by Purchaser of this Agreement and the other documents and instruments contemplated hereunder.

9

(e)    Solvency.  Purchaser is not now insolvent and will not be rendered insolvent by the transactions contemplated by this Agreement. As used in this section, "insolvent" means that the sum of the debts and other probable liabilities of Purchaser exceed the present fair saleable value of Purchaser's assets.

(f)    Non-Registration of Bonds.  Purchaser acknowledges and agrees that the Bonds are not registered under the Securities Act of 1933 (the "Securities Act"); and Purchaser agrees that such Bonds will not be sold after the Closing Date without registration under the Securities Act or an exemption there-from.

PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT NEITHER BTC NOR BONDHOLDER MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESSED OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE PURCHASED ASSETS, THE BONDS, THE ASSUMED LIABILITIES OR BTC'S BUSINESS, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.

ARTICLE V

COVENANTS

Section 5.1    363 Milestones

(a)    The parties hereto agree that:

(i)    All Qualified Bidders (as defined in the Bid Procedures) shall have until 5:00 p.m. (EST) on October 14, 2011 to deliver Qualified Bid Documents (as defined in the bid procedures) to BTC.

(ii)    BTC shall conduct an auction at the offices of Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202 on October17, 2011 at 10:00 a.m. (EST).

(iii)    BTC shall present the Successful Bid (as defined in the Bid Procedures) and the Runner-Up Bid (as defined in the Bid Procedures) to the Bankruptcy Court for approval on October 26, 2011 at 10:00 a.m.

(iv)    The parties anticipate that the Closing shall take place within 14 days of the Bankruptcy Court's entry of the Final Sale Order and in advance of the Definitive Closing Date (defined below).

Section 5.2    BTC's Pre-Closing Covenants.

(a)    BTC covenants and agrees with respect to the Purchased Assets that, between the date hereof and the Closing Date, in order that Purchaser may have a reasonable opportunity to make an investigation of the Purchased Assets, BTC shall give Purchaser and Purchaser's counsel, accountants, and other representatives, reasonable access to the Land, the

10

Project, and BTC records relating to the Purchased Assets.  The rights of Purchaser under this section shall be exercised at Purchaser's sole expense.

(b)    BTC shall promptly notify Purchaser of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against BTC which challenges the transactions contemplated hereby; and BTC, its members and managers shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of BTC contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.3    Purchaser's Pre-Closing Covenants.  Purchaser shall promptly notify BTC of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Purchaser which challenges the transactions contemplated hereby; and Purchaser shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of Purchaser contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.4    Bondholder's Pre-Closing Covenants.  In the event that Purchaser shall have elected to purchase the Bonds:

(a)    Bondholder covenants and agrees with respect to the Bonds that, between the date hereof and the Closing Date, Bondholder will neither solicit nor accept, the sale of Bonds to a party other than Purchaser independent of the sale process set forth herein.

(b)    Bondholder shall promptly notify Purchaser of any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Bondholder which challenges the transactions contemplated hereby; and Purchaser shall not take any action which (i) is materially inconsistent with its obligations under this Agreement; (ii) would cause any representation or warranty of Bondholder contained herein to be or become false or invalid; or (iii) could unreasonably hinder or delay the consummation of the transactions contemplated by this Agreement.

Section 5.5    Cooperation and Further Assurances.  This Agreement is a transaction in which Purchaser, or its assignee, pursuant to Section 1.5 of this Agreement has the option to elect to become the owner of 100% of the Bonds outstanding.  If such election is exercised, Purchaser and Bondholder shall provide each other with reasonable cooperation from the date hereof through and following the Closing, and Bondholder agrees to promptly take all such actions as reasonably requested by Purchaser to give effect to the transactions contemplated by this Agreement.

Section 5.6    City Approvals.  Purchaser covenants and agrees to proceed in an expeditious, diligent and commercially reasonable manner to obtain the City Approvals.

11

Section 5.7    Lease Default Claims.    Purchaser covenants and agrees to reach agreement with all tenants with claims that BTC is in default under any Assumed Contracts and Leases, such that no such tenant shall object to assumption and assignment of the lease in connection with entry of the Final Sale Order.    Purchaser shall be solely liable for any obligations made in such agreements.    In the alternative, Purchaser shall post with the Bankruptcy Court any security necessary for the Bankruptcy Court to issue the Final Sale Order and assign the Assumed Contracts and Leases to Purchaser, and Purchaser shall remain solely liable for the satisfaction of such claims.

## ARTICLE VI

## CONDITIONS TO CLOSING

Section 6.1    Bondholder's Conditions to Close.    The obligation of Bondholder to sell and deliver the Bonds to Purchaser at the Closing is subject to the satisfaction (or waiver by Bondholder) on or prior to the Closing Date of each of the following conditions:

(a)    Representations and Warranties.    All of the representations and warranties of Purchaser and BTC contained in this Agreement shall be true and correct on and as of the Closing Date.

(b)    Compliance with Agreement.    Purchaser and BTC shall have performed and complied in all material respects with all their respective obligations and covenants under this Agreement required to be performed or complied with prior to the Closing.

(c)    No Litigation.    As of the Closing, no litigation, proceeding, investigation or inquiry shall be pending or threatened by any third party seeking to enjoin or prevent the consummation of the transactions contemplated by this Agreement or to obtain damages or other relief by reason of such consummation.

(d)    Closing Deliveries.    Purchaser and BTC shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(e)    Sale Order.    The Bankruptcy Court shall have entered the Final Sale Order.

Section 6.2    Purchaser's Conditions to Close.    The obligation of Purchaser to purchase the Purchased Assets at the Closing is subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of each of the following conditions:

(a)    Representations and Warranties.    All of the representations and warranties of Bondholder and BTC contained in this Agreement shall be true and correct in all material respects as of the Closing.

651978.9
12411232.3

(b)     Compliance with Agreement. Bondholder and BTC shall have performed and complied in all material respects with all their respective obligations and covenants under this Agreement required to be performed or complied with prior to the Closing.

(c)     No Litigation.   At the Closing Date, no litigation, proceeding, investigation or inquiry shall be pending or threatened by any third party seeking to enjoin or prevent the consummation of the transactions contemplated by this Agreement or to obtain damages or other relief by reason of such consummation.

(d)     Closing Deliveries. BTC and Bondholder shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(e)     Sale Order. The Bankruptcy Court shall have entered the Final Sale Order, which shall be reasonably acceptable to Purchaser.

(f)     City Approvals. The City shall have approved an agreement between Purchaser and the City regarding (1) an amendment to the Development Agreement on terms and conditions acceptable to Purchaser or Purchaser shall elect in writing to proceed without an amended Development Agreement, and (2) amendments to the Lease and other documents related to the Bonds necessary (in the reasonable discretion of Purchaser) to cause (a) the terms of the Bonds and the Lease to be adjusted to conform to the terms of new financing obtained by Purchaser, and (b) the bonds to be re-marketed (collectively, the "City Approvals").

(g)     No Material Adverse Change.   No material adverse change shall have occurred after the date of this Agreement with respect to the Purchased Assets.

Section 6.3   BTC's Conditions to Close. The obligation of BTC to sell the Purchased Assets at the Closing is subject to the satisfaction (or waiver by BTC) on or prior to the Closing Date of each of the following conditions:

(a)     Closing Deliveries. Purchaser and Bondholder shall have delivered or caused to be delivered all deliveries required of them under Section 3 of this Agreement.

(b)     Sale Order. The Bankruptcy Court shall have entered the Final Sale Order.

ARTICLE VII

SURVIVAL

Section 7.1   Survival. All representations and warranties contained in this Agreement shall expire at the Closing. All covenants and agreements of BTC and the Purchaser that require by their terms performance after the Closing shall survive the Closing.

ARTICLE VIII

13

<u>TERMINATION</u>

Section 8.1    <u>Termination Events</u>.  By notice given prior to or at the Closing, subject to <u>Section 8.2</u>, this Agreement may be terminated as follows:

(a)    by Purchaser if a material breach of any provision of this Agreement has been committed by Bondholder or BTC and such breach has not been cured within 5 business days of written notice or waived by Purchaser;

(b)    by Bondholder if a material breach of any provision of this Agreement has been committed by Purchaser, and such breach has not been cured within 5 business days of written notice or waived by Bondholder;

(c)    by mutual consent of Purchaser, BTC and Bondholder; or

(d)    by Bondholder if the Closing has not occurred on or before November 30, 2011 (the "Definitive Closing Date"), or such later date as the parties may agree upon, unless Bondholder is in material breach of this Agreement.

Section 8.2    <u>Automatic Termination</u>.    This Agreement will automatically terminate upon the closing of the sale of the Purchased Assets or the Bonds to any party other than the Purchaser.

Section 8.3    <u>Effect of Termination</u>.

(a)    Purchaser's right of termination under Sections 8.1(a) and 8.1(c) is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 8.1(a), all obligations of the parties under this Agreement will terminate, except that the obligations of the parties in this Section 8.3 will survive; provided, however, that, if this Agreement is terminated because of a breach of this Agreement by Bondholder or because one or more of the conditions to the Purchaser's obligations under this Agreement is not satisfied as a result of Bondholder's failure to comply with its obligations under this Agreement, the Purchaser's right to pursue all legal remedies will survive such termination unimpaired.

(b)    In the event this Agreement is terminated by Bondholder under Section 8.1(b), Bondholder shall be immediately entitled to payment of the entire Deposit as its sole remedy in the event of any such breach and termination event, which the parties agree is fair and reasonable.

ARTICLE IX

MISCELLANEOUS

Section 9.1    <u>Further Assurances</u>.  After the Closing, each party to this Agreement shall from time to time, at the request of and without further cost or expense to any other party to this

14

Agreement, execute and deliver such other instruments and take such other actions as may reasonably be requested in order more effectively give effect to the transactions contemplated by this Agreement.

Section 9.2    Benefit and Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  No party may voluntarily or involuntarily assign its interest under this Agreement to any person other than a Qualified Assignee, without the prior written consent of the other parties hereto.  For purposes of this Agreement "Qualified Assignee" means any third party assignee of Purchaser; provided, however, that Purchaser shall not be relieved of any of its obligations under this Agreement as a result of any assignment permitted hereunder.

Section 9.3    Amendments.  No amendment, waiver of compliance with any provision or condition hereof or consent pursuant to this Agreement shall be effective unless evidenced by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, extension or discharge is sought.

Section 9.4    Headings.  The headings set forth in this Agreement are for convenience only and will not control or affect the meaning or construction of the provisions of this Agreement.

Section 9.5    Governing Law.  The construction and performance of this Agreement shall be governed by the laws of the State of Ohio without giving effect to the choice of law provisions thereof.  Any action, suit or proceeding brought by any party to this Agreement relating to or arising out of this Agreement or any other agreement, instrument, certificate or other document delivered pursuant hereto (or the enforcement hereof or thereof) must be brought and prosecuted as to all parties in, and each of the parties hereby consents to service of process, personal jurisdiction and venue in, the state and Federal Court of general jurisdiction located in Kenton County, Kentucky or, if applicable, the Bankruptcy Court.

Section 9.6    Notices.  Any notice, demand or request required or permitted to be given under the provisions of this Agreement shall be in writing, including by facsimile, and shall be deemed to have been duly delivered and received on the date of personal delivery, on the third day after deposit in the U.S. mail if mailed by registered or certified mail, postage prepaid and return receipt requested, on the day after delivery to a nationally recognized overnight courier service if sent by an overnight delivery service for next morning delivery or when dispatched by facsimile transmission (with the facsimile transmission confirmation being deemed conclusive evidence of such dispatch) and shall be addressed to the following addresses, or to such other address as any party may request, in the case of BTC, by notifying Purchaser, and in the case of Purchaser, by notifying BTC:

If to BTC:                                Buttermilk Towne Center, LLC
                                          Taft Stettinius & Hollister LLP
                                          Attn: Timothy Hurley
                                          425 Walnut Street, Suite 1800
                                          Cincinnati, OH 45202

651978.9
12411232.3

If to Purchaser:                        Visconsi Buttermilk Ltd.
                                        30050 Chagrin Boulevard
                                        Pepper Pike, OH 44124-5704
                                        Attn: Anthoni Visconsi II

With a copy to:                         Gregg S. Levy, Esq.
                                        McCarthy, Lebit, Crystal & Liffman Co., LPA
                                        101 West Prospect Avenue, #1800
                                        Cleveland, OH 44115

If to Bondholder:                       Bank of America, N.A.
                                        Buchanan Ingersoll & Rooney PC
                                        Attn: Timothy Palmer
                                        One Oxford Centre
                                        301 Grant Street, 20th Floor
                                        Pittsburgh, PA 15219


Section 9.7    Counterparts.  This Agreement may be executed in one or more counterparts (including faxed or e-mail counterpart images), each of which will be deemed an original and all of which together will constitute one and the same instrument.

Section 9.8    No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 9.9    Severability.  The parties agree that if one or more provisions contained in this Agreement shall be deemed or held to be invalid, illegal or unenforceable in any respect under any applicable law, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted, and the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

Section 9.10.    Time is of the Essence.  The parties agree that time is of the essence of this Agreement.

Section 9.11.    Entire Agreement.  This is the entire agreement between the parties. All previous communications between the parties, either oral or written, not contained herein are hereby withdrawn and annulled.

Section 9.12    Non-Interference by BTC.  After the Closing, BTC shall not take any actions with respect to BTC's tenants that would have a material adverse effect on the Property.

Section 9.13    Conflict.  In the event of any conflict between the provisions of this Agreement and the Escrow Agreement, the terms of this Agreement shall govern.

16

**IN WITNESS WHEREOF**, the parties hereto, through their duly authorized representatives, as applicable, have hereunto set their hands and caused this Agreement to be duly executed on the date and year first above written.

[Signature Page Immediately Follow]

17

**Purchaser:** *Visconsi Buttermilk LLC.*

By: _____

Name: _ANTHONY VISCONSI II_____

Its: _MANAGING MEMBER_____

**BTC:**

By: _____

Name: _____

Its: _____

**Bondholder:**

By: _____

Name: _____

Its: _____

**Purchaser:**

By: _____
Name: _____
Its: _____

**BTC:**

By: _____
Name: Timothy S. Baird
Its: Manager

**Bondholder:**

By: _____
Name: Daniel C. Siadak
Its: Senior Vice President

## SCHEDULE 4.1(c)

### Permitted Encumbrances

1.  Taxes or assessments approved, levied or enacted by a State, County, Municipality, Township or similar taxing authority, but not yet certified to the tax duplicate of the County in which the land is situated.

2.  Taxes and assessments, if any, for the year 2011 and subsequent years which are a lien, but not yet due and payable.

3.  Tax additions or abatements, if any, which may hereafter be made by legally constituted authorities.

4.  Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky for the use and benefit of the Transportation Cabinet, Department of Highways, recorded in Deed Book 1075, Page 305 of the Kenton County, Kentucky Records.

5.  Permanent easement for construction and maintenance of drainage structures by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1080, Page 220 of the Kenton County, Kentucky Records.

6.  Easements to the Union Light, Heat, and Power Company recorded in Deed Book 491, Page 423, Deed Book 502, Page 156, Deed Book 509, Page 548, Deed Book 516, Page 307, Deed Book 517, Page 18, Deed Book 520, Page 676, Deed Book 526, Page 124, Deed Book 529, Page 356, Deed Book 642, Page 73, Deed Book 670, Page 218, and Deed Book 623, Page 73, of the Kenton County, Kentucky Records.

7.  Easements for Sewer to the Sanitation District No. 1 recorded in Deed Book 544, Page 538, Deed Book 480, Page 402 of the Kenton County, Kentucky Records.

8.  Easement to the Citizens Telephone Company recorded in Deed Book 496, Page 456 of the Kenton County, Kentucky Records.

9.  Easement from Ignace F. Winterberg and Helen M. Winterberg, his wife, to Robert B. Loomis and Marjorie H. Loomis, his wife, recorded in Deed Book 531, Page 443 of the Kenton County, Kentucky Records.

10. Easement from Robert B. Loomis and Marjorie H. Loomis to Ignace F. Winterberg and Helen M. Winterberg recorded in Deed Book 545, Page 214 of the Kenton County, Kentucky Records.

11. Restriction and easement in Deed Book 545, Page 211 of the Kenton County, Kentucky Records.

651978.9
12411232.3

12. Easement over fifty foot passway recorded in Deed Book 481, Page 589 of the Kenton County, Kentucky Records.

13. Rights of the public, if any, in, over and to that portion of the land which lies within the right-of-way of Beechwood Road, Crest Avenue and Anderson Road.

14. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1091, Page 6 of the Kenton County, Kentucky Records.

15. 20' permanent easement to Sanitation District No. 1 recorded in Deed Book 480, Page 385 of the Kenton County, Kentucky Records.

16. 5' wide easement for natural gas line recorded in Deed Book 545, Pages 211 and 214, and Deed Book 531, Page 443 of the Kenton County, Kentucky Records.

17. Easement for Benefit of Property recorded in Deed Book 545, Page 214 of the Kenton County, Kentucky Records.

18. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1083, Page 225 of the Kenton County, Kentucky Records.

19. Sewer Easement to Sanitation District No. 1 recorded in Miscellaneous Book 480, Page 383 and in Miscellaneous Book 540, Page 513 of the Kenton County, Kentucky Records.

20. Permanent easement for construction and maintenance of drainage structure by Deed of conveyance to the Commonwealth of Kentucky Transportation Cabinet, Department of Highways recorded in Deed Book 1073, Page 111 of the Kenton County, Kentucky Records.

21. The following matters shown or indicated on the ALTA Survey prepared by E.J. Foltz, P.E., L.S. KY LS 3322 of Cartec Engineering Corp. dated July 26, 2004:

   a. Existing sanitary sewer lines (the location of which is unknown), existing telephone utilities and existing electric utilities running throughout the Land.

   b. Adjoining lot owner appears to be using a gravel parking lot on the Land without the benefit of a recorded easement.

   c. Storm and sanitary sewers appear to drain onto or through adjoining property to the east without the benefit of an easement(s).

   d. Electric lines appearing to service the Land running across the adjoining property, to the northeast and west without the benefit of easements.

651978.9
12411232.3

22.     Terms and conditions of an unrecorded Parking License Agreement between Joseph A. Cleves, Jr., Trustee of WRR Trust and Bonefish/Crescent Springs, Limited Partnership, a Florida limited partnership dated June 26, 2003 for the purpose of parking motor vehicles.

23.     Terms and conditions of an Agreement of Lease between City of Crescent Springs (Lessor) and Buttermilk Towne Center, LLC (Lessee) dated as of August 1, 2004 as recorded September 1, 2004 in Official Record Book C-2310, Page 274; and First Amendment to Lease dated October 7, 2004 and recorded February 16, 2005 in Official Record Book C-2501, Page 149 of the Kenton County, Kentucky Records.

        Partial Assignment of Leasehold Interest related to the same from Buttermilk Towne Center, LLC to Home Depot U.S.A., Inc. as set forth in Official Record Book C-2873, Page 341 (as to Lot 8).

        Assignment of Leasehold Interest related to the same from Buttermilk Towne Center, LLC to National City Bank as set forth in Official Record Book C-2874, Page 10 (as to Lot 2).

        Amended and Restated Agreement of Lease between City of Crescent Springs, Kentucky and Buttermilk Towne Center, LLC as set forth in Official Record Book C-3596, Page 184.

24.     Rights of sublessees, if any, pursuant to unrecorded sublease agreements.

25.     Rights of the mobile home park tenants, if any, pursuant to unrecorded lease agreements.

26.     Certificate of Land Use Restriction as to unrecorded subdivision plat as set forth in Official Record Book C-2437, Page 288.

27.     Rights of Home Depot U.S.A., Inc. under the Ground Sublease referenced in the Memorandum of Ground Sublease set forth in Official Record Book C2487, Page 149 (as to Lot 8).

28.     Terms and conditions of the Development Agreement between Buttermilk Towne Center, LLC, and Home Depot U.S.A., Inc. as referenced in the Memorandum of Development Agreement set forth in Official Record Book C2536, Page 183.

29.     Terms and conditions and easements created under the Restriction Agreement and Grant of Easements as set forth in Official Record Book C2605, Page 42. Consent and subordination of Fee Owner related thereto set forth in Official Record Book C2605, Page 97. Consent and Subordination of Mortgage related thereto as set forth in Official Record Book C2605, Page 101.

30.     Terms and conditions and easements created under the Common Area Maintenance Agreement set forth in Official Record Book C2609, Page 281. Consent and Subordination of Fee Owner related thereto set forth in Official Record Book C2616,

Page 147. Consent and Subordination of Mortgage related thereto as set forth in Official Record Book C2616, Page 151.

31. Matters as shown on the subdivision plat of Buttermilk Towne Center, LLC, as set forth on Plat Slides 2034 and 2034A, 2034B and 2034C. Addendum to Plat of Buttermilk Towne Center in Official Record Book C2983, Page 103.

32. Right of Remke Markets, Inc. under the lease referenced in the Memorandum of Lease set forth in Official Record Book C3252, Page 190 and again in Official Record Book C3417, Page 102 as collaterally assigned by Remke Markets, Inc. to SUPERVALU Holdings, Inc. in Official Record Book C3355, Page 299 (as to Lot 11).

33. Rights of L.A. Fitness International, LLC under the lease referenced in the Memorandum of Lease set forth in Official Record Book C 3538, Page 44.

34. Terms and conditions as contained in the Agreement in Lieu of Taxes between the City of Crescent Springs, Kentucky, the Kenton County School District and Buttermilk Towne Center, LLC as referenced in the Memorandum of Agreement Regarding Agreement in Lieu of Taxes set forth in Official Record Book C3735, Page 64.

35. Easement for utility purposes to Duke Energy of Kentucky, Inc. as set forth in Official Record Book C3892, Page 242.

651978.9
12411232.3

## SCHEDULE 6.2(i)

## Cure Amounts

| ASSUMED CONTRACT | CURE AMOUNT |
|---|---|
| Library PILOT Agreement | $ 130,269.33 |
| School/City PILOT Agreement (School Payment) | $ 453,648.00 |
| School/City PILOT Agreement (City Payment) | $ 188,889.23 |
| Advance America | $ 0 |
| Ashley Furniture | $ 0 |
| NKY Haircuts, LLC/Big League Haircuts | $ 0 |
| Cincinnati Tan | $ 0 |
| Remke Markets, Inc. Lease | $ 0 |
| Fit Envy of Florence, Inc. d/b/a Quiznos | $ 0 |
| NKY Haircuts, LLC | $ 0 |
| Fed Ex Office and Print Services, Inc. f/k/a Fed Ex Kinko's Office and Print Services, Inc. | $ 0 |
| City of Crescent Springs | $ 0 |
| Elegant Nails Spa | $ 0 |
| Empire Buffet | $ 0 |
| Home Depot | $ 0 |
| National City Bank | $ 0 |
| Papa Murphy's | $ 0 |
| Rhodes | $ 0 |
| Salsarita's | $ 0 |

651978.9
12411232.3

Tower Wireless                                    $_____0_____

Verizon Wireless                                  $_____0_____

651978.9
12411232.3

## EXHIBIT 1.1(a)

**Equipment, Machinery & Tangible Personal Property**

None.

651978.9
12411232.3

## EXHIBIT 1.1(b)

### Assumed Contracts and Leases

1.    Amended and Restated Agreement of Lease between City of Crescent Springs, Kentucky and Buttermilk Towne Center, LLC $56,000,000 Maximum Aggregate Principal Amount Taxable Industrial Revenue Bonds, Series 2007 (Buttermilk Towne Center, LLC Project) Dated as of December 1, 2007 (as amended by agreement between Purchaser and City, which shall be approved by the City).

2.    Lease Agreement dated April 14, 2004 between Buttermilk Towne Center, LLC and Remke Markets, Inc., including:

      a.    Lease Guaranty Agreement dated June 2, 2004 between SUPERVALU Holdings, Inc. and Buttermilk Towne Center, LLC

      b.    Guarantor Substitution Agreement dated March 11, 2005 between Remke Markets, Inc. and Buttermilk Towne Center, LLC.

2.    Lease Agreement dated January 18, 2006 between Buttermilk Towne Center, LLC and Advance America, Cash Advance Centers of Kentucky, Inc., including:

      a.    Guaranty of Lease Agreement dated January 12, 2006 between Advance America, Cash Advance Centers of Kentucky, Inc. and Buttermilk Towne Center, LLC.

      b.    Amendment of Lease dated October 8, 2007 between Buttermilk Towne Center and Advance America, Cash Advance Centers of Kentucky, Inc.

4.    Lease Agreement dated August 12, 2005 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc., including:

      a.    First Amendment of Lease Agreement dated January 8, 2006 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc.

5.    Lease Agreement dated December 21, 2004 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC, including:

      a.    First Amendment to Lease dated February 20, 2006 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC.

6.    Lease Agreement dated July 11, 2007 between Buttermilk Towne Center, LLC and Cincinnati Tan Company, LLC.

7.    Agreement of Lease dated August 1, 2004 between Buttermilk Towne Center, LLC and City of Crescent Springs, Kentucky.

651978.9
12411232.3

8.  Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Elegant Nail Spa, LLC, including:

   a.  Guaranty of Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Phuc Pham ("Guarantor").

9.  Lease Agreement dated November 16, 2007 between Buttermilk Towne Center, LLC and Empire Buffet of Kentucky, Inc.

10.  Lease Agreement dated September 18, 2006 between Buttermilk Towne Center, LLC and FedEx Kinko's Office and Print Services, Inc.

11.  Ground Sublease Agreement dated December 13, 2004 between Buttermilk Towne Center, LLC and Home Depot U.S.A., Inc., including:

12.  Ground Lease dated May 16, 2005 between Buttermilk Towne Center, LLC and National City Bank, including:

   a.  Amendment to Ground Lease dated July 24, 2006 between Buttermilk Towne Center, LLC and National City Bank.

13.  Lease Agreement dated January 6, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC, including:

   a.  Guaranty of Lease Agreement dated December 22, 2005 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").
   b.  First Amendment to Lease Agreement dated April 14, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC.
   c.  Assignment and Assumption of Lease dated June 18, 2007 between Papa Murphy's at Buttermilk Towne Center, LLC and Brojos, Inc.
   d.  Amendment to Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").
   e.  Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and  Bradley Joseph Jones and Tonya Lee Jones (collectively, the "Guarantors").

14.  Lease Agreement dated August 17, 2005 between Buttermilk Towne Center, LLC and Shivam Enterprises, Inc. d/b/a Salsarita's.

15.  Lease Agreement dated June 28, 2007 between Buttermilk Towne Center, LLC and Tower Wireless, Ltd.

651978.9
12411232.3

16.  Lease Agreement dated March 3, 2006 between Buttermilk Towne Center, LLC and Wireless Venture Partners, LLC.

17.  Agreement in Lieu of Taxes dated November 19, 2007 among Buttermilk Towne Center, LLC, City of Crescent Springs, and Kenton County School District (the "School/City PILOT Agreement").

18.  Agreement in Lieu of Taxes dated December 17, 2007 between Buttermilk Towne Center, LLC and Kenton County Public Library (the "Library PILOT Agreement").

651978.9
12411232.3

# EXHIBIT 2.1

**Form of Assignment & Assumption Agreement**

See attached.

651978.9
12411232.3

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** ("Assignment") is made and entered into this _____ day of _____, 2011, by and between **BUTTERMILK TOWNE CENTER, LLC**, an Ohio limited liability company ("Assignor"), whose address is c/o Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202, and Visconsi Buttermilk Ltd., an Ohio limited liability company ("Assignee"), whose address is 360 Corporate Circle, 30050 Chagrin Boulevard, Pepper Pike, Ohio 44124-5704.

## R E C I T A L S

**WHEREAS,** Assignor is a party to those executory contracts and unexpired leases listed on Exhibit A, attached hereto and incorporated herein by reference (the "Assumed Contracts"), affecting that certain real property known "Buttermilk Towne Center" located at Buttermilk Pike and Anderson Road in the City of Crescent Springs, Kentucky (the "Project"); and

**WHEREAS,** Assignor, Assignee and Bank of America, N.A., as Bondholder, entered into a certain Asset Purchase Agreement dated October 17, 2011 (the "Purchase Agreement"), whereby Assignor has agreed to sell and Assignee has agreed to purchase the Purchased Assets (as that term is defined in the Purchase Agreement), including but not limited to Assignor's leasehold interest under that certain Amended and Restated Agreement of Lease dated as of December 1, 2007, with the City of Crescent Springs, Kentucky, all pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and,

**WHEREAS,** pursuant to the terms of the Purchase Agreement, Assignee also has the option to purchase from the Bondholder the Bonds (as that term is defined in the Purchase Agreement) relating to the financing of certain improvements on the Project; and

**WHEREAS,** in addition to the Cash Purchase Price (as that term is defined in the Purchase Agreement), the consideration for the acquisition of the Purchased Assets and the Bonds include the assumption by Assignee of Assignor's rights and obligations under the Assumed Contracts along with Assignee's agreement to pay those Cure Amounts (as that term is defined in the Purchase Agreement) set forth on Exhibit B attached hereto and incorporated herein by reference; and,

**WHEREAS,** subject to the terms and conditions contained herein and the Purchase Agreement, Assignor desires to assign to Assignee all of Assignor's right, title and interest in, to and under the Assumed Contracts; and

**WHEREAS,** Assignee desires to assume all of Assignor's obligations under the Assumed Contracts and agrees to pay the Cure Amounts; and

**WHEREAS,** the conveyance set forth in this Assignment has been approved by final Order entered by the U.S. Bankruptcy Court for the Easter District of Kentucky in Case No. 10-21162 ("Sale order") as being free and clear of all liens, claims and encumbrances.

**NOW THEREFORE**, for valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1.    Assignor assigns to Assignee all of its right, title and interest in the Assumed Contract free, clear and unencumbered pursuant to the Sale Order, and Assignee assumes and agrees to perform all of the obligations of Assignor under the Assumed Contracts.

2.    Assignee hereby agrees to pay the Cure Amounts set forth on Exhibit B.

SIGNED as of the date first written above.

Signed and Acknowledged in the          **BUTTERMILK TOWNE CENTER, LLC**

By:_____
Its:_____

STATE OF _____    :
                                              :    ss
COUNTY OF_____    :

The foregoing Assignment and Assumption Agreement was signed and acknowledged before me this _____ day of _____, 2011, by _____, the of Buttermilk Towne Center, LLC, an Ohio limited liability company, Assignor.

_____
Notary Public

STATE OF _____    :
                                              :    ss
COUNTY OF_____    :

The foregoing Assignment and Assumption Agreement was signed and acknowledged before me this _____ day of _____, 2011, by _____, the of Buttermilk Towne Center, LLC, an Ohio limited liability company, Assignor.

_____
Notary Public

12411250.1

## Assumed Contracts and Leases

1.   Amended and Restated Agreement of Lease between City of Crescent Springs, Kentucky and Buttermilk Towne Center, LLC $56,000,000 Maximum Aggregate Principal Amount Taxable Industrial Revenue Bonds, Series 2007 (Buttermilk Towne Center, LLC Project) Dated as of December 1, 2007 (as amended by agreement between Purchaser and City, which shall be approved by the City).

2.   Lease Agreement dated April 14, 2004 between Buttermilk Towne Center, LLC and Remke Markets, Inc., including:

   a.   Lease Guaranty Agreement dated June 2, 2004 between SUPERVALU Holdings, Inc. and Buttermilk Towne Center, LLC
   b.   Guarantor Substitution Agreement dated March 11, 2005 between Remke Markets, Inc. and Buttermilk Towne Center, LLC.

2.   Lease Agreement dated January 18, 2006 between Buttermilk Towne Center, LLC and Advance America, Cash Advance Centers of Kentucky, Inc., including:

   a.   Guaranty of Lease Agreement dated January 12. 2006 between Advance America, Cash Advance Centers of Kentucky, Inc. and Buttermilk Towne Center, LLC.
   b.   Amendment of Lease dated October 8, 2007 between Buttermilk Towne Center and Advance America, Cash Advance Centers of Kentucky, Inc.

4.   Lease Agreement dated August 12, 2005 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc., including:

   a.   First Amendment of Lease Agreement dated January 8, 2006 between Buttermilk Towne Center, LLC and Morris Furniture Co. of Cincinnati, Inc.

5.   Lease Agreement dated December 21, 2004 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC, including:

   a.   First Amendment to Lease dated February 20, 2006 between Buttermilk Towne Center, LLC and NKY Haircuts, LLC.

6.   Lease Agreement dated July 11, 2007 between Buttermilk Towne Center, LLC and Cincinnati Tan Company, LLC.

7.   Agreement of Lease dated August 1, 2004 between Buttermilk Towne Center, LLC and City of Crescent Springs, Kentucky.

8.   Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Elegant Nail Spa, LLC, including:

      a.     Guaranty of Lease Agreement dated May 18, 2007 between Buttermilk Towne Center, LLC and Phuc Pham ("Guarantor").

9.    Lease Agreement dated November 16, 2007 between Buttermilk Towne Center, LLC and Empire Buffet of Kentucky, Inc.

10.    Lease Agreement dated September 18, 2006 between Buttermilk Towne Center, LLC and FedEx Kinko's Office and Print Services, Inc.

11.    Ground Sublease Agreement dated December 13, 2004 between Buttermilk Towne Center, LLC and Home Depot U.S.A., Inc., including:

12.    Ground Lease dated May 16, 2005 between Buttermilk Towne Center, LLC and National City Bank, including:

      a.     Amendment to Ground Lease dated July 24, 2006 between Buttermilk Towne Center, LLC and National City Bank.

13.    Lease Agreement dated January 6, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC, including:

      a.     Guaranty of Lease Agreement dated December 22, 2005 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").

      b.     First Amendment to Lease Agreement dated April 14, 2006 between Buttermilk Towne Center, LLC and Papa Murphy's at Buttermilk Towne Center, LLC.

      c.     Assignment and Assumption of Lease dated June 18, 2007 between Papa Murphy's at Buttermilk Towne Center, LLC and Brojos, Inc.

      d.     Amendment to Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and Mark J. Roma and Stephanie M. Roma (collectively, the "Guarantors").

      e.     Guaranty of Lease Agreement dated June 18, 2007 between Buttermilk Towne Center, LLC and  Bradley Joseph Jones and Tonya Lee Jones (collectively, the "Guarantors").

14.    Lease Agreement dated August 17, 2005 between Buttermilk Towne Center, LLC and Shivam Enterprises, Inc. d/b/a Salsarita's.

15.    Lease Agreement dated June 28, 2007 between Buttermilk Towne Center, LLC and Tower Wireless, Ltd.

16.    Lease Agreement dated March 3, 2006 between Buttermilk Towne Center, LLC and Wireless Venture Partners, LLC.

17.   Agreement in Lieu of Taxes dated November 19, 2007 among Buttermilk Towne Center, LLC, City of Crescent Springs, and Kenton County School District (the "School/City PILOT Agreement").

18.   Agreement in Lieu of Taxes dated December 17, 2007 between Buttermilk Towne Center, LLC and Kenton County Public Library (the "Library PILOT Agreement").

12411250.1

## Cure Amounts

| **ASSUMED CONTRACT** | **CURE AMOUNT** |
|---|---|
| Library PILOT Agreement | $ 130,269.33 |
| School/City PILOT Agreement (School Payment) | $ 453,648.00 |
| School/City PILOT Agreement (City Payment) | $ 188,889.23 |
| Advance America | $ 0 |
| Ashley Furniture | $ 0 |
| NKY Haircuts, LLC/Big League Haircuts | $ 0 |
| Cincinnati Tan | $ 0 |
| Remke Markets, Inc. Lease | $ 0 |
| Fit Envy of Florence, Inc. d/b/a Quiznos | $ 0 |
| NKY Haircuts, LLC | $ 0 |
| Fed Ex Office and Print Services, Inc. f/k/a Fed Ex Kinko's Office and Print Services, Inc. | $ 0 |
| City of Crescent Springs | $ 0 |
| Elegant Nails Spa | $ 0 |
| Empire Buffet | $ 0 |
| Home Depot | $ 0 |
| National City Bank | $ 0 |
| Papa Murphy's | $ 0 |
| Rhodes | $ 0 |
| Salsarita's | $ 0 |
| Tower Wireless | $ 0 |
| Verizon Wireless | $ 0 |

12411250.1

## **EXHIBIT 2.2**

**Allocation of Purchase Price**

To be determined by parties.

651978.9
12411232.3

## EXHIBIT 3.1(c)

**Bill of Sale**

See attached.

651978.9
12411232.3

## BILL OF SALE

      **KNOW ALL MEN BY THESE PRESENTS** that in consideration for the payment of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **BUTTERMILK TOWNE CENTER, LLC**, an Ohio limited liability company ("BTC"), with its principal place of business c/o Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202, does hereby grant, sell, assign, transfer, convey, and set over to Visconsi Buttermilk Ltd., an Ohio limited liability company, whose address is 360 Corporate Circle, 30050 Chagrin Boulevard, Pepper Pike, Ohio 44124-5704, the Purchased Assets as defined in that certain Asset Purchase Agreement dated October 17, 2011 between BTC, Visconsi Buttermilk Ltd. and Bank of America, N.A.

      **IN WITNESS WHEREOF,** BTC has executed this Bill of Sale on the _____ day of _____, 2011.

                                 BUTTERMILK TOWNE CENTER, LLC

                                 By:_____

                                 Its:_____

### EXHIBIT 5.1(a)(iii)

**Sale Order**

See attached.

651978.9
12411232.3